**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. PIERCE DIVISION**

|  |  |  |
|---|---|---|
| MICHAEL NOEL, KATHLEEN WIKSTEN, and CLAIRE LADOUCEUR, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:21-cv-14492-DMM |
| v. | ) ) | JURY TRIAL DEMANDED |
| MHC HERITAGE PLANTATION, LLC, MHC OPERATING LIMITED PARTNERSHIP, MHC PROPERTY MANAGEMENT, L.P., MHC PROPERTY MANAGEMENT GP, L.L.C., and EQUITY LIFESTYLE PROPERTIES, INC. f/k/a MANUFACTURED HOME COMMUNITIES, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Michael Noel, Kathleen Wiksten, and Claire Ladouceur ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, for their Class Action Complaint against Defendants MHC Heritage Plantation, MHC Operating Limited Partnership, MHC Property Management, L.P., MHC Property Management GP, L.L.C., and Equity Lifestyle Properties, Inc. f/k/a Manufactured Home Communities, Inc. ("Defendants"), and pursuant to this Court's order dated April 25, 2022, allowing the filing of amended pleadings [DE 43], allege as follows:

## I.    INTRODUCTION

1.      Mobile home park owners and operators owe duties to the mobile homeowners defined by statute and contract, including to provide essential services for the mobile homes in the park, such as paved streets, sewer lines, water lines, and an adequate storm drainage system.

1

2.      These duties are defined under Florida law because mobile homeowners can easily be taken advantage of by the owners and operators of the mobile home parks in which their homes are situated.  This is because of the unequal bargaining power in the relationship where, despite its name, the homes are not mobile so the homeowners cannot pick up and go if they are dissatisfied with the park owner and operator's maintenance and management of the property.

3.      Plaintiffs rent lots in Heritage Plantation mobile home park (the "Park") in which their mobile homes are situated.  Defendants ELS, MHC Operating Limited Partnership, and MHC Heritage Plantation, LLC, the owners of the Park, and Defendants MHC Property Management GP, L.L.C. and MHC Property Management, L.P., the managers of the Park, owe Plaintiffs and the members of the Class the duties to provide essential services for their homes, including paved streets, sewer lines, water lines, and, when it rains, an adequate storm drainage system.

4.      Despite this, Defendants have knowingly and willfully refused to fulfill their duties by, among other things, failing to have an adequate stormwater drainage system to serve the Park.  The current antiquated stormwater drainage system creates severe flooding during ordinary rainfall.  Defendants have knowledge of the system's failures because flooding has plagued the Park for decades and residents routinely complain, but Defendants have failed to take any corrective action.

5.      In fact, Defendants have been found in violation of the Indian River County Municipal Code because the Park's stormwater is discharging into the county's sewer system. Despite the adjudicated code violation, Defendants have seemingly made a cost-benefit decision to *not* remedy the violation and comply with the code because Defendants are willingly incurring

a fine of $100 per day, which now totals over $146,000.

6.      The flooding and constant wet ground in the Park have ruined countless floors of the residents' mobile homes and damaged their vehicles.  The aged storm drains have collapsed, creating sinkholes which have cracked foundations and mobile homes.  Each flood event brings silt, mud, and any number of unknown contaminants that may include bacteria, E. coli, and fertilizer, and leaves a slippery aftermath that is not removed or cleaned by Defendants.  Over the years, numerous residents in this over-age-55 community located in Vero Beach, Florida have fallen and been injured in the sludge left after flooding.  Defendants are aware of many instances of property damage and personal injury, but have failed to undertake any remedial action to correct the underlying problems of the antiquated storm drainage system.

7.      Plaintiffs bring this putative class action to require Defendants to uphold their duties to provide an adequate stormwater drainage system at the Park.  Plaintiffs assert claims for breach of contract, breach of the covenant of quiet enjoyment, negligence, private nuisance, trespass, and constructive eviction.  In addition to seeking injunctive relief, Plaintiffs also seek compensatory damages and punitive damages.

## II.    PARTIES

8.      Plaintiff Michael Noel is a mobile homeowner who leases the land beneath his mobile home for residential use at 824 Concord Street, Vero Beach, FL 32966, at Lot #242 within the Heritage Plantation mobile home Park.

9.      Plaintiff Kathleen Wiksten is a mobile homeowner who leased the land beneath her mobile home for residential use at 709 Justice Street, Vero Beach, FL 32966, at Lot #61 within the Park from May 18, 2018 to April 13, 2020, and as of February 21, 2022, is a joint owner of the mobile home located at 112 Congress St., Vero Beach, FL 32966 at Lot # 128 within the Park.

3

10. Plaintiff Claire Ladouceur is a mobile homeowner who leases the land beneath her mobile home for residential use at 802 Concord Street, Vero Beach, FL 32966, at Lot #231 within the Park.

11. The Park is an age-55 and older mobile home community.  It has 437 mobile home lots and is located at 1101 Ranch Road, Vero Beach, Indian River County, Florida 32966.

12. The Park was established in or around 1976.  On June 11, 1994, Defendants' predecessor-in-interest, Gatorland Vistas, Inc., an Illinois corporation with its principal place of business at Two North Riverside Plaza, Suite 800, Chicago, IL 60606, acquired ownership of the Park.

13. Beginning with Gatorland Vistas, Inc.'s ownership, Manufactured Home Communities, Inc., now known as Defendant Equity Lifestyle Properties, Inc. ("ELS"), was an agent designated on the prospectus to receive notices and demands regarding the Park.

14. On or around October 6, 2003, Gatorland Vistas, Inc. transferred its ownership interest in the Park to Defendant MHC Operating Limited Partnership, which on October 17, 2003, then transferred all or part of its interest to Defendant MHC Heritage Plantation, LLC.

15. Defendants MHC Operating Limited Partnership and MHC Heritage Plantation, LLC hold themselves out to be the owners of the Park.

16. On November 15, 2004, Manufactured Home Communities, Inc. changed its name to Defendant ELS, and Manufactured Home Communities, Inc. surrendered its license to do business in the state of Florida.

17. Defendant MHC Heritage Plantation, LLC is a Delaware limited liability company with its principal place of business at Two North Riverside Plaza, Suite 800, Chicago, IL 60606.  It is registered to do business in Florida and its member is Defendant MHC Operating

Limited Partnership.

18.     MHC Operating Limited Partnership is an Illinois Limited Liability Company with its principal place of business at Two North Riverside Plaza, Suite 800, Chicago, IL 60606. It is registered to do business in Florida and its General Partner is Defendant ELS.

19.     MHC Property Management, L.P. is a Delaware Limited Liability Company with its principal place of business at Two North Riverside Plaza, Suite 800, Chicago, IL 60606. It is registered to do business in Florida and its General Partner is Defendant MHC Property Management GP, L.L.C.

20.     MHC Property Management GP, L.L.C. is a Delaware Limited Liability Company with its principal place of business at Two North Riverside Plaza, Suite 800, Chicago, IL 60606. It is registered to do business in Florida and its member is Defendant MHC Operating Limited Partnership (of which ELS is the General Partner).

21.     Defendants MHC Property Management, L.P.  and MHC Property Management GP, L.L.C. hold themselves out to be the entities overseeing the management of the Park.

22.     Defendant ELS is a Maryland corporation with its principal place of business at Two North Riverside Plaza, Suite 800, Chicago, IL 60606.  ELS is registered to do business in Florida.

23.     Defendants ELS, together with MHC Operating Limited Partnership and MHC Heritage Plantation, LLC, hold themselves out as the owners of the Park.

24.     Defendant ELS is the owner, directly or indirectly, of numerous mobile home parks in the State of Florida and throughout the United States.

25.     Defendant ELS, together with MHC Operating Limited Partnership, "are a fully integrated owner of lifestyle-oriented properties … consisting of property operations and home

sales and rental operations primarily within manufactured home … communities…."[1]

26.    Defendants ELS and MHC Operating Limited Partnership own the land which they "lease to customers who own manufactured homes," generally on an annual basis. Defendants' "business model is characterized by low maintenance costs and low customer turnover costs."[2]

27.    One of Defendants ELS and MHC Operating Limited Partnership's mobile home properties is Heritage Plantation, located in Vero Beach, Florida and comprised of 64 acres and 437 sites (as of 12/31/21).[3]

28.    The Park was previously known as Heritage Plantation Mobile Home Park, and before that, Heritage Village Mobile Home Park.

29.    As set out above, Defendants ELS, MHC Operating Limited Partnership, and MHC Heritage Plantation, LLC have owned the Park since October 6, 2003, and likely as early as June 11, 1994, when the Park was acquired by Gatorland Vistas, Inc.

### III.    JURISDICTION AND VENUE

30.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one plaintiff is a citizen of a different state than at least one defendant.

31.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the Park is located in this judicial district, Defendants have engaged in business in this judicial district, and a

---

[1] https://equitylifestyle.gcs-web.com/static-files/f8cc9265-6c62-47fc-8392-32d1ec930e4e, p.1.
[2] *Id.*
[3] *Id.* at 28.  *See also* https://www.equitylifestyleproperties.com/our-portfolio/mh-portfolio.

substantial part of the events giving rise to the claims at issue took place in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  Background

#### 1.  The Heritage Plantation Prospectus

32.     A mobile home prospectus is fundamentally a disclosure document.  As required by the Florida Mobile Home Act ("FMHA"), Fla. Stat. § 723.012, the prospectus drafted by the park owner must contain certain information, including a description of the mobile home park property, a description of the recreational and other common facilities, the arrangements for management of the park and maintenance and operation of the park property, a description of the manner in which utility and other services will be provided to the homeowners, and an explanation of the manner in which rents and other charges will be raised, including 90 days' advance notice and disclosure of any rate increases or pass-through charges.  The prospectus also identifies the lot and rent to be paid.

33.     Attached as Exhibit A is a copy of Plaintiff Noel's Heritage Plantation prospectus (the "Prospectus") dated August 26, 1999, as amended November 8, 2002, the terms of which he accepted on April 2, 2017.

34.     The monthly amount in April 2017 for Plaintiff Noel's site was $546.73, plus $6.89 for trash removal.  Today, Plaintiff Noel pays $674.00 in rent and $9.05 for trash removal.

35.     Attached as Exhibit B is a copy of Plaintiff Wiksten's Heritage Plantation Prospectus for her original lot, which, like Plaintiff Noel's, is dated August 26, 1999, as amended November 8, 2002, the terms of which she accepted on May 3, 2018.

36.     The monthly rental in May 2018 for Plaintiff Wiksten's site was $590.00, plus $8.34 for trash removal, which increased over time to $662.19 in rent and $11.51 for trash removal.

7

37.     Beginning on August 1, 1988, Plaintiff Ladouceur's parents rented the land on which their mobile home sat for $189.84 per month.  In 2002, Plaintiff Ladouceur began to reside in the Park with her mother, and assumed the lease for the lot in or around June 2018. Plaintiff Ladouceur took title to her mother's mobile home in June 2018.  Today Plaintiff Ladouceur pays $664.24 in rent plus $10.86 for trash removal.  Plaintiff Ladouceur's Prospectus is the same in substance as Plaintiffs Noel and Wiksten's.

38.     The Prospectus identifies the owner of the Park as Gatorland Vistas, Inc., whose ownership interest as set out above was ultimately conveyed to the current owners, Defendants ELS, MHC Operating Limited Partnership, and MHC Heritage Plantation, LLC.  The entity authorized to receive notices and demands on behalf of the Park owner is Manufactured Home Communities, Inc. n/k/a Defendant ELS.  Exhibits A and B, § II.

39.     The Prospectus states that the management, operation, and maintenance of the Park is the responsibility of the Park Manager, who is physically located on-site:

> The management of Heritage Plantation is the responsibility of the Park Manager….  All questions and problems concerning park operation should be directed to the Park Manager.
>
> The maintenance and operation of the Park property is also the responsibility of the Park Manager.  Any problems which arise concerning park property should be directed to the attention of the Park Manager.

*Id.*, § V.

40.     MHC Property Management, L.P. and MHC Property Management GP, L.L.C. manage the Park.

41.     The FMHA, which defines the "operator of a mobile home park" as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority

8

to make decisions relating to the mobile home park." Fla. Stat. § 723.003(16). Thus, Defendants MHC Property Management, L.P. and MHC Property Management GP, L.L.C. are the "operators" of the Park under the FMHA.

42.     The FMHA also defines a "mobile home park owner" as "an **owner or operator** of a mobile home park." Fla. Stat. § 723.003(13) (emphasis added).

43.     Thus, all Defendants, whether managers or direct or indirect owners, are considered "owners" of the Park under the FMHA.

44.     Defendant ELS is the parent company or General Partner, directly or indirectly, of all other Defendants.

45.     The Prospectus makes clear that paved streets, sewer lines, and water lines are a few of the enumerated facilities and permanent improvements of the Park. Exhibits A and B, § IV.C.

46.     The Prospectus specifies that providing the storm drainage system is the responsibility of the Park's owner, but the cost of the storm drainage system is allocated to the individual lots on a pro rata basis:

> Storm drainage is provided by street drains draining to culverts and then into the lake. Two (2) pumps also divert stormwater by pumping into a canal at the north side of the community. There is no other storm drainage system available. The storm drainage system, as provided, is the responsibility of the Park. The cost of storm drainage is allocated to the individual lots on a pro rata basis and included in the base rent portion of the monthly lot rental amount. The pro rata share will be determined by dividing the number of mobile home spaces leased by a manufactured home owner by the total number of leased mobile home spaces in the Park.

*Id.,* § VII.E.

47.     The Prospectus also states that the Park owner may be required to construct permanent improvements in the Park, not presently known or contemplated, to benefit the Park's

homeowners:

> From time to time, the Park, in the future, may be required by
> government action, or by its own discretion, to construct, build or
> provide for permanent or non-permanent improvements in the Park
> not yet known or contemplated, which permanent or non-
> permanent improvements shall be for the use or benefit of the Park
> manufactured home owners or used for the operation and
> management of the Park.

*Id.,* § IV.F.3.  Yet, the cost of installing such capital improvements and/or performing repairs at

the Park may only be borne by the mobile homeowner "in the form of increases in the lot rental

amount."  *Id.,* § VI.  The rent increases for improvements or otherwise must comply with the

Prospectus (*see id.,* § VIII) and the FMHA.

### 2. The Longstanding Flooding Problems at Heritage Plantation

48.     Since at least October 2003, and likely before, the Park has been plagued by

drainage and flooding issues following average rainfalls.

49.     The Park's stormwater drainage system is comprised of an underground storm

system of original and antiquated pipes.  Because of the age and condition of the pipes, sinkholes

have occurred in the Park, where pipes have collapsed.

50.     In addition, the joints in the storm pipes are compromised, causing stormwater to

leak into the ground and vice versa.  Because the ground is constantly soaked, it cannot absorb

the water during ordinary precipitation events.

51.     Moreover, collapsing pipes have damaged the streets, and also the residents'

foundations and mobile homes.

52.     Severe flooding of the Park has been the norm following ordinary rainfalls in the

years that Defendants owned and operated the Park, as illustrated by the following photographs.

53.     The following are photographs of flooding that occurred on October 9, 2011:











54.     The following are photographs of flooding that occurred in September of 2017:





55.     The following are photographs of flooding that occurred on November 15, 2020:



56.     The following are photographs of flooding that occurred on May 20, 2021:









My front yard

57.     Flooding occurred nearly every month in the summer and fall of 2021, including

June 3 and August 2, 2021:





58.     The photographs above and below are just a few examples of the flooding that has

plagued Heritage Plantation during Defendants' ownership and operation of the Park:













59.     There were times when residents kayaked in the Park's flood waters, as well as drove hydrofoils through the Park.

60.     Also, there were times when residents, including Plaintiff Claire Ladouceur and her mother, had to be transported to and from their homes in a truck with high ground clearance

21

because ordinary cars were not able to navigate the Park's streets due to the flood waters.

61.    Because of the flooding, there have also been incidents when emergency services vehicles refused to respond to calls in the Park due to the high and undriveable flood waters.

### 3.    Homeowners Have Complained to Defendants about the Flooding, but No Steps Have Been Taken to Remedy the Problem

62.    The Park's homeowners have complained to Defendants, as well as their agents and representatives, about the conditions at the Park caused by the failure of the storm drainage system, flooding, and attendant moisture.  Residents have also complained to the Florida Department of Health.

63.    In 2005, a Park resident complained to the Florida Department of Health regarding the roads and drainage system.  The Florida Department of Health noted in 2005 (16 years ago) that the drainage system was 30 years old and of an obsolete design:

> the department received a complaint regarding the Park roads and drainage system.  It is acknowledged that the roads were initially built in or about 1975.  The design of the drainage is based upon storm drains located in the center portion of the roads.  Over the years the roads have developed depressions and low areas where stormwater puddles and does not reach the drains.

64.    In 2009, a frustrated homeowner complained to the Florida Department of Health: "Complainant advised there is standing water on her property producing slippery conditions and also water that has been running into Congress St. for approx. 7 wks.  She notified the management office and they would not provide any assistance."

65.    In November 2020, 11 years later, that same resident complained to the Florida Department of Health of the standing water in front of her home.  The resident advised that she had paid "$10,000 for flooring" which is being ruined because of the water, and that there are a lot of mosquitoes breeding in the standing water.  The resident lamented, "This standing water

problem has gone on for years.  Association does nothing."

66.     Defendants have wholly ignored the problem and failed to take any action to remedy the flooding issues at the Park, other than *ad hoc* maintenance of the current, outmoded system:



67.     In January of 2021, Plaintiff [Sundbye] Wiksten notified Defendant ELS of the homeowners' concerns regarding the flooding issues:

HPAC has gathered statements and affidavits of homeowners who have tried to have their injuries, concerns, repairs of safety issues etc. addressed by **ELS** Management and property manager Rebecca Ruby to no avail.

The concerns of these action committee members over the last 10 years include flooding (and the inability of travel within the community because of it), and safety issues directly resulting from the flooding (including injuries).

With no corrective actions evident BECAUSE OF THE YEAR AFTER YEAR flooding issues………we have formalized our complaints and are requesting Federal, State and local government offices to intervene.

68.     In response, Defendant ELS denied having received many or even **any** complaints from Park homeowners for many years:

Good Afternoon Ms. Sundbye,

I wanted to reach out to you regarding the emails you sent to me yesterday to acknowledge that I am in receipt of your concerns and will look into each.

Our resident's satisfaction is always our number one priority and we hope to resolve any issues as best we can. Fortunately, we have not had many (& in some cases, any) resident discontent or unpleasant communications or issues at your community in many years. We have been able to address any concerns professionally & effectively with both the HOA, as the voice of the community, as well as with individual residents as they confidentially bring up their private matters. With that being said, we will look into any matters that you have addressed pertaining to you and will have someone reach out to you directly to further discuss and resolve.

Thank you for bringing your concerns to our attention. It is much appreciated.

Best Regards,

Charlene Silvestro
Senior Regional Manager
Equity Lifestyle Properties, Inc.
4300 W. Cypress Street - Suite 400
Tampa, FL 33607

69.     Soon thereafter, the Heritage Plantation homeowner's association also lodged a complaint about the flooding and its aftermath on behalf of the homeowners.  On May 25, 2021, the homeowner's association sent Defendant ELS's representative a letter, complaining of issues that "are still not resolved," including "flooded streets and now collapsing storm drains," ADA compliance, repairs and maintenance of common areas, and street sweeping "to keep the slime" from the flooding at bay.  Attached as Exhibit C is a true and correct copy of the letter.

> **4.  Defendant MHC Heritage Plantation, LLC was Found in Violation of the Municipal Code by Discharging Stormwater into the County's Sewer System and Has Failed to Remediate the Violation, Incurring a Fine Over $132,000 that Mounts Daily**

70.     It appears that Defendants have no intention of repairing the stormwater drainage system at the Park.  Defendant MHC Heritage Plantation, LLC has been found in violation of the municipal code for discharging stormwater into the county's sewer system.  Specifically, on June 26, 2017, the Code Enforcement Board of Indian River County (the "Code Enforcement Board") found that MHC Heritage Plantation, LLC was in violation of Section 201.29 of the Code of Laws and Ordinance of Indian River County, Florida for illegally discharging stormwater into

the county's sewer system.  6/26/17 Order, Case No. 2017010135, Exhibit D.  The Code

Enforcement Board found that the Park's stormwater was inflowing and infiltrating the County's

sewer system.

71.     The Code Enforcement Board imposed the following remediation measures on

MHC Heritage Plantation, LLC:

> Smoke test the entire park to identify all areas of potential
> infiltration; seal all items under that smoke; TV all lines from the
> manhole to the main trunk lines; repair any cracks, breaks or other
> areas of potential infiltration; repair and/or upgrade all manholes;
> repair cleanouts; ensure that all manhole connections are tight so as
> to prevent infiltration; smoke test the entire system after work has
> been completed to assure that all issues have been addressed; TV
> any trunk lines that are six inches or larger; and provide the Indian
> River County Department of Utility Services with the final reports,
> certifying that no potential areas of infiltration are identified.

*Id.*

72.     The Order directed MHC Heritage Plantation, LLC to remediate the violation on

or before September 22, 2017, or face fines of $100 per day for non-compliance.  *Id.*

73.     There were at least four extensions of the compliance deadline, and, on March 26,

2018, the Code Enforcement Board held a hearing to determine compliance.  Even though they

were directed to appear at that hearing, representatives of MHC Heritage Plantation, LLC did not

appear.

74.     The Code Enforcement Board found that "the required corrective action has not

been taken as ordered and that there does in fact exist illegal discharge into the county sewer

system…."  3/26/18 Order, Case No. 2017010135, Exhibit E.  The Code Enforcement Board

imposed a fine of $100 for each day the violation continues.  *Id.*  The order imposing the fine is

or will be recorded as a lien against the property.  *Id.*

75.     As of April 21, 2022, the fine is over $146,000 and increases by $100 per day.

76.     Without any concern for how the lack of an adequate stormwater drainage system affects the Park's mobile homeowners, it appears that Defendants have made a cost-benefit decision that it is more economically feasible to incur a violation of $100 per day (now over $146,000) than to undertake the repairs needed to make the stormwater drainage system compliant.

### 5. The Residents' Homes and Personal Property Have Been Damaged Because of the Flooding, Moisture, and Mold

77.     In addition to the inconvenience caused by trapping residents inside their homes, the flooding has damaged the residents' mobile homes and ruined their personal property.  For example, the pooling water below the residents' homes has damaged the flooring of many homes.  Some residents have had to replace flooring on multiple occasions; others who cannot afford to do so live with mold, mildew, and spores in their residence.

78.     Plaintiffs Michael Noel and Kathy Wiksten had to replace the floors of their mobile homes within the first year of their tenancies.  Another owner had to replace her floors in her home that were completely ruined from the flooding over the years.  Two others had to replace their respective flooring.  One owner had to replace the flooring in her mobile home twice due to excess moisture and notified management about it.  Plaintiff Claire Ladouceur's flooring needs to be repaired due to the constant waters and moisture, but she has not done so because she cannot afford it.

79.     One owner replaced her floors in 2013, and they need to be replaced again.  She complained to Defendants' management, who told her that it was an act of God and she has to live with it.  In 2017, the flood water was three to four feet high and water came into a resident's home.  He replaced the floors down to the beams, and the cost of the repair was over $12,000, during which he was displaced from his residence for over a week.  Such repairs are out of

financial reach for many of the Park's residents on fixed incomes.

80.    The flooding has also infiltrated the residents' air conditioning units and related ductwork, and the moisture has also caused swelling of doors, cabinets, and window frames. One mobile homeowner had to replace all ductwork in his home.  Another has moldy air conditioner filters, but she is unable to pay to replace them yet her electric bills have increased to nearly $200 per month.  She notified Defendants' management, who told her it was an "act of God."

81.    In addition, the flood waters pooling in the roadways and residents' driveways have damaged many vehicles.  For example, in 2013, Plaintiff Claire Ladouceur had to replace the brakes on her car twice in six months.  She reported the incident to Defendants' manager, who told her that if she didn't like it, she could move.  Another homeowner's car needed new brakes and an anti-lock brake system after driving through flood waters at the Park.  She reported the matter to the Park's manager, who told her not to drive if there is flooding, which could mean being trapped inside for days.  Another had to change brake pads and replace rotors on his car twice because of ponding water:



82.    In addition, collapsing storm drainage pipes are causing sink holes throughout the

Park, which have damaged the residents' driveways, foundations, and other personal property.



83.     The wall under one homeowner's mobile home caved in due to the unstable ground, and her driveway became cracked.  The structural integrity of another couple's mobile home was compromised due to unstable ground, and the home cracked and the gap keeps getting wider with additional cracks appearing.  Flower boxes that were part of their original brick foundation of that particular mobile home have broken and fallen.  Another couple's block cement planter and wall collapsed.  When they reported it to Defendants' manager, she laughed and said she herself was busy cleaning up all the fish in the road from the flooding.

84.     In addition to the above, the flood waters have also ruined plants, plantings, and other landscaping at various residents' homes.  The above are merely examples and are not an exhaustive list of problems and damage.

### 6.   The Residents Have Suffered Personal Injuries Due to Defendants' Lack of Maintenance After Flooding

85.     While this lawsuit does not seek damages for personal injuries, the aftermath of the flooding puts the Park's age-55 or over residents at risk of personal injury.  When the flood waters recede, there is a slippery build-up of mud and silt that remains.  The muddy residue is

not routinely cleaned by Defendants by street sweeping or other means.  As a result and over the

years, various homeowners and their guests have been injured by slipping and falling, including:

- One homeowner fell on slime in front of his home on October 3, 2021 and was sent by ambulance to the hospital and thereafter notified the Park manager;

- Another homeowner fell on Nov. 10, 2020 because of a slimy road and notified the Park owner of the incident;

- Another fell in the street and injured her knee;

- A mobile homeowner fell in the fall of 2019 because of the mud and injured her knee and hip and notified management of the incident;

- Another fell in September 2019 due to slime and injured her hands, wrists and knee;

- An owner fell twice, once in June 2020 and the other in 2019 due to slippery conditions and receives pain injections to this day; she notified management of the incident;

- A resident fell in July 2019 when she lost her footing on the slippery road and reported it to the Park manager who told her she shouldn't walk on the slippery sides of the road but should instead walk in the middle of the road;

- A homeowner fell in June of 2018 because of the messy residue left behind after the water drained and tore his rotator cuff; he underwent surgery and only has 75% range of motion;

- A homeowner's fiancée fell when walking to the mailbox in May 2018 and reported it to management, who told her to walk in the middle of the road;

- A homeowner slipped in front of her home on the slime and broke her arm in October of 2017;

- An owner fell in September of 2013 because the road was slimy and seriously injured her knee requiring surgery, notified management of the incident, and ultimately recovered pursuant to a personal injury lawsuit;

- A mobile homeowner slipped on sludge/slime on the side of her road and injured her back, knee, and shoulder from the fall, reported it to Park management who told her to be more careful; her sister also fell in or around 2008 or 2009;

- A mobile homeowner fell on slime while trying to assist her 85-year-old neighbor;

- Another slipped and fell on slime and notified management of same; and

- One owner slipped in slime at mailbox and fell onto seat of a mobility scooter; has fallen other times.

86.     The Park is an over-age-55 community and, in light of the number of ongoing and serious injuries of which Defendants were aware caused by the aftermath of the flooding, Defendants have failed to routinely maintain the condition of the roads following the flooding.

### 7.   The Defendants Also Fail to Maintain the Park's Common Areas

87.     In addition to the above, there have been Park residents who have fallen and been injured due to Defendants' poor upkeep and maintenance of other common areas at the Park. For example, on April 15, 2019, a resident was walking home after bingo at the clubhouse in the Park and, because of poor lighting, tripped in a pothole.  She hit her head and face on the pavement and was dazed and unable to move for about 10 minutes until she was assisted by another resident.  She was taken by ambulance to the hospital.

88.     Similarly, one mobile homeowner fell twice in potholes while leaving the management office.  One fell due to poor lighting and fractured her shoulder in 2018.  Another sat on a bench near the pond one day and the bench collapsed.

89.     The Heritage Plantation homeowners have complained to the Defendants about the general maintenance and upkeep of common areas of the Park, but Defendants have failed to act.

90.     In November 2019, a complaint was lodged with the Florida Department of Health regarding the condition of the pool, asserting that the pool's pavers contain "thousands of crevices for dirt, animal droppings and mold to accumulate" and that the resident "doesn't recall

the deck ever being power washed or cleaned." The Park was found in violation of the applicable Code provisions. *See* November 22, 2019 violation, attached as Exhibit F.

91.     In July 2021, less than two years later, the entrances to the swimming pool and clubhouse contained mold:





92.     During Defendants' ownership, in 1996, 2017, and 2018, there have been other

code violations in connection with the Defendants' maintenance and upkeep of the pool.

93.     In July 2021, the pool at Heritage Plantation appeared to contain black algae:





94.    Black algae is called cyanobacteria, and it creates cyanotoxins which can make

people sick.  It also can harbor other organisms or harmful bacteria like E. coli which can cause

illness.  Black algae is hard to kill because it develops a protective coating that resists chlorine

treatment, and it develops deep roots that can grow into concrete, plaster, and other porous

surfaces that compound the difficulty of removing it.  Best practices suggest that swimming

pools containing black algae should not be used.[4]

### 8.  Dangerous Electrical Conditions Exist

95.    In addition to the drainage problems at the Park, Defendants have also neglected

potentially hazardous electrical conditions in the Park's common areas.  For example, in

December 2020, a homeowner advised the Park manager of exposed conduit traversing a street

in the Park depicted in the below image.  The manager responded that the pipe contained "non-

viable wiring;" however, there was doubt as to the accuracy of this response as the common area

lighting in and around the conduit stopped working.

_____

[4] https://poolresearch.com/black-algae/.



96.     Indian River County subsequently found that the Defendant MHC Operating Limited Partnership, LLC buried conduit in the road in violation of the applicable ordinances and codes.  Specifically, on February 2, 2021, Defendant MHC Operating Limited Partnership, LLC received a Notice of Violation issued by Indian River County, finding that the Park was in violation of the Florida Building Code and/or the Code of Ordinance of Indian River County because there was no permit for its installation and the conduit was not buried sufficiently deep. The Notice is attached as Exhibit G.

97.     The Notice of Violation states, "Electrical wiring conduit buried in road intersection without a permit.  Conduit Per NEC Table 300.5 must be minimum 24-inch depth/cover over conduit."  The Notice of Violation also stated, "After-the-Fact Building Permit is required through Indiana River County…."  Compliance was required within 30 days.

### 9.     Defendants Retaliate Against Residents for Complaining About the Park's Maintenance

98.     Under the Park's Rules and Regulations which are a part of the Prospectus,

mobile homeowners have certain duties while living in the Park, including maintaining their units in a good condition at all times: "To preserve the beauty of our Community, your home and site must be maintained in clean and good condition at all times. This includes washing, waxing and/or painting of the house or roof as needed." *See* Exhibit A, p.2.

99.     Yet, when the homeowners complain to Defendants or their agents about enforcing the Rules and Regulations and otherwise maintaining the aesthetics of the Park, the Park Manager retaliates. For example, one couple complained for several years about the condition and appearance of this mobile home behind theirs which appears to be in violation of the Park's Rules and Regulations:





100.     In seeming retaliation, on July 15, 2021, the Park manager sent the couple a Site

Inspection Report requiring them to paint the trim on their mobile home within 15 days (or 30 if

the homeowner is out of state).  Putting aside that July/August is not the optimal time for exterior

painting in Florida, the couple's home was in the following immaculate condition when they

received the notice:



36





101.    At the same time the Park Manager cites homeowners for failing to upkeep their mobile homes, Defendants fail to maintain the Park's common areas, including the pool and clubhouse, as well as the below:





**B. The Continuing Violation Doctrine Extends The Statutes of Limitations.**

102.     Plaintiffs' claims are subject to the following statutes of limitations: contract (five years, Fla. Stat. § 95.11(2)(b)); breach of the covenant of quiet enjoyment (four years, Fla. Stat. § 95.11(3)(p)); negligence (four years, Fla. Stat. § 95.11(3)(a)); private nuisance (four years, Fla. Stat. § 95.11(3)(p)); trespass (four years, Fla. Stat. § 95.11(3)(g)); and constructive eviction (four years, Fla. Stat. § 95.11(3)(p)).

103.     However, the continuing violation doctrine extends Plaintiffs' limitations periods back to at least October 6, 2003, when Defendants MHC Operating Limited Partnership and MHC Heritage Plantation LLC acquired ownership of the Park.

104.     The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period.

105.     The continuing violation doctrine applies when there are continuing violations. The violations are continuing when a plaintiff complains of a continuation of the violation that extends into the present.  A continuing violation occurs when there are continuous harmful acts, and not continual harmful effects from an original completed act.

106.     Here, each time the Park floods is a continuous harmful act, which extends Plaintiffs' and the Class's limitations period.

## V.     CLASS ALLEGATIONS

107.     Plaintiffs bring this action on behalf of the following Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), (b)(3) and/or 23(c)(4): "All persons who leased a lot in the Heritage Plantation mobile home park since October 6, 2003."

108.     Plaintiffs reserve the right to modify or amend the Class definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

109.     Excluded from the Class are Defendants and any of their affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all persons who make a timely election to be excluded from the Class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members.  Also excluded from the Class are persons who leased a lot in the Heritage Plantation mobile home Park and who had or have an ownership interest in either Defendant entity or own stock in Defendant ELS (NYSE:  ELS).

110.     Numerosity:  There are 437 mobile home lots in the Heritage Plantation mobile home Park, and there have likely been hundreds and perhaps even thousands of mobile homeowners renting lots in the Park whose claims fall within the applicable statutes of

limitations.

111.     Typicality:  Plaintiffs' claims are typical of the claims of each Class member in that Plaintiffs and the Class owned/own mobile homes in the Heritage Plantation mobile home Park and have suffered the same damages and injuries.  Plaintiffs are advancing the same legal theories on behalf of themselves and the Class.

112.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests and the interests of all other members of the Class are identical, and Plaintiffs are cognizant of their duty and responsibility to the Class.  Accordingly, Plaintiffs can fairly and adequately represent the interests of the Class.  Moreover, Plaintiffs' counsel are competent and experienced in litigating class actions, including litigation of this kind.  Plaintiffs and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

113.     Commonality and Predominance:  There are numerous questions of law and fact common to the Class, and these common questions predominate over any issues affecting only individual Class members, making certification appropriate under Rule 23(b)(3).  Questions common to the Class include:

>     a.   Whether Plaintiffs and the Class are entitled to damages that occurred as a result of Defendants' breach of the Prospectus by failing to provide an adequate storm drainage system for the Park and to maintain and upkeep the Park's common areas;
>
>     b.   Whether Defendants' failure to maintain the stormwater system and the attendant flooding constitutes a breach of the covenant of quiet enjoyment such that Plaintiffs and the Class are absolved of paying further rent;

c.   Whether Plaintiffs and the Class are entitled to damages for Defendants' negligence by failing to provide an adequate storm drainage system for the Park, failing to remediate the adjudicated violation of the Indian River County Code regarding discharging stormwater into the County's sewer system, and for otherwise failing to upkeep and maintain the Park;

d.   Whether Plaintiffs and the Class are entitled to punitive damages because Defendants' failure to provide an adequate storm drainage system for the Park, failure to remediate the adjudicated violation of the Indian River County Code regarding discharging stormwater into the County's sewer system, and for otherwise failing to upkeep and maintain the Park, is so reckless and wanting in care that it constitutes a conscious disregard of the rights of Plaintiffs and the Class;

e.   Whether Defendants' failure to maintain the stormwater system and attendant flooding constitutes private nuisance and trespass;

f.   Whether Defendants' failure to maintain the stormwater system and attendant flooding, which impacted ingress and egress to the Park and individual lots, constitutes constructive eviction;

g.   Whether Defendants should be enjoined to take all necessary steps to provide an adequate stormwater system at the Park and otherwise make the Heritage Plantation mobile home park compliant with all codes, ordinances, and statutes.

114.   Superiority:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

42

encountered in the management of this class action.  The purpose of a class action is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation.  Individual litigation by each Class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system.  In sum, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

115.    This action is also properly maintainable under Rule 23(c)(4), in that particular issues common to the Class, as set out *supra*, are most appropriately and efficiently resolved via class action, and would advance the disposition of this matter and the parties' interests therein.

## VI.    CLAIMS FOR RELIEF

### Count I – Breach of Contract

116.    Plaintiffs reallege paragraphs 32 - 115 as if set forth in full herein.

117.    The Prospectus constitutes a valid and binding contract between Plaintiffs and the Class and Defendants.  A

118.    s set out above, the Prospectus makes clear that paved streets, sewer lines, and water lines are a few of the enumerated facilities and permanent improvements of the Park to be provided by the Park owner.  Exhibits A and B, § IV.C.

119.    The Prospectus also specifies that the storm drainage system is the responsibility of the Park's owner, and the mobile homeowners pay to maintain that system as a portion of their rent. *See id.,* § VII.E.

120.    The "cost of storm drainage is allocated to the individual lots on a pro rata basis and included in the base rent portion of the monthly lot rental." *Id*.

121.    Plaintiffs and the Class have complied with all relevant terms of their respective

contracts by, among other things, paying rent.

122. Defendants have breached the contract by, among other things, failing to maintain the Park's stormwater drainage system; ignoring the residents' repeated complaints about the flooding; failing to clean up the muddy and slippery roads after flooding; and failing to maintain the Park's common areas.

123. Plaintiffs and the Class have been damaged.

124. Plaintiffs and the Class have paid rent year in and year out expecting the Park to have an adequate storm draining system, but it does not.

125. Instead, Defendants have collected rents paid by Plaintiffs and the Class – a portion of which is specifically allocated to storm drainage – and have disregarded the residents' complaints and ignored the flooding conditions at the Park during ordinary rainfall.

126. As a result, the homeowners' homes, vehicles, and other personal property have been damaged by the incessant flooding.

127. Moreover, Plaintiffs and the Class have suffered diminution in the value of their mobile homes.

128. Based on the foregoing, Plaintiffs and the Class seek damages for breach of contract to compensate them for their injuries, damages, and losses.

129. The injuries, damages, and losses include, but are not limited to, past, present, and future compensation for personal property damage; economic losses; relocation costs; rental overcharges; reduced mobile home values or replacement costs; loss of use; mental anguish; and stress-related physical symptoms.

**Count II – Breach of the Covenant of Quiet Enjoyment**

130. Plaintiffs reallege paragraphs 32 - 115 as if set forth in full herein.

131.     The repetitive flooding and drainage issues that have been plaguing the Park since Defendants' ownership constitutes a breach of the covenant of quiet enjoyment.  Plaintiffs and the Class are and have been deprived of the beneficial enjoyment of their residences, and the lots on which their mobile homes sit have been rendered unsuitable for the purposes for which they exist.

132.     Based on Defendants' breach of the covenant of quiet enjoyment, Plaintiffs and the Class ask this Court to declare that they have no responsibility for future rent payments.

133.     Plaintiffs and the Class also seek compensation for their injuries, damages, and losses flowing from Defendants' breach of the covenant of quiet enjoyment.

134.     The injuries, damages, and losses include, but are not limited to, past, present, and future compensation for personal property damage; economic losses; relocation costs; rental overcharges; reduced mobile home values or replacement costs; loss of use; mental anguish; and stress-related physical symptoms.

### Count III – Negligence

135.     Plaintiffs reallege 32 - 115 as if set forth in full herein.

136.     Under the FMHA, a mobile park owner has certain specific duties.  These duties include complying with all relevant codes; maintaining buildings and common areas in a good state of repair; providing access to common areas; maintaining utility connections and systems; and complying with promulgated park rules and regulations.  Fla. Stat. § 723.022.[5]

137.     The Florida Administrative Code also imposes duties on mobile home park owners as they relate to stormwater drainage.  For example, prior to installation of a mobile

---

[5] This action is not being brought pursuant to the FMHA.  Instead, the FMHA and other statutes and ordinances identified herein define the duties that Defendants owe to Plaintiffs and the Class under Florida law.

home, "[t]he area beneath and around the home shall be graded, sloped for proper drainage so that water will not accumulate under the home." Fla. Admin. Code. § 15C-1.0102(3). Further, "[e]ach site of a new or modified mobile home … shall be graded so that water drainage will not cause standing water under the unit." Fla. Admin. Code § 64E-15.002.

138.   Section 201.29 of the Code of Laws and Ordinances of Indian River County also imposes duties on landowners that prevent the illegal discharge of stormwaters into the county's sewer system.

139.   Defendants have breached their duties under the above statutes and ordinances by, among other things, failing to maintain an adequate stormwater drainage system; allowing water to pond under the residents' mobile homes; ignoring the residents' repeated complaints about the incessant flooding; failing to clean up the muddy and slippery roads after flooding; failing to maintain the Park's common areas; and failing to correct the existing violation of § 201.29 of the Code of Laws and Ordinances of Indian River County.

140.   Defendants and their agents have knowledge of and awareness of the alleged events and have consciously disregarded the consequences of same.

141.   Defendants' actions and omissions were and continue to be the foreseeable and proximate cause of Plaintiffs' and the Class' injuries.

142.   When the Park experiences flooding as a result of ordinary precipitation events, water collects in streets and other common areas and underneath the residents' mobile homes and vehicles.

143.   Park residents have been forced to wade in stormwater in their driveways, yards, and streets during ordinary rain events, or are otherwise trapped inside their homes.

144.   Defendants and their agents are aware of these flooding events and have failed to

take any action to remedy the problem.

145.    The homeowners' homes, vehicles, and other personal property have been damaged by the incessant flooding.

146.    Moreover, Plaintiffs and the Class have suffered a diminution in the value of their mobile homes.

147.    Plaintiffs and the Class seek compensation for their injuries, damages, and losses flowing from Defendants' breach of the covenant of quiet enjoyment.

148.    The injuries, damages, and losses include, but are not limited to, past, present, and future compensation for personal property damage; economic losses; relocation costs; rental overcharges; reduced mobile home values or replacement costs; loss of use; mental anguish; and stress-related physical symptoms.

149.    Plaintiffs and the Class also seek punitive damages because Defendants' actions and omissions described above were so reckless and wanting in care that it constituted a conscious disregard of the rights of Plaintiffs and the Class.

### Count IV – Private Nuisance

150.    Plaintiffs reallege paragraphs 32 - 115 as if set forth in full herein.

151.    Defendants' failure to maintain the stormwater drainage system in the Park causes the repetitive flooding of the area in, around, and under Plaintiffs' and the Class' mobile homes. Such flooding constitutes a private nuisance.

152.    Defendants' intentional and unreasonable actions described above constitute an invasion of Plaintiffs' and the Class' interest in the private use and enjoyment of their residences.

153.    The private nuisance created by Defendants' actions and omissions has unreasonably interfered and continues to interfere with the Plaintiffs' and the Class' use and

enjoyment of their real and personal property.

154. Defendants' actions and omissions were the foreseeable and proximate cause of Plaintiffs' and the Class' injuries.

155. Based on the foregoing, Plaintiffs and the Class seek compensation for their injuries, damages, and losses, as well as a mandatory injunction.

156. The injuries, damages, and losses include, but are not limited to, past, present, and future compensation for personal property damage; economic losses; relocation costs; rental overcharges; reduced mobile home values or replacement costs; loss of use; mental anguish; and stress-related physical symptoms.

157. Plaintiffs and the Class also seek punitive damages because Defendants' actions and omissions described above were so reckless and wanting in care that it constituted a conscious disregard of the rights of Plaintiffs and the Class.

### Count V – Trespass

158. Plaintiffs reallege paragraphs 32 - 115 as if set forth in full herein.

159. Plaintiffs and the Class have a right to lawfully possess their mobile homes in the Park.

160. Defendants' failure to maintain the stormwater drainage system in the Park causes the repetitive flooding of the area in, around, and under Plaintiffs' and the Class' mobile homes. The entry of such waters is physical and, in light of Defendants' knowledge of the flooding and drainage problems, is intentional and voluntary.

161. Defendants' actions and commissions constitute a trespass, one which is continuing in nature.

162. Defendants' actions and omissions were the foreseeable and proximate cause of

Plaintiffs' and the Class' injuries.

163.     Based on the foregoing, Plaintiffs and the Class seek compensation for their injuries, damages, and losses.

164.     The injuries, damages, and losses include, but are not limited to, past, present, and future compensation for personal property damage; economic losses; relocation costs; rental overcharges; reduced mobile home values or replacement costs; loss of use; mental anguish; and stress-related physical symptoms.

165.     Plaintiffs and the Class also seek punitive damages because Defendants' actions and omissions described above were so reckless and wanting in care that it constituted a conscious disregard of the rights of Plaintiffs and the Class.

### Count VI – Constructive Eviction

166.     Plaintiffs reallege paragraphs 32 - 115 as if set forth in full herein.

167.     Plaintiffs and the Class have a right to lawfully possess, use, and enjoy their mobile homes in the Park as well as the common areas in the Park, and also have a right to ingress and egress from the Park and their homes.

168.     The repetitive flooding and drainage issues that have been plaguing the Park since Defendants' ownership have:

        a.   deprived Plaintiffs and the Class of the continuous beneficial enjoyment of the Park and their mobile homes;

        b.   deprived Plaintiffs and the Class of the continuous ingress and egress to the Park and their homes during and after rain events;

        c.   rendered the lots on which the homes of Plaintiffs and the Class members sit  unsuitable for the purposes for which they exist;

    d   rendered the mobile homes of Plaintiffs and the Class unsuitable for

        habitation due to mold, rotting floors, and other damage from the flooding.

169.    Despite these conditions, Plaintiffs cannot surrender the premises because a mobile home is not easily or inexpensively moved.

170.    These conditions constitute a constructive eviction of Plaintiffs and the Class members.

171.    Based on Defendants' constructive eviction, Plaintiffs and the Class ask this Court to declare that they have no responsibility for future rent payments.

172.    Plaintiffs and the Class also seek compensation for their injuries, damages, and losses flowing from Defendants' constructive eviction, including but not limited to relocation costs to move their mobile homes.

173.    The injuries, damages, and losses include, but are not limited to, past, present, and future compensation for personal property damage; economic losses; relocation costs; rental overcharges; reduced mobile home values or replacement costs; loss of use; mental anguish; and stress-related physical symptoms.

174.    Plaintiffs and the Class also seek punitive damages because Defendants' actions and omissions described above were so reckless and wanting in care that it constituted a conscious disregard of the rights of Plaintiffs and the Class.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter a judgment on their behalf and against Defendants jointly and severally, and further grant the following relief:

A.    Certify the proposed Class pursuant to the Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4);

B.      Designate Plaintiffs as representatives of the proposed Class and Plaintiffs'
counsel as Class counsel;

C.      Award Plaintiffs and the Class compensatory damages, punitive damages, and any
other relief to which they are entitled under the law;

D.      Issue a mandatory injunction, requiring Defendants to remediate all federal, state,
or local law and ordinance violations and make any and all repairs to the Heritage Plantation
mobile home Park consistent with their legal and statutory duties;

E.      Award Plaintiffs and the Class prejudgment interest and costs; and

F.      Award Plaintiffs and the Class such other relief as the Court deems just and
proper.

## VIII.    JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by
jury as to all matters so triable.

Dated: May 6, 2022                              Respectfully submitted,


By: */s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861
gilbert@kolawyers.com
Daniel E. Tropin, FBN 100424
tropin@kolawyers.com
**KOPELOWITZ OSTROW FERGUSON**
**WEISELBERG GILBERT**
2800 Ponce de Leon Blvd., Suite 1100
Coral Gables, FL  33134
Telephone: (305) 384-7269

Elizabeth A. Fegan, *Pro Hac Vice*
beth@feganscott.com
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

Lynn A. Ellenberger, *Pro Hac Vice*
lynn@feganscott.com
**FEGAN SCOTT LLC**
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Robert C. Gilbert*
Robert C. Gilbert