**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. PIERCE DIVISION**

|  |  |
|---|---|
| MICHAEL NOEL, KATHLEEN WIKSTEN, and CLAIRE LADOUCEUR, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>MHC HERITAGE PLANTATION, LLC, MHC OPERATING LIMITED PARTNERSHIP, MHC PROPERTY MANAGEMENT, L.P., MHC PROPERTY MANAGEMENT GP, L.L.C. and EQUITY LIFESTYLE PROPERTIES, INC. f/k/a MANUFACTURED HOME COMMUNITIES, INC.,<br><br>       Defendants. | No.:  2:21-cv-14492-DMM |

**PLAINTIFFS' REVISED MOTION FOR CLASS CERTIFICATION**
**AND INCORPORATED MEMORANDUM OF LAW[1]**

---

[1]On April 22, 2022, Plaintiffs filed their motion for class certification and combined memorandum of law. [DE 42]. On April 25, 2022, this Court granted Plaintiffs' motion for extension of time to file their motion for class certification [DE 35], extending the deadline for plaintiffs to move for class certification (and to amend pleadings and add parties) to May 6, 2022. [DE 43].

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................. 1

II.    PROFFER OF FACTS IN SUPPORT OF CLASS CERTIFICATION ............................ 3

    A.     Plaintiffs' liability claims will be tried using evidence common to the Class.......... 3

        1.     Defendants have defined their duties to maintain the Park's infrastructure in the Heritage Plantation Prospectus, which is common to all Class members. ......... 3

        2.     Defendants have failed to maintain or fix the Park's stormwater drainage system, resulting in flooding during rainfall................................................................ 4

        3.     Robert J. Ross, P.E. opines that the analysis of the condition, maintenance and repair of the Park's stormwater drainage system will be based on information common to the Class. ...................................................................... 8

        4.     Plaintiffs' experiences are typical.................................................................... 9

        5.     Defendants' course of conduct reflects that these liability issues are conducive to handling on a class-wide basis. ............................................. 10

    B.     Damages can be calculated on a classwide basis..................................................... 11

    C.     Class members' claims for repair costs to their homes can be bifurcated and are administratively feasible. .................................................................................. 11

III.   ARGUMENT ................................................................................................ 12

    A.     Plaintiffs satisfy the requirements of Rule 23(a). .................................................. 13

        1.     The Class is sufficiently numerous such that joinder is impracticable.............. 13

        2.     Plaintiffs and the Class Members share common factual and legal issues. ....... 13

        3.     Like each Class member, Plaintiffs leased lots in the Park so their claims are typical of the Proposed Class as a whole. ............................................. 14

        4.     Plaintiffs and their counsel have demonstrated the commitment and competency required to prosecute the class claims. ................................... 15

    B.     Rule 23(b)(3)'s predominance and superiority requirements are satisfied............. 15

        1.     Common questions of fact predominate where Defendants' course of conduct is the single source of harm.......................................................... 16

        2.     Common questions of law predominate since a single state's law applies........ 18

        3.     In addition to common liability questions, there are common damages questions that the jury could address. ........................................................ 19

        4.     Even if this Court determines only liability questions are subject to class-wide evidence, an issues class may be certified under Rule 23(c)(4)........................ 20

        5.     A class action is the most manageable, efficient and superior mechanism for resolving the class members' claims................................................... 22

C.    Alternatively, Plaintiffs' claims for injunctive relief can be certified under Rule 23(b)(2)............................................................................................................. 23

D.    The Class is readily ascertainable. ........................................................................ 24

E.    Plaintiffs' Counsel are qualified to represent the Class. ........................................ 24

IV.    PROPOSED TRIAL PLAN...................................................................................... 24

A.    Phase I: Determination of common issues of liability and damages which can be calculated on a class-wide basis ...................................................................... 25

B.    Phase II: Individual prove-ups for certain compensatory damages ....................... 25

V.    CONCLUSION.......................................................................................................... 25

**Table of Authorities**

**Cases**

*Allapattah Servs. v. Exxon Corp.*,
333 F.3d 1248 (11th Cir. 2003) ..................................................................... 16, 20

*Arndt v. P & M, Ltd.*,
837 N.E.2d 398 (Ohio Ct. App. 2005) ........................................................ 16, 17, 23

*Arnold v. State Farm Fire & Cas. Co.*,
No. 2:17-cv-00148-TFM-C, 2020 U.S. Dist. LEXIS 219533, 2020 WL 6879271 (S.D.
Ala. Nov. 23, 2020) ...................................................................................... 18

*Boudreaux v. Dep't of Transp. & Dev.*,
690 So. 2d 114 (La. Ct. App. 1997) ........................................................... 16-17

*Busby v. JRHBW Realty, Inc.*,
513 F.3d 1314 (11th Cir. 2008) ................................................................... 14

*Bussey v. Macon Cnty. Greyhound Park, Inc.*,
562 F. App'x 782 (11th Cir. 2014) .............................................................. 13

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ....................................................................... 21

*Chi. Prop. Interests, L.L.C. v. Broussard*,
90 So. 3d 563 (La. Ct. App. 2012) ............................................................... 16

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ................................................................................. 12

*Cox v. Am. Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir. 1986) ................................................................... 13

*Henley v. FMC Corp.*,
207 F. Supp. 2d 489 (S.D.W. Va. 2002) ..................................................... 22

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
757 F.3d 599 (7th Cir. 2014) ....................................................................... 21

*In re Scientific Atl. Inc., Sec. Litig.*,
571 F. Supp. 2d 1315 (N.D. Ga. 2007) ....................................................... 21

*Jenkins v. Raymark Indus.*,
782 F.2d 468 (5th Cir. 1986) ....................................................................... 22

*Kaymakcian v. Bd. of Mgrs of the Charles House Condo.*,
49 A.D.3d 407 (N.Y. App. 1st Dep't 2008) ................................................ 19

*Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*,
1994 WL 808074 (S.D. Fla. June 8, 1994) ............................................................ 20

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ................................................................... 16, 20

*Kornberg v. Carnival Cruise Lines, Inc.*,
741 F.2d 1332 (11th Cir. 1984) ............................................................................ 14

*McHale v. Farm Bureau Mut. Ins. Co.*,
409 So. 2d 238 (Fla. Dist. Ct. App. 1982) ............................................................ 20

*Navelski v. Int'l Paper Co.*,
244 F. Supp. 3d 1275 (N.D. Fla. 2017) ........................................................ *passim*

*Navelski v. Int'l Paper Co.*,
261 F. Supp. 3d 1212 (N.D. Fla. 2017) .................................................................. 21

*Pilgrim v. Crescent Lake Mobile Colony, Inc.*,
582 So. 2d 649 (Fla. 2d DCA 1991) ...................................................................... 20

*Powers v. Gov't Emps. Ins. Co.*,
192 F.R.D. 313 (S.D. Fla. 1998) ........................................................................... 18

*Prado-Steiman v. Bush*,
221 F.3d 1266 (11th Cir. 2000) ............................................................................ 14

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
226 F.R.D. 456 (S.D.N.Y. 2005) .......................................................................... 16

*Quick v. Shell Oil Co. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.)*,
241 F.R.D. 435 (S.D.N.Y. 2007) .......................................................................... 16

*Rensel v. Centra Tech. Inc.*,
2 F.4th 1359 (11th Cir. 2021) ........................................................................... 3, 24

*Robinson v. United States*,
327 F. App'x 816 (11th Cir. 2007) ........................................................................ 19

*Roper v. Consurve, Inc.*,
578 F.2d 1106 (5th Cir. 1978) ............................................................................... 18

*Rosen v. J.M. Auto, Inc.*,
270 F.R.D. 675 (S.D. Fla. 2009) ................................................................. 15-16, 20

*Sacred Heart Health Sys. v. Humana Mil. Healthcare Servs.*,
601 F.3d 1159 (11th Cir. 2010) ............................................................................ 22

*Sharf v. Fin. Asset Resolution, L.L.C.*,
295 F.R.D. 664 (S.D. Fla. 2014) ........................................................................... 15

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .......................................................................... 15

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .......................................................................... 12, 13, 23

*Watson v. Shell Oil Co.*,
   979 F.2d 1014 (5th Cir. 1992) .......................................................................... 25

**Rules**

Fed. R. Civ. P. 23……………………………………………………………………..*ibid.*

**Statutes**

Fla. Stat. § 95.11 .......................................................................... 18

Fla. Stat. § 320.015 .......................................................................... 19

Fla. Stat. § 723.012 .......................................................................... 3

**Treatises**

Manual for Comp. Litig. (4th ed. 2004) .......................................................................... 21

## I.    INTRODUCTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Michael Noel, Kathleen Wiksten, and Claire Ladouceur ("Plaintiffs") seek certification of this Class: "All persons who leased a lot in the Heritage Plantation mobile home park since October 6, 2003."[23]

Defendants MHC Operating Limited Partnership, MHC Heritage Plantation, LLC, (collectively, "MHC"), MHC Property Management, L.P., MHC Property Management GP, L.L.C., and Equity Lifestyle Properties, Inc. ("ELS") (together, "Defendants"), the owners and operators of Heritage Plantation Mobile Home Park (the "Park") in Vero Beach, Florida since at least 2003,[4] owe duties pursuant to statute, contract and at common law to provide essential services in the Park, such as paved streets, sewer lines, water lines, and an adequate stormwater drainage system. Plaintiffs and the Class members own mobile homes and lease lots from Defendants in the Park where their mobile homes sit.

Plaintiffs allege that Defendants have breached their duties to the Class by, among other things, failing to have an adequate stormwater drainage system to serve the Park.  The current antiquated system creates severe flooding throughout the Park during ordinary rainfall. The flooding and constant wet ground in the Park significantly affect both common areas and personal property. Despite their knowledge, Defendants have failed to adequately replace or repair the stormwater drainage system to prevent flooding. These facts raise questions common to all Plaintiffs and Class members, *i.e.* whether Defendants failed to adequately maintain and repair the stormwater drainage system and whether the inadequacies and disrepair of the stormwater drainage system are the cause of the flooding in the Park, making this case ideal for class treatment.

---

[2] Today, Plaintiffs filed an Amended Class Action Complaint ("Am. Compl.") [DE 49], adding, among other Defendants, MHC Operating Limited Partnership, a Park owner since October 6, 2003.

[3] Excluded from the Class are Defendants and any of their affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all persons who make a timely election to be excluded from the Class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members. Also excluded from the Class are persons who had or have an ownership interest in either Defendant entity or own stock in Defendant ELS (NYSE: ELS).

[4] *See* Am. Compl., ¶¶ 13-16; Form 10-K of Equity Lifestyle Properties, Inc. for the year ended December 31, 2021 ("Form 10-K"), at S-8, attached as Ex. A to Declaration of Lynn Ellenberger ("Ellenberger Decl."), attached as Ex. 1 hereto.

1

First, Plaintiffs satisfy Fed. R. Civ. P. 23(a). The Class includes persons who have leased 437 lots in the Park over 19 years, satisfying numerosity. Moreover, the overarching common questions are whether Defendants breached their duties to provide an adequate stormwater drainage system in the Park and whether those breaches have resulted in the endemic flooding in the Park. Plaintiffs are typical of the Class members as they lease lots in the Park on which their mobile homes sit, experienced flooding, and were damaged. Finally, Plaintiffs and their counsel are adequate, and have no interests antagonistic to the Class members.

Next, Plaintiffs satisfy Rule 23(b)(3) with respect to the questions of liability and injunctive relief requiring repairs, because their claims are brought under a single state's law (Florida) and the evidence that will be used to prove the breaches will be from Defendants' own records and expert testimony. Thus, for liability and injunctive relief, common questions of law and fact predominate. Further, Plaintiffs satisfy Rule 23(b)(3) and (c)(4) with respect to their claims for relocation costs, refunds of rents paid that were supposed to be used to maintain and repair the stormwater system, diminution in value and replacement costs, and loss of use, because the evidence to be used at trial is common to the Class. And, for their individual damages claims for repairs to their mobile homes, Plaintiffs request that the Court bifurcate this proceedings, such that the individual damages claims will proceed after liability is established on a class-wide basis.

A class action is manageable and superior and the only realistic method for litigating and deciding these issues. The alternative is hundreds of individual actions using the same evidence to demonstrate that Defendants breached their duties. Many of the Class members do not have the resources to individually litigate against a public company like ELS.

Plaintiffs alternatively request that the Court certify the questions of liability and injunctive relief pursuant to Rule 23(b)(2), because Defendants have refused to provide sufficient repairs to the stormwater drainage system to prevent further flooding, affecting the Class as a whole.

The Class is readily ascertainable because the definition is based on objective criteria, *i.e.*, current and former lessees of lots in the Park, who will be identifiable from Defendants' records. Accordingly, Plaintiffs respectfully request that the Court certify the Class.

## II. PROFFER OF FACTS IN SUPPORT OF CLASS CERTIFICATION[5]

### A. Plaintiffs' liability claims will be tried using evidence common to the Class.

### 1. Defendants have defined their duties to maintain the Park's infrastructure in the Heritage Plantation Prospectus, which is common to all Class members.

Defendants "are a fully integrated owner of lifestyle-oriented properties ("Properties") consisting of property operations and home sales and rental operations primarily within manufactured home ("MH")…communities…." Ellenberger Decl., Ex. A (Form 10-K) at 1. Defendants own the land which they "lease to customers who own manufactured homes," generally on an annual basis. Form 10-K, at 1, F-18. Defendants' "business model is characterized by low maintenance costs and low customer turnover costs." Form 10-K, at 1. One of Defendants' MH Properties is Heritage Plantation. Form 10-K, at 28. Located in Vero Beach, Florida, Heritage Plantation is comprised of 64 acres and 437 sites (as of 12/31/21), of which 90.4% are leased. Form 10-K, at 28. *Cf.* Compl., ¶ 98 (436 lots); Answer, ¶ 98 (admits).

A mobile home park owner is required to provide a prospectus to every lot lessee. By statute, Fla. Stat. § 723.012, the prospectus must include a description of the mobile home park property, the common facilities, the arrangements for management, maintenance and operation of the park property, the provision of utility and other services, and the manner in which rents and other charges will be raised.  Compl., ¶ 26; Answer, ¶ 26 (admits). The prospectus also identifies the lot and rent to be paid. Compl., ¶ 26; Answer, ¶ 26 (admits).[6]

The Heritage Plantation prospectus ("Prospectus") is dated August 26, 1999, as amended November 8, 2002.[7] Each lot lessee is required to sign a document reflecting that they accepted the Prospectus. *See* Compl., ¶¶ 28, 30; Answer, ¶¶ 28, 30 (admits). *See also* Noel Decl., Ex. A, at

---

[5] Plaintiffs' fact proffer is based on their investigation without the benefit of conducting any formal discovery. Ellenberger Decl., ¶¶ 6-10.  *Rensel v. Centra Tech. Inc.*, 2 F.4th 1359, 1365 (11th Cir. 2021) (finding denial of certification was an abuse of discretion where plaintiffs did not have an opportunity "to conduct some discovery before moving for class certification.")

[6] *See also* Form 10-K, at 6 ("In Florida, … the MH community owner must deliver to the prospective resident a prospectus….")

[7] *See* Compl., ¶¶ 28, 30, Exs. A, B to Compl. (Prospectus); Answer, ¶¶ 28, 30 (admits attachments are the Park's Prospectus). *See also* Ex. A to Declaration of Michael Noel ("Noel Decl."), Ex. 5; and Ex. A to Declaration of Kathy Wiksten ("Wiksten Decl."), Ex. 6.

1; Wiksten Decl., Ex. A, at 1.[8]

The Prospectus states that the management, operation, and maintenance of the Park is the responsibility of the Park Manager. Prospectus, § V. The Prospectus makes clear that paved streets, sewer lines, and water lines are a few of the enumerated facilities and permanent improvements of the Park. Prospectus, § IV.C; Compl., ¶ 37; Answer, ¶ 37 (admits). The Prospectus specifies that the storm drainage system is the responsibility of the Park's owner, but the homeowners pay for the maintenance of this system as a portion of their rent on a pro rata basis:

> Storm drainage is provided by street drains draining to culverts and then into the lake. Two (2) pumps also divert stormwater by pumping into a canal at the north side of the community. There is no other storm drainage system available. The storm drainage system, as provided, is the responsibility of the Park. The cost of storm drainage is allocated to the individual lots on a pro rata basis and included in the base rent portion of the monthly lot rental amount. The pro rata share will be determined by dividing the number of mobile home spaces leased by a manufactured home owner by the total number of leased mobile home spaces in the Park.

Prospectus, § VII.E; Compl., ¶ 38; Answer, ¶ 38 (admits). The Prospectus also states that the Park owner may be required to construct permanent improvements in the Park to benefit the Park's homeowners. Prospectus, § IV.F.3; Compl., ¶ 39; Answer, ¶ 39 (admits).

### 2. Defendants have failed to maintain or fix the Park's stormwater drainage system, resulting in flooding during rainfall.

Since at least October 2003, when the MHC Defendants acquired ownership of the Park, the Park has been plagued by drainage and flooding issues following average rainfalls. Compl., ¶

---

[8] The following Plaintiff and Class member declarations are attached hereto: Michael Noel ("Noel Decl."), Ex. 5; Kathy Wiksten ("Wiksten Decl."), Ex. 6; Claire Ladouceur ("Ladouceur Decl."), Ex. 7; Laura Mauser ("Mauser Decl."), Ex. 8; Phylicia Aronowitz-Bedoya ("Aronowitz-Bedoya Decl."), Ex. 9; Kathleen Paris ("Paris Decl."), Ex. 10; Dennis Miller ("Miller Decl."), Ex. 11; Robert Fluckiger ("Fluckiger Decl."), Ex. 12; Edward Turkasz ("Turkasz Decl."), Ex. 13; Robert Woods ("Woods Decl."), Ex. 14; Dominick Praino ("Praino Decl."), Ex. 15; Patricia Weiler ("Weiler Decl."), Ex. 16; Stanley Paxton ("Paxton Decl."), Ex. 17; Sally Moore ("Moore Decl."), Ex. 18; CarolAnn Palmes ("Palmes Decl."), Ex. 19; Richard Lockard ("Lockard Decl."), Ex. 20; Mark Decker ("Decker Decl."), Ex. 21; Nina Clay ("Clay Decl."), Ex. 22; Ann Keenan ("Keenan Decl."), Ex. 23; Kathleen Hill ("Hill Decl."), Ex. 24; Donna Downey ("Downey Decl."), Ex. 25; Deborah Harris ("Harris Decl."), Ex. 26; Wayne Frost ("Frost Decl."), Ex. 27; Carol Streib ("C. Streib Decl."), Ex. 28; Thomas Streib ("T. Streib Decl."), Ex. 29; Michael Young ("Young Decl."), Ex. 30; and Helen Ritter ("Ritter Decl."), Ex. 31. Pursuant to Local Rule 5.3(b)(2), and CM/ECF Administrative Procedures, Section 6, Redaction of Personal Information, any redactions in the exhibits to the declarations are limited to personal identifying information.

4, 41. *See, e.g.,* Ladouceur Decl., ¶¶ 5-6; Paxton Decl., ¶¶ 4, 6; Ritter Decl., ¶ 2. Plaintiffs allege that the Park's stormwater drainage system is comprised of an underground stormwater system of original and antiquated pipes.  Compl., ¶ 4, 6, 42. Because of the age and condition of the pipes, sinkholes have developed throughout the Park, where pipes have collapsed. *Id.*, ¶ 42. *See, e.g.,* Noel Decl., ¶ 16; Fluckiger Decl., ¶ 12; Hill Decl., ¶ 6; Harris Decl., ¶ 10; T. Streib Decl., ¶ 19; Young Decl., ¶ 7. One sinkhole was outside of the back gate, which is an alternate way for residents to access the Park when the main gate is flooded. Because it took Defendants over a year to fix it, residents did not have an alternate route in or out of the Park to avoid flood waters that year. Hill Decl., ¶ 6.

Plaintiffs allege that the joints in the pipes are compromised, causing stormwater to leak into the ground and vice versa. Because the ground is constantly soaked, it cannot absorb the water during ordinary precipitation events. Compl., ¶ 43, 44.  *See, e.g.,* Fluckiger Decl., ¶ 10; Paxton Decl., ¶ 9; Priano Decl., ¶ 5.  Collapsing pipes have damaged the streets, Fluckiger Decl., ¶¶ 15 & Ex D; Noel Decl., ¶ 17, and flooding has damaged home foundations, floors, and walls. Compl., ¶ 44. *See, e,g,* Fluckiger Decl., ¶ 9; Palmes Decl., ¶¶ 8, 10; Paris Decl., ¶¶ 8-10; Paxton Decl., ¶ 11; Mauser Decl., ¶¶ 10-11 & Ex A.

While fact and expert discovery will reveal the extent of the system's disrepair, several government authorities have documented the faulty design and disrepair of the stormwater drainage system. For example, in response to a 2005 complaint from a Park resident to the Florida Department of Health ("FDOH") regarding the roads and drainage system, the FDOH noted then (16 years ago) that the drainage system was 30 years old and of an obsolete design:

> It is acknowledged that the roads were initially built in or about 1975.  The design of the drainage is based upon storm drains located in the center portion of the roads. Over the years the roads have developed depressions and low areas where stormwater puddles and does not reach the drains.

Compl., ¶ 56. *See* Ellenberger Decl., Ex. B. Defendants did not fix the issues identified by FDOH.

On June 26, 2017, the Code Enforcement Board of Indian River County (the "Code Enforcement Board") found that MHC was illegally discharging stormwater into the county's sewer system, due to cracks and lack of maintenance in the Park's stormwater drainage system. Ellenberger Decl., Ex. C (6/26/17 Order, Case No. 2017010135).  The Code Enforcement Board ordered remediation measures for MHC:

> Smoke test the entire park to identify all areas of potential infiltration; seal all items under that smoke; TV all lines from the manhole to the main trunk lines; repair any

cracks, breaks or other areas of potential infiltration; repair and/or upgrade all manholes; repair cleanouts; ensure that all manhole connections are tight so as to prevent infiltration; smoke test the entire system after work has been completed to assure that all issues have been addressed; TV any trunk lines that are six inches or larger; and provide the Indian River County Department of Utility Services with the final reports, certifying that no potential areas of infiltration are identified.

*Id.* The Order directed MHC to remediate the violation on or before September 22, 2017, or face fines of $100 per day for non-compliance. *Id.* After at least four extensions of the compliance deadline, on March 26, 2018, the Board held a hearing to determine compliance, but MHC failed to appear. Ellenberger Decl., Exs. D-G. The Code Enforcement Board found that "the required corrective action has not been taken as ordered and that there does in fact exist illegal discharge into the county sewer system…." *Id.*, Ex. H (3/26/18 Order, Case No. 2017010135). The Code Enforcement Board imposed a fine of $100 for each day the violation continues. *Id.* The Order was recorded as a lien on the Heritage Plantation property. *Id.* As of April 21, 2022, the fine is $146,700 and increases by $100 per day. *Id.*, Ex. I.

In 2020, the Park's on-site manager admitted in an email that Defendants "are stumped" on how to deal with the "heavy rains" because particular roads are "pitched" towards other roads, "which makes draining that area quickly nearly impossible during heavy rainstorms." Noel Decl., ¶ 21. This admission comes amidst multiple emails from ELS to all Park residents before or after rain, notifying them that, *e.g.,* "[w]ater levels are dropping but Heritage Blvd., Congress and some of the side street[s] are still too deep in most areas to drive through," Aronowitz-Bedoya Decl., Ex. C (9/12/17); "[w]e're expecting rain storms with potential for flooding," so the Park will open additional exit gates, *id.*, Ex. D (5/25/20); "We're expecting heavy rain bands throughout Saturday and Sunday that can cause street flooding in our community," so "[p]lease stay off the roads unless absolutely necessary," *id.*, Ex. E (7/31/20); "if we have heavy rainfall, our streets will flood until the storm drains can discharge," *id.*, Ex. F (7/31/20).

As a result of the inadequate stormwater drainage system, severe flooding of the Park has been the norm following ordinary rainfalls under Defendants' ownership. *See* Ladouceur Decl., ¶¶ 5-6. The severe flooding is described throughout the Class member declarations, including that the flooding reaches "well over three feet in depth," "water will sit at two to three feet," "water levels can reach two feet" but is "extreme" during hurricanes or tropical storms, the flooding is "significant," "large flooding events," "extensive flooding," and "never-ending flooding." *See, e.g.,* Paris Decl., ¶ 6; Paxton Decl., ¶ 5; Weiler Decl., ¶ 11; Aronowitz-Bedoya Decl., ¶ 6; Downey

6

Decl., ¶ 4; Harris Decl., ¶¶ 4-5. One resident lamented, "I have lived in Florida for roughly forty years and have never seen or dealt with this kind of flooding, not even after hurricane Andrew in 1992, until moving to Heritage Plantation." Harris Decl., ¶ 4. The flooding is also depicted in numerous photos taken by the Class members through 2021. *See, e.g.,* Ladouceur Decl., ¶¶ 6-10; Noel Decl., ¶ 10; Fluckiger Decl., ¶¶ 13-14, Exs. B-C; Turkasz Decl., ¶ 8 & Ex A; Weiler Decl., ¶ 5; Harris Decl., ¶ 8 & Ex. A; Young Decl., ¶ 4 & Ex. A.

During times when the Park is flooded, residents have kayaked and driven hydrofoils in the Park's flood waters. Ladouceur Decl., ¶ 16. There have also been times when residents have to be transported to and from their homes in a truck with high ground clearance, or must stay home, because ordinary cars were not able to navigate through the flood waters. *See id.*, ¶ 12; *see also* Paxton Decl., ¶ 5; Wood Decl., ¶ 4; Aronowitz-Bedoya Decl., ¶ 8; Palmes Decl., ¶ 4. Because of flooding, there have also been times when emergency vehicles had to go around to the back due to the undriveable waters at the front entrance. *See* Paxton Decl., ¶ 8. One Class member explains: "The fear of a heavy downpour is always on my mind. I still work outside of my home and when it begins to rain all I can think is, 'Will I be able to get home?'" Harris Decl., ¶ 6.

The constant wet ground has damaged countless mobile homes. Many of the Class members report floors in their homes that have "soft spots." Hill Decl., ¶ 8; Downey Decl., ¶ 5; C. Streib Decl., ¶¶ 6-9; T. Streib Decl., ¶¶ 9-11. Others have had to replace the floors because of the flooding and moisture, costing thousands of dollars. *See, e.g.,* Wiksten Decl., ¶ 9; Noel Decl., ¶ 18; Fluckiger Decl., ¶ 5; Paris Decl., ¶ 13; Paxton Decl., ¶ 10; Wood Decl., ¶ 5; Aronowitz-Bedoya Decl., ¶ 9; Palmes Decl., ¶ 11; Praino Decl., ¶ 10; Miller Decl., ¶ 8; C. Streib Decl., ¶¶ 6, 9. Some Class members cannot afford such repairs. *See, e.g.,* Ladouceur Decl., ¶ 20; Paris Decl., ¶ 12; Mauser Decl., ¶ 9.

The flooding and moisture have also infiltrated Class members' air conditioning units and ductwork. *See, e.g.,* Fluckiger Decl., ¶ 6; Palmes Decl., ¶ 11; T. Streib Decl., ¶ 13. In addition, the constant moisture allows mold and mildew to grow in the homes. *See, e.g.,* Wiksten Decl., ¶ 10; Ladouceur Decl., ¶ 21; Fluckiger Decl., ¶ 7-8 & Ex. A; Turkasz Decl, ¶ 5; Palmes Decl., ¶ 11; Praino Decl., ¶ 10; Miller Decl., ¶ 7. This presents health risks for residents. *See, e.g.,* Wiksten Decl., ¶ 9; Palmes Decl., ¶ 11; Aronowitz-Bedoya Decl., ¶ 9. After the flood waters recede, there is a slippery, slimy muck left behind on the roads, walkways, and in common areas that has caused countless residents to slip and fall. *See, e.g.,* Wiksten Decl., ¶ 17; Noel Decl., ¶ 15; Weiler Decl.,

7

¶¶ 4, 6-10; Paxton Decl., ¶¶ 12-13; Palmes Decl., ¶ 14; Priano Decl., ¶ 6; Hill Decl., ¶ 7.

The Park's homeowners have complained to Defendants, as well as their agents and representatives, about the flooding and attendant moisture for years.  Compl., ¶¶ 4, 23, 56, 57, 60, 62, 83, 197; Wiksten Decl., ¶ 12; Ladouceur Decl., ¶ 19; Fluckiger Decl., ¶ 13; Turkasz Decl., ¶ 7; Praino Decl., ¶ 11; Miller Decl., ¶ 10; T. Streib Decl., ¶¶ 16-17; Young Decl., ¶ 8. Although she had already complained at least 30 times to the Park manager, in January 2021, Plaintiff Kathleen Wiksten notified ELS's corporate office of the homeowners' concerns regarding the flooding issues. Compl., ¶ 60; Wiksten Decl., ¶ 12. And, on May 25, 2021, the homeowner's association sent ELS's representative a letter, complaining of issues that "are still not resolved," including "flooded streets and now collapsing storm drains," and street sweeping "to keep the slime" from the flooding at bay. Compl, ¶ 62, Ex. C; Wiksten Decl., ¶ 15 & Ex. B. Notwithstanding, the flooding and resulting problems persist to the present.

> **3.  Robert J. Ross, P.E. opines that the analysis of the condition, maintenance and repair of the Park's stormwater drainage system will be based on information common to the Class.**

Robert J. Ross, P.E. is a professional civil engineer licensed by the State of Florida with over 27 years' experience in water resources engineering, hydraulics and hydrology, surface water modeling, ground water modeling, drainage design, flood control, stormwater master planning studies, and stormwater management plan review. *See* Declaration of Robert J. Ross, P.E. ("Ross Decl."), ¶¶ 1-2, attached as Ex. 2.

In preparation for class certification, Mr. Ross was asked for a preliminary opinion, as to: (a) whether an assessment of the flooding and drainage issues at Heritage Plantation could be conducted on a centralized, or class-wide, basis, or whether the assessment is dependent on individual issues unique to each Class member; (b) if class-wide, what work he would need to undertake to render an expert opinion as to the causes of the flooding at the Park, including whether Defendants have adequately provided and maintained the Park's master storm water system and whether the Park's master storm water system functions appropriately to handle ordinary rain events; and (c) whether, based on his preliminary assessment, the failure to design and construct an adequate master storm water system, or maintain and update the master storm water system, is the cause of the flooding problems at the Park. Ross Decl., ¶ 11. Mr. Ross's opinion is based on his experience as a civil engineer who specializes in water resources, a review of publicly available documents, a preliminary site inspection, and evidence of flooding. Ross Decl., ¶¶ 13-14 & Ex. B.

Mr. Ross explained that "an assessment of the flooding and drainage issues at Heritage Plantation would necessarily be conducted on a centralized, or class-wide, basis. [His] assessment is not dependent on individual issues of the residents of the Park nor on any documents or information unique to any particular resident…." *Id.,* ¶ 12.a. This is because Mr. Ross's expert analysis pertains to the Park's master storm water system that serves the entire Park.  *Id.,* ¶ 28.

Mr. Ross explained that the analysis and testing of the water infrastructure at the Park will necessarily involve information that will be provided during the discovery process as well as testing that will be conducted during the merits phase of the litigation. *Id.,* ¶ 1. He explained that, first, he will review any existing plans (as built) for the Park's existing storm water system and any modifications thereto. *Id.,* ¶ 17. If the plans are not available, a professional land surveyor would need to create a topographic survey of the Park. *Id.,* ¶ 18. Mr. Ross would next oversee a televised inspection of certain pipes in the park to analyze infiltration into the system from the water table. *Id.,* ¶ 19.

His firm would also conduct a hydraulic and hydrologic drainage analysis to look at the flood stages from when the Park was built as compared to the later improvements to assess how it functions during storm events. *Id.,* ¶ 21. The discharges for such study would be simulated and verified based on the allowable discharge criteria from the local authorities, including St. John's River Water Management District. *Id.,* ¶ 22. Water sampling of such discharges would be conducted. *Id.,* ¶¶ 23-24. Based upon all of the above analyses, Mr. Ross would be able to identify the causes of the flooding in the Park, as well as develop a comprehensive engineering design to repair the Park's storm water management system. *Id.,* ¶ 25. Because the contemplated work involves the Park's master drainage system that serves the entire Park, it is class-wide and not individual to any class member. *Id.,* ¶ 28.

### 4.  Plaintiffs' experiences are typical.

Each of the Plaintiffs has leased lots from Defendants in Heritage Park and owns a mobile home which sits on their lot, like all other Class members.[9] Each of the Plaintiffs is subject to the

---

[9] *See* Form 10-K, at 1, F-18. *See also, e.g.,* Noel Decl., ¶¶ 2-3; Wiksten Decl., ¶¶ 2-3; Ladouceur Decl., ¶¶ 2-3; Fluckiger Decl., ¶¶ 2-3; Turkasz Decl, ¶ 5; Paris Decl., ¶¶ 2-3; Woods Decl., ¶¶ 2-3; Aronowitz-Bedoya Decl., ¶¶ 2-5; Lockard Decl., ¶¶ 2-3; Moore Decl., ¶¶ 2-3; Palmes Decl., ¶¶ 2-3; Priano Decl., ¶¶ 2-3; Mauser Decl., ¶¶ 2-3; Miller Decl., ¶¶ 2-3; Hill Decl., ¶¶ 2-3; Downey Decl., ¶¶ 2-3; Harris Decl., ¶¶ 2-3; Frost Decl., ¶¶ 2-3, C. Streib Decl., ¶¶ 2; T. Streib Decl., ¶¶ 2-3; Young Decl., ¶¶ 2-3; and Ritter Decl., ¶¶ 2-3.

Prospectus, just like all Class members.[10] Each of the Plaintiffs pays rent to Defendants, just like every other Class member.[11]

The three Plaintiffs and over twenty Class members have submitted declarations describing their experiences with the flooding in the Park and providing numerous photos of the flooding. *See* note 8, *supra*. Their experiences are consistent with each other and with the experiences of dozens of Class members who submitted questionnaires to Plaintiffs' counsel as well. Ellenberger Decl., ¶¶ 2-4. To demonstrate that the flooding was not limited to a particular portion of the Park, and that all Class members are affected, attached as Ex. J to the Ellenberger Decl. is a map which depicts the Park, and the home locations of the Plaintiffs, declarants, and a sampling of 33 Class members who submitted questionnaires. This graphic, and the supporting declarations, demonstrate that the experiences of Plaintiffs from the flooding in the Park are typical of the Class members throughout the Park.

### 5. Defendants' course of conduct reflects that these liability issues are conducive to handling on a class-wide basis.

Defendants attempted to procure a class-wide release through an Agreement submitted to the Park's homeowners' association. *See generally* Declaration of Dianne McNeill ("McNeill Decl."), attached as Ex. 4. Defendants' attempt to secure a class-wide release through a simple vote reflects that the class mechanism is appropriate – albeit with Court oversight and the proper protections for Class members in place.

Because neither the Agreement nor the process to procure the vote contained disclosures about this lawsuit or the opportunity for Class members to exclude themselves from the release, Plaintiffs filed an Expedited Motion to Limit Communications with Putative Class Members and Issue Corrective Notice. [DE 27]. On April 20, 2022, the Court entered an Order granting Plaintiffs' motion in part and held that Park residents "have a right to know about the pendency of this litigation before deciding whether to waive any of their legal rights under it." Order, at 5 [DE

---

[10] *See* Compl., ¶¶ 28, 30, Exs. A, B to Compl. (Prospectus); Answer, ¶¶ 28, 30 (admits*). See also, e.g.,* Noel Decl., ¶ 4; Wiksten Decl., ¶ 4.

[11] *See* Compl., ¶ 26; Answer, ¶ 26 (admits). *See also, e.g.,* Noel Decl., ¶¶ 2-3; Wiksten Decl., ¶¶ 2-3; Ladouceur Decl., ¶¶ 3-4; Fluckiger Decl., ¶¶ 2-3; Turkasz Decl, ¶ 5; Paris Decl., ¶¶ 2-3; Woods Decl., ¶¶ 2-3; Aronowitz-Bedoya Decl., ¶¶ 2-5; Lockard Decl., ¶¶ 2-3; Moore Decl., ¶¶ 2-3; Palmes Decl., ¶¶ 2-3; Priano Decl., ¶¶ 2-3; Mauser Decl., ¶¶ 2-3; Miller Decl., ¶¶ 2-3; Hill Decl., ¶¶ 2-3; Downey Decl., ¶¶ 2-3; Harris Decl., ¶¶ 2-3; Frost Decl., ¶¶ 2-3, C. Streib Decl., ¶¶ 2-3; C. Streib Decl., ¶¶ 2; T. Streib Decl., ¶¶ 2-3; Young Decl., ¶¶ 2-3; and Ritter Decl., ¶¶ 2-3.

37]. The Court explained that it was "concerned by any attempt to coerce a favorable settlement for Defendants by withholding relevant information from putative class members, to the extent such an attempt was made here." Order, at 6. The Court ordered Defendants to "ensure that potential class members are aware of the pendency of this litigation prior to any vote on Defendants' settlement proposal," and held that it "will decline to give legal effect to any waivers made before such notice was given." Order, at 5-7. On April 20, 2022, after being given notice of the pendency of this lawsuit at the meeting, the Park residents rejected Defendants' settlement proposal. Ellenberger Decl., Ex. L.

### B. Damages can be calculated on a classwide basis.

Jeffrey Rothbart, J.D., LLM, is a real estate appraisal expert with over 19 years of real estate experience. *See* Expert Report of Jeffrey Rothbart, J.D., LLM., ("Rothbart Rpt."), ¶ 1, attached as Ex. 32. Mr. Rothbart opines that class-wide damages can be calculated for residents of a mobile home park where promised infrastructure or services were not provided by the mobile home park's owners or operators. *Id.,* ¶¶ 12-13. He explained that he can calculate damages on a classwide basis in several areas based on his experience, including: (a) damages resulting from constructive eviction, where class-wide damages would include the costs to relocate the Class members' mobile homes out of the Park, *id.*, § D.1; (b) damages resulting from the failure of the Defendants to use the rents collected from the Class members to maintain or repair the stormwater drainage system, where the classwide damages would include a refund of some or all of the rents paid, *id.*, § D.2; (c) damages for diminution in value to the Class members' mobile homes or replacement costs to replace the homes, *id.*, § D.3; and (d) damages for loss of use as a result of ingress and egress to the Park and/or the Class members' lots being impacted by lack of drainage after storms, *id.*, § D.4.

### C. Class members' claims for repair costs to their homes can be bifurcated and are administratively feasible.

Robert Hyte is the Director of Operations for Settlement Services, Inc. ("SSI"), a Florida-based company with over 30 years' experience in all phases of class action administration, including claims programs. Declaration of Robert Hyte Regarding Feasibility of Class-Wide Notice and Manageability of Program for Individual Damage Claims ("Hyte Decl."), ¶¶ 1, 6, 7, attached as Ex. 3. Mr. Hyte opines that a notice program to Class members comprised of current and former lessees of the 436 lots in the Park is feasible. First, notice would be provided via mail, email, and text to Class members, all of whom can be identified through Defendants' books and

11

records. *Id.*, ¶ 12. Mr. Hyte opines that this "is a reliable, easy and efficient process and allows individual notice to be provided to a substantial percentage of a Class." *Id.*

Mr. Hyte also opines that administration of a program permitting the Class members to submit claims for individual property damages resulting from flooding is manageable. *Id.*, ¶ 28. Class members would have the opportunity to submit claims for damages to SSI (or a settlement administrator chosen by the Court), through mail, email, or online. *Id.*, ¶ 23. If timely and complete, SSI would complete a preliminary analysis to determine if the supporting documentation substantiated out-of-pocket costs to the homes or other repairs caused by or related to flooding, or whether any estimates of work not yet performed are substantiated. *Id.*, ¶¶ 24, 28.

SSI would provide weekly reports to the Court and the parties as to the claims received, if any deficiencies exist, or any other relevant information. *Id.*, ¶ 26. If a claim is deficient, SSI would follow up via email and phone to secure adequate documentation. *Id.*, ¶ 25. After the conclusion of the notice period, SSI would provide the Court and the parties with a final spreadsheet and proposed damages as initially substantiated by SSI. *Id.*, ¶ 27. This process could be undertaken within a few weeks after the claims period. *Id.*, ¶ 28. SSI would then submit these preliminary recommendations to this Court at which point Defendants could contest some or all of the claim submissions after which SSI would conduct follow-up as needed. *Id.*, ¶ 30. SSI has used this process in other cases. *Id.*, ¶ 29 (citing cases). SSI's role is to ensure that the process is manageable for the parties and the Court, so that the Court can adjudicate the individual damages claims. *Id.,* ¶¶ 31. Such a claims process is "manageable" and "efficient." *Id.,* ¶ 32.

### III.   ARGUMENT

A class action must satisfy each of the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. In addition, the proposed class action must fall into one of the three categories enumerated in Rule 23(b). *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). It is Plaintiffs' burden to "affirmatively demonstrate" compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

Plaintiffs seek certification of their liability, class damages, and injunctive relief claims under either (i) Rule 23(b)(3), which adds two additional prerequisites: predominance and superiority, or (ii) Rule 23(c)(4), which provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Alternatively, Plaintiffs seek certification of their liability and injunctive relief claims only under Rule 23(b)(2), pursuant to

which a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2).

### A. Plaintiffs satisfy the requirements of Rule 23(a).

### 1. The Class is sufficiently numerous such that joinder is impracticable.

Numerosity under Rule 23(a)(1) requires proof that the putative class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). "While there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (internal quotation marks omitted). Defendants' own documents reflect that there are 437 mobile home lots in the Park. Ex. A to Ellenberger Decl., p.28. Moreover, as reflected in the Ross Declaration and the map of affected areas (Ex. J to the Ellenberger Decl.), all areas of the Park are affected by the inadequate storm drainage system, as are common areas (including ingress and egress), thereby affecting all residents. These numbers easily satisfy numerosity. *See Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1305 (N.D. Fla. 2017) (numerosity satisfied where the "class consists of more than 300 property owners in the subject neighborhoods" where flooding occurred).

### 2. Plaintiffs and the Class Members share common factual and legal issues.

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class," but "does not require that all the questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557. Rather, commonality requires "that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 788 (11th Cir. 2014) (citation omitted). The inquiry further requires "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551.

The analysis in *Navelski* is instructive. There, the class was comprised of 160 homes in several Florida subdivisions that were two miles downstream from the defendant paper mill. During a heavy rainstorm, a dam on the defendant's property collapsed, causing flooding – or more severe flooding – of class members' homes. *Navelski*, 244 F. Supp. 3d 1275. Finding that plaintiffs satisfied Rule 23(a)(2), the court explained:

> In this case, Plaintiffs have alleged questions of fact for which there are common
> answers pertaining to Defendant's maintenance or abandonment of the Kingsfield

13

> Road Dam and to whether the flooding of homes in Plaintiffs' neighborhoods was caused or made more severe by the failure of the Dam. Plaintiffs have also presented questions of law, for which there are common answers, regarding whether Defendant is liable, under four separate legal theories, for its alleged course of conduct with respect to the Dam and for the alleged consequences therefrom. These are issues that underlie every claim and they are common not only to the representative plaintiffs, but also to the rest of the class.

*Id.* at 1305-1306. As in *Navelski,* the overarching and common liability questions in this case include whether Defendants failed to adequately maintain and repair the stormwater drainage system, and whether the inadequacies and disrepair of the system were the cause of the flooding in the Park. These common questions alone satisfy Rule 23(a)(2).

### 3. Like each Class member, Plaintiffs leased lots in the Park so their claims are typical of the Proposed Class as a whole.

To satisfy the typicality requirement of Rule 23(a)(3), the class representatives' claims or defenses must be typical of the claims or defenses of the class. This inquiry focuses on the relationship between the interests of the representative parties and the interests of the class as a whole. *See Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322-23 (11th Cir. 2008). This is established by a showing that the claims of the class and its representatives arise from the same events, practice, or conduct and are based on the same legal theories. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). This does not mean that the claims of the class representatives and those of the class must be identical. *Id.* Once the class representatives demonstrate that the same unlawful conduct affected both them and the rest of the class, factual variations among the individual claims generally will not defeat typicality. *Id.*

*Navelski* is instructive here as well. The paper mill defendant argued that the plaintiffs were not typical of class members because each home suffered varying levels of flooding and were damaged to varying degrees. Rejecting these arguments, the court explained:

> The claims of the class representatives in this case are typical since they are based on the same legal theories—negligence, trespass, nuisance, and strict liability—and arise from the same event, practice, or course of conduct—the collapse of the Kingsfield Road Dam as a result of Defendant's alleged failure to properly maintain or abandon it—that give rise to the claims of the other class members. The fact that individual homes within the proposed class area did not all flood at the exact same time does not, as Defendant argues, render Plaintiffs' claims atypical. All individual homes within the proposed class area are alleged to have experienced stigma

14

damages and/or flooding that was either caused or made more severe by the Dam's failure, regardless of the time it occurred.

*Navelski*, 244 F. Supp. 3d at 1306. The court also held that variations in damages do not defeat typicality. *Id.* (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)) ("Differences in the amount of damages between the class representative and other class members does not affect typicality.") Typicality was satisfied where assessing liability did not require highly individualized determinations. *Id.* .

Here, each of the Plaintiffs and Class members owns a mobile home and leases a lot from Defendants in Heritage Plantation. Each has experienced, either in the common areas or on their lots (or both), the flooding arising from Defendants' course of conduct, *i.e.* the failure to maintain and repair the stormwater drainage system in the Park. Whether each of them incurred out-of-pocket costs for repairs or diminution in value does not render them atypical. As owners in the flood-affected Park, Plaintiffs are members of the Class, and their claims are typical of the Class's claims.

### 4. Plaintiffs and their counsel have demonstrated the commitment and competency required to prosecute the class claims.

Adequacy of representation under Rule 23(a)(4) "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). The "purpose of the adequacy requirement is to protect the legal rights of the unnamed class members." *Sharf v. Fin. Asset Resolution, L.L.C.*, 295 F.R.D. 664, 670 (S.D. Fla. 2014) (citation omitted). Plaintiffs have no interests that are antagonistic to or conflict with the interests of unnamed class members. Rather, Plaintiffs share an interest with the other Class members in requiring Defendants to fix or replace the stormwater drainage system, as well as recovering from Defendants for the losses they have suffered due to Defendants' actions. Plaintiffs' counsel are experienced and committed to vigorously prosecuting this class action to obtain injunctive relief and damages for Plaintiffs and the Class. Plaintiffs will fairly and adequately protect the interests of the Class, satisfying Rule 23(a)(4).

### B. Rule 23(b)(3)'s predominance and superiority requirements are satisfied.

Parties seeking class certification must also satisfy one of the subsections of Rule 23(b). *Rosen v. J.M. Auto, Inc.*, 270 F.R.D. 675, 678 (S.D. Fla. 2009). Here, certification is appropriate under Rule 23(b)(3), because "(1) 'questions of law or fact common to the members of the class

15

predominate over any questions affecting only individuals members,' and [] (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

### 1. Common questions of fact predominate where Defendants' course of conduct is the single source of harm.

For predominance, "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004). *See also Rosen*, 270 F.R.D. at 681 ("Issues that are subject to generalized proof and applicable to the whole class must predominate over the issues involving individualized proof.") (citing *Wehunt v. Ledbetter*, 875 F.2d 1558, 1558 (11th Cir. 1989). "[T]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003).

In cases where defendants' conduct causes damage to property, there is a "demonstrated cohesiveness of the class due to shared experience that is confined in time and place and produces similar effects" supporting class certification. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 477 (S.D.N.Y. 2005). As one court explained when certifying subclasses involving damages to class members' property resulting from a chemical spill, "Courts have repeatedly drawn distinctions between proposed classes involving a single incident or *single source of harm* and proposed classes involving multiple sources of harm occurring over time. The former warrant certification, while the latter do not." *Quick v. Shell Oil Co.* (*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*), 241 F.R.D. 435, 447 (S.D.N.Y. 2007) (citation omitted) (emphasis supplied). Courts have certified classes claims arising out of a single course of conduct or single source of harm, which results in property damage from flooding. *See, e.g., Navelski*, 244 F. Supp. 3d at 1308-09 (certifying classes of homeowners whose properties were damaged by flooding after defendant's dam failed during a storm); *Arndt v. P & M, Ltd., 83*7 N.E.2d 398 (Ohio Ct. App. 2005) (certifying class of mobile park homeowners for injunctive relief where the park owner failed to fix the stormwater drainage system to stop flooding from nearby river).[12]

---

[12] *See also Chi. Prop. Interests, L.L.C. v. Broussard*, 90 So. 3d 563 (La. Ct. App. 2012) (certifying class where flooding arose from the same set of operative facts and related to all class members: the shutting off of drainage pumps in Jefferson Parish during the hurricane); *Boudreaux v. Dep't of Transp. & Dev., 69*0 So. 2d 114 (La. Ct. App. 1997) (certifying class of homeowners where

*Arndt* is factually analogous to this lawsuit.  There, a class action for injunctive relief was filed on behalf of residents of a mobile home park which contained 233 lots. *Id.* at 44. The park was bisected by a creek, which created a flood plain. Plaintiffs alleged repeated flooding of the creek over 12 years, and sought injunctive relief against the park's owner/operator to comply with relevant codes, keep the premises in a fit and habitable condition, and to maintain all storm sewer and water systems. *Id.* at 400-01 (internal quotations and citations omitted).

After defining the *Arndt* defendants' statutory duties, the court found the case suitable for class treatment as to the injunctive relief claim, explaining:

> In the present case, there was evidence that common areas of the park, including roads and recreational areas, were affected by the flooding of Mahoning Creek. There was also evidence that flood events created public health issues that would be the concern of all park residents, such as seepage, mosquitoes, and sewage overflow. Since all residents of P & M Estates have an interest in the maintenance of common areas, as well as the fit and habitable condition of the general premises, the class of all current residents of P & M Estates has standing to seek injunctive relief.

*Arndt*, 837 N.E.2d at 403-404. The court rejected defendant's arguments that a class could not be certified because only some class members' homes were damaged, given that defendant had the duty to maintain the water systems. *Id.*

Just as the duties of the defendant in *Arndt* were defined by statute, so too are Defendants' duties here.[13] Moreover, as to Plaintiffs' breach of contract claim, all Class members are governed by the same Prospectus which defines Defendants' duty to maintain and repair the stormwater system. Prospectus, § VII.E; Compl., ¶ 38; Answer, ¶ 38 (admits). Also as in *Arndt,* the evidence here reflects that common areas of the Park, including roads and recreational areas, were affected by the flooding after rain. Similarly, the evidence reflects that flood events created public health issues that would be the concern of all Class members, such as seepage, sewage overflow, mold, sinkholes and slime. Accordingly, as in *Arndt*, Plaintiffs' injunctive relief claims are suitable for class treatment either in conjunction with Plaintiffs' damages claims under Rule 23(b)(3) or under (b)(2). *See* Section III.C, *infra.*

The *Navelski* court's analysis of predominance on the question of liability is also

---

design and construction of bridge over a river acted as a dam and caused flooding).

[13] Compl., ¶ 1, 26; Answer, ¶ 1 (admits that the Florida Mobile Home Act imposes obligations on the park owner), 26 (admits).

17

instructive. As discussed *supra,* the *Navelski* plaintiffs alleged claims for negligence, nuisance, trespass, and strict liability based on their contention that defendant did not maintain a dam properly, which led to its failure during the storm, causing harm to the neighborhood and plaintiffs' homes. *Navelski*, 244 F. Supp. 3d at 1284. Finding that common questions predominated, the court explained: "Thus, the core factual and legal issues with respect to liability in this case—whether or not Defendant's conduct caused the Dam to fail, whether or not the Dam's failure caused flooding in the subject neighborhood, and, if so, to what extent Defendant should be held liable— are resolvable by proof that is common to all class members." *Id.* at 1309. Because "[e]very class member's claims depend on common evidence that will resolve these same liability issues, and proof of one plaintiff's claims necessarily will be proof of the others," the court held that plaintiffs satisfied Rule 23(b)(3) as to their liability case (but bifurcated damages for individual trials). *Id.*

Similar to *Navelski,* Plaintiffs have demonstrated that the core factual and legal issues with respect to liability—whether or not Defendants' conduct caused (and continues to cause) the stormwater drainage system to fail or be inadequate, whether or not the inadequacy of the stormwater drainage system causes flooding in the Park, and, if so, the extent of Defendants' liability—are resolvable by proof that is common to all Class members. *See generally* Ross Decl.

**2.   Common questions of law predominate since a single state's law applies.**

Plaintiffs assert claims for breach of contract, breach of the covenant of quiet enjoyment, negligence, private nuisance, trespass, and constructive eviction under Florida law. "[C]ertification of a class comprised of members from a single state cures and/or significantly limits problems associated with variances in state laws," supporting predominance. *Powers v. Gov't Emps. Ins. Co.*, 192 F.R.D. 313, 320 (S.D. Fla. 1998).[14]

Moreover, the question of whether the Class's claims are limited to the defined statute of limitations or are tolled is a common question. While the statute of limitations for Plaintiffs' claims are four or five years,[15] the question of whether the continuing violation doctrine applies is a

---

[14] *See also Arnold v. State Farm Fire & Cas. Co., CIV. ACT. NO. 2:17-cv-00148-TFM-C, 20*20 U.S. Dist. LEXIS 219533, at *32, 2020 WL 6879271 (S.D. Ala. Nov. 23, 2020) ("this case 'is peculiarly manageable' because resolution of this litigation only involves the analysis of the laws of a single state, standard-form contract language, and the uniform conduct of a single insurer"); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1115 (5th Cir. 1978) (finding class action superior means of adjudicating class who all "live[d] in one state" and whose addresses were in defendant's file).

[15] *See* Am., Compl., ¶ 102.

common one. "Under the continuing violation doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period." *Nat'l Parks & Conserv. Ass'n v. TVA, 50*2 F.3d 1316, 1322 (11th Cir. 2007). In other words, the doctrine "permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007). "When the violation alleged involves a continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases." *Robinson*, 327 F. App'x at 818.

Here, Plaintiffs allege that flooding has plagued the Park since at least 2003 when the MHC entities acquired the Park, and has not yet ceased. Plaintiffs' and the Class members' declarations show long-standing and ongoing flooding, resulting property damage, personal injury, and numerous complaints to Defendants. Because Defendants had a continuing duty to remediate the issues and failed to do so, the continuing violation doctrine should apply.[16] At this juncture, the Court need not decide whether the doctrine applies, but only whether the question of a continuing violation is a common one. Given that the question of Defendants' knowledge of the flooding and breach of their duties is a common one, the continuing nature of these breaches should also be a common one.

### 3. In addition to common liability questions, there are common damages questions that the jury could address.

Plaintiffs bring claims for various categories of damages that are capable of resolution on a class-wide basis, including relocation costs, refund for rental payments, diminution in value and/or replacement cost, and loss of use. *See* Rothbart Rpt. As to relocation costs, such damages can be determined for all Park residents based in publicly available data. Rothbart Rtp., ¶¶ 25-43. As to over paid rents, the Prospectus specifies that a portion of the rent will be used for maintenance of the storm drainage system. Prospectus, § VII.E. Whether or to what extent Defendants paid for appropriate maintenance and repair of the system will be subject to discovery; if they did not, class-wide damages based on the amount of rents improperly collected can be mechanically calculated based on Defendants' books and records and decided by the jury on a

---

[16] *See, e.g., Kaymakcian v. Bd. of Mgrs of the Charles House Condo.*, 49 A.D.3d 407 (N.Y. App. 1st Dep't 2008) (applying the continuing wrong doctrine where there were recurring leaks and defendants "had a continuing duty to repair the building's limited common elements").

19

class-wide basis. *See* Form 10-K, at F-18. No information unique to any particular Class member is necessary for this straightforward damages calculation. *See* Rothbart Rpt., ¶¶ 44-50.

Third, many courts consider class wide diminution of value damages to be a common issue supporting certification.[17] Florida law classifies mobile homes as personal property when the homeowner does not own the land on which the home sits. Fla. Stat. § 320.015. Florida courts recognize that "the cost of the repairs made plus the diminution in value will ordinarily be the proper measure of damages" for damage to personal property. *McHale v. Farm Bureau Mut. Ins. Co.*, 409 So. 2d 238, 239 (Fla. Dist. Ct. App. 1982). *See also* Fla. Std. Jury Instr. (Civ.) 501.2h.[18] Defendants promote the sale of these mobile homes on the Heritage Plantation website and, thus, have records relevant to the calculation of such damages. *See* Ex. M to Ellenberger Decl. Accordingly, Plaintiffs' damages' claims for diminution in value are suitable for class treatment. *See* Rothbart Rpt., ¶¶ 51-66. Finally, loss of use is also a common issue, capable of determination for all Park residents by using the Defendants documents and available weather data to determine loss of use, and then multiplying that by reasonable rents. *See* Rothbart Rpt., ¶¶ 67-78.

> **4. Even if this Court determines only liability questions are subject to class-wide evidence, an issues class may be certified under Rule 23(c)(4).**

The need for individualized damages determinations does not prevent a finding that common issues predominate. *Allapattah Servs.*, 333 F.3d at 1261. *See also Klay*, 382 F.3d at 1259 (same). Instead, the Court must determine "whether the individual issues involved in calculating

---

[17] *See Rosen*, 270 F.R.D. at 682 (certifying claims upon finding, "the determination of diminution of value caused by the same alleged defect in the same year and model of car is a common issue, not an individual that defeats predominance"); *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 1994 WL 808074, at *5 (S.D. Fla. June 8, 1994) (certifying class of tenants when common issues included "whether allegedly deteriorated conditions in the common areas and the common systems within the individual units caused diminution of rental value for units within the project"). *See also Sutton v. Hoffmann La. Roche*, Nos. A-5545-18T3, A-5546-18T3, A-5548-18T3, A-5549-18T3, 2020 WL 2745404 (N.J. Super. Ct. May 27, 2020) (N.J. App. May 27, 2020) (affirming class certification for diminution in value to homes from chemical contamination, stating the trial court "accepted plaintiffs' argument that they intend to provide expert evidence proving an overall class-wide percentage of property value diminution attributable to the contamination during merits discovery").

[18] *See also Pilgrim v. Crescent Lake Mobile Colony, Inc.*, 582 So. 2d 649, 651 (Fla. 2d DCA 1991) (reversing judgment for defendant, where in assessing alleged diminution in value of a mobile home community, the jury considered testimony as to lack of services and a site visit where they observed deterioration and thus "had competent substantial evidence before it of such deterioration and diminution.").

20

damages so overwhelm the common issues related to liability that predominance is destroyed." *Navelski*, 244 F. Supp. 3d at 1309. As in *Navelski*, the fact that individual out of pocket cost questions may exist does not overwhelm the central questions of liability:

> Because in this case, every aspect of liability can be resolved on a classwide basis, it would be neither efficient nor fair to anyone, including Defendant, to hold over 300 trials to hear the same evidence and decide the same liability issues. The Court is thus satisfied that common issues of law and fact as to causation and liability predominate over the issues requiring individualized proof, and the need to bifurcate and allow individual trials as to damages does not preclude certification of a class for these common issues.

> The remaining damages questions, such as personal property losses, would not be addressed during the class trial. Any individual damages issues here pale in comparison to the volume of common issues discussed above related to [defendant's] liability for the flooding and resulting stigma damages.

*Navelski*, 244 F. Supp. 3d at 1309.[19] Denying defendant's motion for reconsideration of the class certification decision and explaining how the liability and damages phases would be bifurcated, the court explained that "[t]he subsequent juries' sole task will be to determine the amount of damage attributable to the flood waters in each plaintiff's home. This damages inquiry is legally and factually independent of causation, which focuses on how the flood waters came to be in Plaintiffs' homes in the first place." *Navelski v. Int'l Paper Co.*, 261 F. Supp. 3d 1212, 1219 (N.D. Fla. 2017).

Trial courts have great discretion to conduct and manage litigation in an efficient and equitable manner. *See* Manual for Comp. Litig., at Introduction, § 10.13 (4th ed. 2005). Rule 23 "allows district courts to devise imaginative solutions to problems created by… [determining] individual damages issues." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). *See also In re Scientific Atl. Inc., Sec. Litig.,* 571 F. Supp. 2d 1315, 1343 (N.D. Ga. 2007) (certifying class upon finding, "even if the Court ultimately concludes that aggregate damages models are not sufficiently reliable for use in this case, the Court is convinced that other viable alternatives exist to address any individual damages issues that may arise"). Accepted methods of assessing the individual damages of class members include:

> (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages

---

[19] *See also In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014) (fashioning a class remedy to award class members damages in a manner requiring "buyer-specific hearings" would not "run[] afoul of" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)).

proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Id.* (citations omitted).[20]

Here, in the event the Court is hesitant to certify a (b)(3) class despite the abundant predominant common issues, Plaintiffs propose certification of a Rule 23(c)(4) class as to the issues of Defendants' liability. Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). This is the very approach urged by the authoritative Manual for Complex Litigation, specifically: "An issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages." Manual for Comp. Litig. § 21.24 (4th ed. 2004). Resolution of the common issues will provide considerable savings, both for the litigants and the Court, since the evidence to be presented for these common issues is identical for all class members. *See Jenkins v. Raymark Indus.*, 782 F.2d 468, 473 (5th Cir. 1986) (finding a trial plan on class issues "is clearly superior to the alternative of repeating, hundreds of times over, the litigation of the state of the art issues with, as that experienced judge says, 'days of the same witnesses, exhibits and issues from trial to trial'"). Pursuant to Plaintiffs' proposal, Defendants' liability may be determined and can be reduced to a verdict, materially advancing the litigation.

### 5. A class action is the most manageable, efficient and superior mechanism for resolving the class members' claims.

Superiority focuses on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys. v. Humana Mil. Healthcare Servs.*, 601 F.3d 1159, 1183–84 (11th Cir. 2010). Here, the advantages of class action litigation are many and clear. Defendants' liability is a common question that would be inefficient and costly to litigate many times over, and which far outweighs the individual issues. The Eleventh Circuit has recognized the significance of this consideration, holding that "the more common issues predominate over individual issues, the more desirable a class action lawsuit will be." *See id.*

---

[20] For example, in *Henley v. FMC Corp.*, 207 F. Supp. 2d 489 (S.D.W. Va. 2002), a class action involving a toxic chemical cloud, the court ordered a two-phase trial. First, the jury would decide liability on a classwide basis. *Id.* at 491. The second phase, "if necessary, would involve the disposition of individual claims of class members," under which "[r]esolution [could] occur either by a series of mini-trials or disposition by a special master or mediator." *Id.* at 491.

This action appears to be the only pending litigation concerning the subject flooding. Because proof during the liability phase will not differ among Class members, it is unlikely that management of the class action will become overwhelming or unreasonably difficult. In this case, the question of Defendants' failure to maintain or repair the stormwater drainage system is a common one. *See* Ross Decl. The litigation costs will be greater than many of the individual homes' values in the neighborhood. Individually, these are cost-prohibitive, negative value cases, and to litigate them individually would be extremely inefficient considering that all the same evidence that bears on the liability issues which impact the Class are the same. Rather than conduct 400+ individual trials on each Class member's claims, the Court can resolve these issues in a single proceeding. In sum, all of the Rule 23(b)(3) factors weigh heavily in favor of finding class treatment superior for determining liability in this case.

### C. Alternatively, Plaintiffs' claims for injunctive relief can be certified under Rule 23(b)(2)

Rule 23(b)(2) allows a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2557 (internal quotation marks omitted). Thus, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* As discussed above, the *Arndt* court certified a class of mobile homeowners against a park for injunctive relief, where the park had allegedly failed to maintain an adequate stormwater drainage system. *Arndt*, 837 N.E.2d at 403-04. The court's decision was based, in part, on "evidence that flood events created public health issues that would be the concern of all park residents, such as seepage, mosquitoes, and sewage overflow." *Id.* The court held that, "[s]ince all residents of P & M Estates have an interest in the maintenance of common areas, as well as the fit and habitable condition of the general premises, the class of all current residents of P & M Estates has standing to seek injunctive relief." *Id.* As in *Arndt,* Plaintiffs have proffered evidence that common areas of the park, including roads and recreational areas, were affected by the flooding after rain, and that flood events created public health issues that would be the concern of all park residents, such as seepage, sewage overflow, mold, sinkholes and slime. Accordingly, Plaintiffs' injunctive relief claims are suitable for class treatment under Fed. R. Civ. P. 23(b)(2).

### D.  The Class is readily ascertainable.

The Eleventh Circuit holds that "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Rensel*, 2 F.4th at 1369 (quoting *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021)) (internal quotations omitted). A class is thus ascertainable if its members are capable of determination by reference to objective, verifiable criteria. *Rensel*, 2 F.4th at 1369. Plaintiffs easily satisfy the ascertainability requirement here, where the Class is objectively comprised of those individuals who leased lots in the affected Park. *See Navelski*, 244 F. Supp. 3d at 1305 (the class is ascertainable where "the proposed class boundaries are defined in objective terms as including only individuals who were homeowners in [certain] subdivisions in Cantonment, Florida as of April 29, 2014"). Here, these individuals are identifiable through the books and records maintained by Defendants.

### E.  Plaintiffs' Counsel are qualified to represent the Class.

Rule 23(g) requires that the Court appoint class counsel upon certification of the class. Factors for the Court to consider include: the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representation of the class. Fed. R. Civ. P. 23(g)(1)(C)(i).

Proposed class counsel are qualified and capable of representing the Class. The lawyers at Fegan Scott LLC and Kopelowitz Ostrow Ferguson Weiselberg Gilbert are well-versed and experienced in class litigation. *See* Ellenberger Decl., Ex. N (Fegan Scott resume), Ex. O (Kopelowitz firm resume). Plaintiffs' counsel has done extensive work to identify and investigate potential claims in the action, including but not limited to researching Florida law, conducting site visits, retaining a civil engineering expert to investigate the stormwater drainage system and causes of flooding, interviewing Class members, and working with the Plaintiffs to understand the facts. Moreover, even though this case is in its early stages, this Court has been able to observe the diligence of Plaintiffs' counsel in working on an expedited basis to ensure that the Class members' claims were protected from a class-wide release without disclosure. Finally, both firms have already committed, and will continue to commit, the resources necessary to represent the Class.

### IV.  PROPOSED TRIAL PLAN

Should the court certify this matter as a class action under Rule 23(b)(3) and (c)(4), Plaintiffs propose the following proceedings:

### A. Phase I: Determination of common issues of liability and damages which can be calculated on a class-wide basis

The parties at trial would be the Plaintiffs, appearing as class representatives on behalf of the Class, and Defendants. This phase of the trial would determine liability, injunctive relief, and class-wide damages relating to relocation costs, refund of rents, diminution in value/replacement cost, and loss of use. The verdict in Phase I would be binding on all Class members and Defendants.

### B. Phase II: Individual prove-ups for certain compensatory damages

Phase II will only take place if the jury finds Defendants liable in whole or in part to the Class in Phase I. *See, e.g.,* Ellenberger Decl., Ex. P (Verdict [DE 226], *Navelski,* No. 3:14-cv-445 (N.D. Fla. Feb. 26, 2018) (initially holding a trial solely on the question whether the defendant "was negligent in its design, maintenance, and/or continued operation of the [] dam structure;" because the jury answered "no," the court did not implement the phase 2 individual damages proceedings)). Phase II would address any individual damages that Class members seek to recover in addition to the class-wide damages mentioned above. For example, Plaintiffs could pursue personal property and other out-of-pocket losses during Phase II. This could be accomplished via a claims process where all class members are given notice of their right to pursue these damages and Class members would be required to alert counsel of their intention to proceed in this manner. There would then be a series of trials depending on the Court's calendar, or with a Special Master. *See, e.g.,* Ellenberger Decl., Ex. Q (Order of Status Conference [DE 279], *Dijkstra v. Carenbauer*, No. 5:11-cv-152 (N.D W. Va. Jan. 14, 2015) (first making a finding of classwide liability, and second providing a mechanism for individual class members to submit claims)).

As an alternative, at the beginning of Phase II, the Court could identify compensatory damages formulas for streamlining determination of individual claims, such as out of pocket costs incurred and estimated repair costs for flood damage. *See, e.g.,* W*atson v. Shell Oil Co.,* 979 F.2d 1014, 1017-18 (5th Cir. 1992) (affirming proposed four phase trial plan, including a phase for common issues of liability, and a phase to resolve individual compensatory damage claims).

### V.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court certify the proposed Class, appoint the Plaintiffs as Class Representatives and their counsel as Class Counsel, direct notice of certification of the Class pursuant to Rule 23, and grant such other and further relief as this Court deems appropriate.

Dated: May 6, 2022

Respectfully submitted,

By: */s/ Robert C. Gilbert*
ROBERT C. GILBERT, FBN 561861
gilbert@kolawyers.com
DANIEL E. TROPIN, FBN 100424
tropin@kolawyers.com
KOPELOWITZ   OSTROW   FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Blvd., Ste. 1100
Coral Gables, FL  33134
Telephone: (305) 384-7269

ELIZABETH A. FEGAN *(pro hac vice)*
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019

LYNN A. ELLENBERGER (*pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
*Attorneys for Plaintiffs and the Proposed Class*

26

## CERTIFICATE OF SERVICE

I, Robert C. Gilbert, an attorney, certify that I caused the foregoing to be filed on May 6, 2022 via CM/ECF which will serve all attorneys of record electronically.

By: */s/ Robert C. Gilbert*
ROBERT C. GILBERT, FBN 561861
gilbert@kolawyers.com
KOPELOWITZ   OSTROW   FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Blvd., Ste. 1100
Coral Gables, FL  33134
Telephone: (305) 384-7269