# EXHIBIT 32

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. PIERCE DIVISION**

| | |
|---|---|
| MICHAEL NOEL, KATHLEEN WIKSTEN, and CLAIRE LADOUCEUR, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MHC HERITAGE PLANTATION, LLC, and EQUITY LIFESTYLE PROPERTIES, INC. f/k/a MANUFACTURED HOME COMMUNITIES, INC.,<br><br>Defendants. | No.: 2:21-cv-14492-DMM |

**EXPERT REPORT OF JEFFREY S. ROTHBART IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Jeffrey S. Rothbart, declare as follows:

**A. Background and Qualifications**

1. I am the Managing Member of Real Estate Expert Witnesses, LLC ("REEW"). I have over 19 years of institutional, commercial and residential real estate experience including, but not limited to, valuation, acquisitions, development, general contracting, equity and debt financing and lending standards, legal document review, asset/portfolio management, capital markets, leasing, dispositions, sustainability, HOA formation and administration, and brokerage.

2. I have a B.A. from Emory University, a J.D. from IIT-Chicago Kent College of Law, an LL.M. in Taxation from Northwestern University, a Certificate in Hotel Real Estate and Asset Management from Cornell University as well as a Certificate in Real Estate Investment and Development from Rice University Jones Graduate School of Business.

3. Over the course of my career, I have participated in over $3 billion worth of commercial and residential real estate transactions, across property types, geography and risk

profile, almost all of which involved matters of title and title insurance. Highlights include, but are not limited to:

a. Participated in over $3,000,000,000 of commercial real estate transactions across property type and geography.

b. Disposed of over $1,750,000,000 in commercial real estate assets.

c. Formed over $200,000,000 in real estate joint ventures.

d. Managed over 11,000,000 SF of commercial real estate assets.

e. Procured over $500,000,000 in equity and debt investments.

f. Negotiated over 200 retail leases totaling more than 2,000,000 SF.

g. Development of over $5 million in residential real estate.

h. Own approximately 100 acres of raw land for development.

4. In addition to the above, for the majority of my career, I also served as de facto General Counsel. In that role as de facto General Counsel, I was charged with many roles and responsibilities, one of which was the review of all property operations and management agreements.

5. I have published over 40 articles and research reports on the commercial real estate markets which were cited in over 100 different real estate publications.

6. I have also consulted, either as an expert witness or on a third-party basis, in over 100 matters. Previous clients include municipalities, public REITs, governmental agencies, universities, religious institutions, insurance companies, creditors to bankruptcy, equity investors, developers, general contractors, property owners, tenants and individual homeowners.

7. Additionally, I am an Adjunct Professor of Law at IIT-Chicago Kent College of Law, a licensed Illinois attorney, a licensed Illinois Real Estate Broker, formerly a LEED-AP for



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

New Construction v2.2 and formerly held NASD/FINRA Series 22 and 63 licenses. I have been a 'market participant' for the PwC Korpacz Real Estate Investor Survey since approximately 2006. I am also a Certified Mediator through the National Association of Certified Mediators.

8. Exhibit A reflects my curriculum vitae and includes a list of all publications authored in the previous 10 years and a list of all other cases in which, during the previous 4 years, I testified as an expert at trial or by deposition.

9. REEW is being compensated at the rate of $650 per hour for my time in this matter. Payment is not contingent on my opinions.

10. Attached as Ex. B is a list of documents I considered in forming my opinions.

**B. Summary of Preliminary Opinions**

11. I was retained by Plaintiffs' counsel in connection with their Motion for Class Certification. I understand that this report is preliminary as discovery is ongoing. I reserve the right to update, revise, or change any information or opinions contained herein once I receive a complete set of information and data.

12. I was asked to opine based on my experience in the real estate industry whether class-wide damages can be calculated for residents of a mobile home park where promised infrastructure or services were not provided by the mobile home park's owners or operators.

13. My preliminary opinion is that class-wide damages can be calculated for residents of a mobile home park where promised infrastructure or services were not provided by the mobile home park's owners or operators.

14. My preliminary opinion, based on my analysis set forth below, is that I can calculate damages on a classwide basis in several areas based on my experience, including:



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

a. Damages resulting from constructive eviction, where class-wide damages would include the costs to relocate the Class members' mobile homes out of the Park;

b. Damages resulting from the failure of the Defendants to use the rents collected from the Class members to maintain or repair the stormwater drainage system, where the classwide damages would include a refund of some or all of the rents paid;

c. Damages for diminution in value to the Class members' mobile homes or replacement costs to replace the homes;

d. Damages for loss of use as a result of ingress and egress to the Park and/or the Class members' lots being impacted by lack of drainage after storms.

15. As described below, these damages can be calculated based on information that should be in Defendants' books and records, publicly available and third-party data, and the analysis of the engineering expert.

**C. Summary Of Facts**

16. The following summary of facts is based on my review of the Complaint, as well as the Motion For Class Certification and accompanying exhibits.

17. Heritage Plantation (the "Property") is an age-55 and older mobile home community located in Vero Beach, Florida, Indian River County, which was established in or around 1985. The Property includes a 436-lot, mobile home park located at 1101 Ranch Road, Vero Beach, Florida 32866.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

18. The Property is currently owned and/or operated by Defendants MHC Operating Limited Partnership, MHC Heritage Plantation, LLC, and Equity Lifestyle Properties, Inc. ("ELS"). ELS is a publicly traded company which trades on the NYSE (NYSE: ELS).

19. Plaintiffs allege that, since approximately October of 2003, the Property has been plagued by drainage and flooding issues following average rainfalls. Plaintiffs allege that the stormwater drainage system is comprised of original and antiquated pipes, or is otherwise a compromised system, and thus the ground has a difficult time absorbing rainwater during ordinary precipitation events.

20. Plaintiffs allege that the result is severe flooding following ordinary rainfall. These allegations are supported by the photographs contained in Paragraphs 46-51 and 74 of the Complaint as well as those in or attached to numerous Class member declarations.

21. Plaintiffs allege that, despite numerous complaints from residents and reports from an on-site property manager, the Defendants have failed to repair the stormwater drainage on site.

22. Plaintiffs allege that the Prospectus specifies that a portion of the rent will be used for maintenance of the storm drainage system. *See* Prospectus, § VII.E.

23. I understand the case is being brought as a class action and the "Class" is defined as "All persons who leased a lot in the Heritage Plantation mobile home park since October 6, 2003."

**D. Class-wide damages can be calculated where Defendants failed to maintain or repair infrastructure in the Park, affecting all Class members.**

24. There are several categories of damages for mobile homeowners, i.e., the Class members, where the mobile home park's owners or operators did not provide promised infrastructure or services.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

**1. Costs to move the Class's mobile homes can be calculated on a class-wide basis.**

25. When services are not provided and/or the lack of services causes damage to mobile homes, a mobile homeowner may be constructively evicted.

26. Constructive eviction is generally defined as a disturbance to the tenant by a landlord (or landlord's agent) that substantially interferes with the tenant's possession of the premises and either renders the premises unfit for the purpose for which the tenant entered into the lease or deprives the tenant of the beneficial enjoyment of the property.

27. Here, constructive eviction may occur where the Property owner and operator fails to provide essential services or allows flooding conditions to exist such that the Property is unfit for living or the flooding deprives the Class members of the beneficial enjoyment of their mobile homes (and the Park's common areas).

28. However, despite constructive eviction, the Class members cannot easily move. The phrase "mobile home" is a misnomer; a mobile home is actually just a pre-manufactured home that an owner purchases and typically places on real estate owned by others.

29. In fact, if the structure is built after 1976 and meets all federal rules for quality, durability, safety, and affordability, it is technically called a "manufactured home." If it was built before 1976, it is technically called a "mobile home." In this report, I use the terms interchangeably but always intend to connote a manufactured home.

30. A mobile home is not on wheels like a recreational vehicle. Rather, it is immobile and, once placed in its location, the homeowner arranges for connection to utilities, and may arrange for the installation of a porch, foundation (or skirting), and interior features. Thus, mobile homeowners cannot just easily (or cheaply) pick up and move their homes when services are not provided.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

31. The costs associated with moving their mobile homes are substantial.

32. There are generally two types of moves: transport-only or a full-service move.

33. A transport-only move will include attaching the move-ready manufactured home to a towing vehicle, moving it to a new location, and unhooking it. The mover would also provide the necessary permits and liability insurance.

34. A full-service move covers all of the above in addition to disconnecting all utilities, skirting and attached structures and then reconnecting them at the new location. Full-service moves include the disconnect, reconnect and transport services.

35. Assuming that the Class members would move their homes within a 60-mile radius of the Park, the size of the mobile homes are relevant to calculating damages.

36. A single wide home generally includes square footage ranging from as little as 600 square feet up to 1,300 square feet. Single wides are typically 18 feet or less in width and 90 feet or less in length. The most common size for a single wide home is 72 feet wide by 15 feet wide, with a total of 1,080 square feet.[1]

37. To move a single-wide mobile home using the full-service moving service and the estimated distance of up to 60 miles will cost about $3,000-$5,000.[2] Because they are smaller in width, a single wide home can be shipped on one semi-trailer.

---

[1] https://realtytimes.com/agentnews/advicefromagents/item/1001800-mobile-homes-single-wide-or-double-wide#:~:text=Because%20they%20are%20smaller%20in,measuring%2026%20by%2056%20feet; https://www.mhvillage.com/resources/buyers/explore/mobile-home-sizes-guide.

[2] https://www.moving.com/tips/moving-mobile-home-expect-pay/



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

38. Double wide homes generally range between 1,000 square feet to 2,300 square feet. A typical double wide home is 20 feet wide and 80 feet or less in length, with the average measuring 26 by 56 feet. [3]

39. To move a double-wide mobile home using the full-service moving service and the same distance of up to 60 miles, the cost will be about $4,000-$10,000. [4] Due to their size, a double wide home needs to be shipped as two separate units and joined on site to create a doublewide home.

40. Based on the homes for sale on the Park's website, it preliminarily appears that the typical mobile homes are either single wide or double wide.[5] I expect that, during discovery, I will have access to the size of the current mobile homes in the Park (as well as on a historical basis from the listings maintained by the Park).

41. Once we know the size of the mobile homes in the community, I can obtain an estimate from movers to move the mobile homes within a 60-mile radius. With this, it is my opinion I can calculate class-wide damages for constructive eviction based on the estimated costs to move the Class's mobile homes within a 60-mile radius.

42. The equation would look as follows where SW is the number of single-wide homes, CSW is the cost to move the single-wide homes, DW is the number of double-wide homes, DSW is the cost to move the double-wide homes,[6] and CED is class-wide constructive eviction damages.

---

[3] https://realtytimes.com/agentnews/advicefromagents/item/1001800-mobile-homes-single-wide-or-double-wide#:~:text=Because%20they%20are%20smaller%20in,measuring%2026%20by%2056%20feet; https://www.mhvillage.com/resources/buyers/explore/mobile-home-sizes-guide.

[4] https://www.moving.com/tips/moving-mobile-home-expect-pay/

[5] https://mymhcommunity.com/Communities/Florida/HeritagePlantation/HomesForSaleOrRent/.

[6] To the extent that there are triple-wide mobile homes, these costs are also calculable.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

CED =sum(SW*CSW,DW*DSW) *or*

(SW*CSW) + (DW*DSW) = CED

43. To the extent that there are additional costs incurred by homeowners in connection with their moves as a result of being constructively evicted, those costs can be proven up by individual homeowners.

**2. Rental overcharges can be calculated on a classwide basis.**

44. The Heritage Plantation Prospectus ("Prospectus") is dated August 26, 1999, as amended November 8, 2002.[7] The Prospectus states that the management, operation, and maintenance of the Park is the responsibility of the Park Manager. Prospectus, § V.

45. As relevant to my opinion, the Prospectus states:

> Storm drainage is provided by street drains draining to culverts and then into the lake. Two (2) pumps also divert stormwater by pumping into a canal at the north side of the community. There is no other storm drainage system available. The storm drainage system, as provided, is the responsibility of the Park. The cost of storm drainage is allocated to the individual lots on a pro rata basis and included in the base rent portion of the monthly lot rental amount. The pro rata share will be determined by dividing the number of mobile home spaces leased by a manufactured home owner by the total number of leased mobile home spaces in the Park.

Prospectus, § VII.E.

46. On a monthly basis, each Class member is required to make a rent payment, a portion of which is allocated to storm drainage.[8]

47. Given (and assuming) the alleged lack of repair and upkeep made to the storm water infrastructure by the Defendants, damages can be calculated on a class-wide basis because the Class should be refunded that portion of the aggregate monthly rental payments which were not

[7] *See* Compl., ¶¶ 28, 30, Exs. A, B to Am. Compl. (Prospectus).

[8] See Compl., Exhibit A – Noel Prospectus, Paragraph VII(E)



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

used for their intended purpose to maintain or repair the infrastructure as set forth in the Prospectus.[9]

48. The information I need to do the calculations will be maintained in Defendants' books and records relating to the collection of rents and the payment of costs (or failure to pay) for the maintenance and repair of the relevant infrastructure.

49. In other words, I will conduct an analysis of the Defendants' budget for the maintenance and repair of the storm water drainage system, the actual expenditures Defendants made (or lack thereof) relating to the storm water drainage system, the engineering analysis of the expenditures that should have been made, and how the rents were actually used by Defendants to determine the aggregate rental amounts by which the Class members overpaid or which should be disgorged.

50. Based on my experience, I expect that all of the information necessary to conduct this analysis will be from Defendants' books and records as well as the independent engineering expert's analysis.

**3. Damages for diminution in value or replacement cost can be calculated using data available on a classwide basis.**

51. When property of any kind is damaged and repaired, the resale value of the property can easily be diminished because of the stigma carried by the repair.

52. Valuation of these damages for mobile homes is more akin to damages to personal property, such as automobiles, rather than real property.

53. Just like an automobile, the resale value of a mobile home will be less than that for a comparable mobile home that has not been damaged. In other words, the damage results in a reduction—or "diminution"—in the resale value of the mobile home.

[9] See Compl., Exhibit A – Noel Prospectus, Paragraph VII(E)



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

54. In addition, as a result of the constant flooding at Heritage Plantation, each of the respective residences has lost value by being located in a park with a reputation of constant flooding, thereby making mobile home sales more difficult and hence less lucrative.

55. It is my opinion that such damages may be conducted via several different valuation techniques including, without limitation, replacement cost analysis.

56. Replacement cost is the amount of money that it would take to rebuild a similar building using current prices for building material and labor. Replacement cost is different from the property's market value, which is the amount of money an arm's length buyer would be willing to pay to acquire the asset in the open market.

57. As noted above, I expect to receive information in discovery regarding the type and number of manufactured homes in the Park (i.e., SW, DW) now and historically. Based on this information, I can source and analyze the amount of money that it would take to rebuild similar buildings using current prices for building material and labor.

58. It is my opinion that I can calculate replacement costs on a class wide basis. The equation would look as follows where SW is the number of single-wide homes, DW is the number of double-wide homes,[10] BL is the cost of building material and labor, and RC is class-wide replacement cost damages.

$$RC=\text{sum}(SW*BL, DW*BL) \textit{ or}$$
$$(SW*BL) + (DW*BL) = RC$$

59. Alternatively, because mobile homes come pre-manufactured and then are placed on real estate, it may be more appropriate to calculate replacement costs based on the average price to purchase manufactured homes on the market.

[10] To the extent that there are triple-wide mobile homes, these costs are also calculable.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

60. The United States Department of Housing and Urban Development conducts a regular survey of the sales prices of manufactured homes that are sold and those intended for sale for residential use. The U.S. Commerce Department's Census Bureau then produces the Manufactured Housing Survey (MHS), which contains data reflecting monthly average sales prices nationwide, and broken down by four regions (Northeast, Midwest, South, and West).[11]

61. In the most recent data (November 2021) from the MHS, the average sales price nationwide for a new manufactured home was $111,900, with the average price of a single-wide at $76,400 and a double-wide at $139,900.[12]

62. The publicly available data from the Census Bureau also breaks down the average sales price of manufactured homes by region, size of home, and month of shipment.

63. For November 2021, the average sales price for single-wide manufactured homes in the South was $77,000, and the average sales price for double-wide manufactured homes in the South was $138,400.[13]

64. Using this publicly-available data, the classwide damages equation for replacement costs would look as follows where SW is the number of single-wide homes, DW is the number of double-wide homes, SASP is the average sales price for single-wide manufactured homes in the South as reported in the MHS, DASP is the average sales price for single-wide manufactured homes in the South as reported in the MHS, and RC is class-wide replacement cost damages.

RC=sum(SW*SASP, DW*DASP) *or*
(SW*SASP) + (DW*DASP) = RC

[11] https://www.census.gov/data/tables/time-series/econ/mhs/latest-data.html

[12] https://www.census.gov/data/tables/time-series/econ/mhs/latest-data.html

[13] https://www.census.gov/data/tables/time-series/econ/mhs/latest-data.html



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

65. Based on my experience, I expect that all of the information necessary to conduct this analysis will be from Defendants' books and records, publicly available data, and/or independent bids for construction.

66. Accordingly, it is my opinion that I can calculate replacement cost damages on a classwide basis.

**4. Damages for loss of use can be calculated using data available on a classwide basis.**

67. As a result of the Defendants' alleged failure to adequately maintain the storm water infrastructure, all of the Class members have lost use of ingress and egress to the Park and/or their lots after storms.

68. Based on my experience, it is my opinion that damages for loss of use of ingress or egress to the Park (and/or to their homes) as a result of flooding events can be calculated on a class-wide basis based on information contained in Defendants' books and records. For example, Plaintiffs allege that the Park manager regular documented in emails before and after storms the loss of ingress or egress, the need to evacuate, and the need to refrain from returning to the Park.

69. Once this information is produced in discovery, I can also compare the information provided to publicly available weather data. For example, the Florida Automated Weather Network measures and stores weather information from over 40 weather stations in Florida.[14] The

[14] http://fawn.ifas.ufl.edu/. Other publicly-available rainfall tracking sources in Florida include, *inter alia*: water management district gauge data, such as the South Florida Water Management District (SFWMD) which operates a database system containing rainfall data by station, site, basin, county, geographic location coordinates, and agency as well as other data features, http://my.sfwmd.gov/dbhydroplsql/show_dbkey_info.main_menu; Next-Generation Radar (NEXRAD), which is a network operated by the National Weather Service (NWS), contains a grid map that shows the spatial distributions of rainfall estimates using mathematical algorithms, and covers Florida, http://www.ncdc.noaa.gov/nexradinv/map.jsp.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

FAWN website provides real-time data and historical data for download. FAWN also provides tools for graphing previous rainfall amounts and mapping weekly and daily totals of rainfall.

70. For example, the below graph was generated on the FAWN website and reflects the rainfall data gathered at the Fort Pierce station (the UF/IFAS Indian River Research and Education Center) in the last seven days:[15]




71. Accordingly, using a combination of information existing in the Defendants' records, together with publicly available weather data and the engineering expert's analysis of overflow, I can calculate the number of days of total or partial loss of use of ingress or egress to the Park (and/or to homes) as a result of flooding events on a classwide basis.

72. Moreover, loss of use damages are generally measured by the reasonable rental value of a substitute property.

73. Again, as noted above, the types of manufactured homes in the Park are knowable through Defendants' books and records. Once this information is produced, I can assess the reasonable rental values for the number of days of loss of use.

---

[15] https://fawn.ifas.ufl.edu/data/graphic.php



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

74. Multiple sources of rental values exist, including but not limited to fair market rental values set by the Department of Housing and Urban Development (HUD) for each county and metro area across the country.[16]

75. Fair Market Rent prices in Sebastian-Vero Beach are very high compared to the national average.[17] This FMR area is more expensive than 90% of other FMR areas. Fair Market Rent for a two-bedroom apartment in Sebastian-Vero Beach is $1,059 per month and a three-bedroom is $1,508.

76. Using this publicly-available data, the classwide damages equation for loss of use would look as follows where SW is the number of single-wide homes, DW is the number of double-wide homes,[18] SRV is the reasonable rental value for single-wide manufactured homes, DRV is the reasonable rental value for double-wide manufactured homes, Days is the number of days for which ingress or egress was affected, and LU is class-wide loss of use damages.

LU=sum(SW*SRV*Days, DW*DRV*Days) *or*

(SW*SRV*Days) + (DW*DRV*Days) = LU

77. Based on my experience, I expect that all of the information necessary to conduct this analysis will be from Defendants' books and records and/or publicly available data.

78. Accordingly, it is my opinion that I can calculate loss of use damages on a classwide basis.

[16] https://www.rentdata.org/articles/what-is-fair-market-rent

[17] As set by HUD, this fair market rent rate applies to Winter Beach, FL, Roseland, FL, Wabasso, FL, Fellsmere, FL, Sebastian, FL, Vero Beach, FL and other cities within the region. https://www.rentdata.org/sebastian-vero-beach-fl-msa/2021.

[18] Depending on the information available from Defendants, I may also convert this equation to bedrooms, e.g., two-bedroom home.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

I affirm that the foregoing is my preliminary opinion based on the information available to me as of today's date.

Dated: May 5, 2022

Jeffrey S. Rothbart



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

# EXHIBIT A



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

# Jeffrey S. Rothbart, Esq., LL.M.



Mobile - (312) 307-1429
jr@realestateexpertwitnesses.com
www.realestateexpertwitnesses.com

Mr. Rothbart has been an expert witness since 2006 and has retained on over 100 matters. Previous clients include, but are not limited to, municipalities, public REITs, Fortune 100 Companies, governmental agencies, universities, insurance companies, creditors to bankruptcy, equity investors, developers, general contractors, property owners, tenants and individual homeowners.

Mr. Rothbart's qualifications include, without limitation:

- Over 19 years of direct commercial and residential real estate experience.
- Licensed Illinois attorney with focus on real estate, tax, bankruptcy and securities law.
- Licensed Illinois real estate broker.
- Adjunct Professor of Law since 2007.
- Participated in over $3,000,000,000 of commercial real estate transactions.
- Direct experience working for publicly traded REIT's, private equity, developers and general contracting.
- Experienced across property type, geography and risk profile.
- Formed over $200,000,000 in real estate joint ventures.
- Managed over 11,000,000 SF of commercial real estate assets.
- Procured over $500,000,000 in equity and debt investments.
- Approved over 200 leases totaling more than 2,000,000 SF.
- Published over 40 articles on commercial real estate investments and markets; cited in over 100 articles.
- Reviewed, commented and critiqued on over 100 MAI Appraisals.

Prior expert experience includes, without limitation, real estate valuation, LLC Operating Agreements, breach of fiduciary duties, breach of representations and warranties, land use, construction damages, standard of care issues, homeowners associations, divorce related issues, brokerage relationships, property tax appeal, eminent domain, landlord/tenant disputes and deceptive leasing practices.

***PROFESSIONAL EXPERIENCE***

---

**STACK REAL ESTATE, LLC** 2013 to Present

**Managing Member**

*A full service real estate firm focused on acquisitions, development, capital markets procurement and consulting.*

- Acquisitions – Acquired over 500 senior living beds, throughout the acuity spectrum.
- Development – Actively developing residential, retail, hotel and industrial sites on nearly 100 acres of owned development land.
- Procured equity and debt capital for institutional quality acquisition and development projects on a nationwide basis.
- Served as an independent manager of real estate related limited liability companies.
- Licensed as a Real Estate Mediatior by the National Assocaiton of Certified Mediators.
- Affilaited entities include, but are not limited to, Real Estate Expert Witnesses, LLC, Real Estate Dispute Mediation, LLC, Real Estate Independent Manager, LLC, Real Estate Appraisal Review, LLC, Berkshire Hathaway Home Services Chicago, Golden Years Advisors, LLC, Birchwood Health Care Partners, LLC, Insignia Homes, LLC, Peer Realty, LLC and Ernst & Young.

**EPN INVESTMENT MANAGEMENT, LLC | EDT RETAIL TRUST, Skokie, IL** 2011 to 2013

*A private investment group focused on retail real estate investments throughout the United States, Europe and Latin America.*

**Vice President, Capital Markets** (8/2011 – 8/2013) | EPN INVESTMENT MANAGEMENT, LLC

Recruited by EPN after its privatization of EDT Retail Trust (see below) to lead the capital markets department which was responsible for equity and debt capital procurement throughout the global platform.

- Spearheaded business development efforts to develop new and further existing equity capital relationships.
- Originated complex capital markets products such as subordinated and mezzanine debt, preferred equity or similar.
- Maintained all of the firm's global relationships with lending institutions (insurance companies, commercial banks and CMBS conduits) and equity investors (pensions, endowments, foundations, sovereign wealth funds, hedge funds and family offices).
- Sourced, negotiated or closed over $500M in crossed collateralized financing for both fixed and floating rate debt.
- Launched EPN's Latin American development and acquisitions platform and evaluated M&A opportunities.
- Advised acquisition team on forecasting and budgeting for prospective investments.
- Served as de-facto general counsel by drafting or negotiating substantially all legal agreements and managing all litigation.

**Vice President, Finance and Asset Management** (1/2011 – 8/2011) | EDT RETAIL TRUST

Oversaw operations of a publicly traded REIT (ASX: EDT) working directly under the CEO. EDT owned 12M square feet of institutional grade real estate located across 20 states with an approximate valuation of $1.43B.

- Spearheaded portfolio and financial management including financial forecasting and budgeting, strategic repositioning, redevelopment, leasing, debt financing and asset-level marketing.
- Managed condemnation process due to road expansion where potential damages exceeded $40 million.
- Prepared financial and investor reporting, including annual reports, quarterly supplemental and Board of Director materials.
- Served as a liaison between the Board Finance, Audit and Investment Committees and third-parties.
- Forecasted REIT and asset level net operating income, expenses and cash flow.
- Worked with DDR Corp. (NYSE: DDR) to streamline reporting to ensure accuracy of property level forecasting and budgeting.
- Reviewed and approved operating and capital expenditure budgets and corporate income statements and balance sheets.
- Performed quarterly, asset valuations across the entire portfolio on an individual asset basis.
- Generated 6.0% annual revenue growth from owned real estate by approving 200 new and renewal retail leases totaling 2M SF with a cumulative first year NOI in excess of $25M.
- Assisted investment banks and advisory consultants in relation to EPN's tender offer and the ultimate disposition of EDT.

**SUPERIOR STREET CAPITAL LLC, Chicago, IL** 2009 to 2011

*A privately-held real estate firm focused on recapitalization and monetization of distressed situations.*

**Managing Director**

Founded a real estate investment firm focused on the acquisition of U.S. commercial real estate through the recapitalization of distressed assets and the monetization of real estate related derivative instruments.

- Implemented tax structuring to mitigate tax consequences to owners of distressed Tenant-in Common syndications through debt restructuring of debt, subordinating investor interest and consolidating management operations.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

**BOULDER NET LEASE FUNDS, LLC | THE BOULDER GROUP, Northbrook, IL** 2003 to 2009

*A private commercial real estate group focused on office and industrial investments throughout the United States.*

**Principal** (2004 - 2009) | BOULDER NET LEASE FUNDS, LLC

Co-founded a real estate private equity company specializing in the acquisition of net leased properties.

- Originated $175 million for two real estate private equity vehicles through discretionary and joint-venture investors.
- Managed all aspects of operations including acquisitions, capital markets, finance, asset management and dispositions.
- Acquired and managed over 1.7M SF of net leased properties nationwide.
- Realized a leveraged, net IRR of 25.5% with an equity multiple of 1.8x.
- Sourced on-balance sheet LIBOR based line of credit with Merrill Lynch Capital.
- Structured sale-leaseback transactions in conformance with FASB and GAAP.
- Served as the primary liaison to legal, accounting, securities, insurance and financial advisors.
- Conducted all due diligence review of property, financial, legal, debt, market and tenant related documentation.
- Underwrote transactions and evaluated IRR, equity multiple and cash-on-cash returns using ARGUS and Excel.
- Managed condemnation process re expansion of a state highway with potential damages exceeding $15M.
- Drafted all investment committee memoranda and implemented all post-Closing, asset business plans.
- Managed all investor relations related functions including investor presentations, financial reporting and cash flow forecasting.
- Negotiated all Private Placement Memorandums and Joint Venture Agreements, Letters of Intent, Purchase and Sale Agreements and Loan Documentation.

**Research Director** (2003 - 2009) | THE BOULDER GROUP

Served as the Research Director for a commercial real estate brokerage firm focused on the net lease sector. All published research was used to generate and affirm the investment strategies implemented by Boulder Net Lease Funds.

- Published over 40 articles on the net lease real estate market which have been cited in over 95 real estate publications including Forbes Magazine, The Korpacz Real Estate Investor Survey published by PriceWaterhouseCoopers, Retail Traffic, Net Lease Forum, Globe Street, Commercial Property News, as well as other national and local real estate publications.
- Prepared and reviewed legal documents including, such as limited liability company operating agreements, assignment agreements, triple net leases, real estate purchase contracts and securitized loan documents.
- Consulted, either as an expert witness or on a third-party basis, for institutional investors, municipalities, corporation and secured and unsecured creditors to a bankruptcy as to the valuation of net leased assets on a nationwide basis.

**Associate Real Estate and Tax Attorney,** Field and Goldberg, LLC, Chicago, IL 2003

**Legal Department Associate**, Related Midwest (f/k/a LR Development Company, LLC), Chicago, IL 2000 to 2002

***INDUSTRY LEADERSHIP***

**Adjunct Professor of Law,** CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL 2007 to Present

**Survey Participant, PWC Korpecz Real Estate Survey** 2006 to Present



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

## *EDUCATION*

**Real Estate Investment and Development Certificate,** RICE BUSINESS, Houston, TX 2021

**Hotel Real Estate Investments and Asset Management Certificate,** CORNELL UNIVERSITY, Ithaca, NY 2020

**Masters of Law in Taxation,** NORTHWESTERN UNIVERSITY, Chicago, IL 2003

**Juris Doctor**, CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL 2002

**Bachelor of Arts in Political Science**, EMORY UNIVERSITY, Atlanta, GA 1999

## *LICENSES & CERTIFICATIONS*

**Certified Mediator,** NATIONAL ASSOCIATION OF CERTIFIED MEDIATORS 2021

Illinois Managing Real Estate Broker Expected 2022

Illinois Real Estate Broker 2015

LEED-AP for New Construction v2.2 2009

NASD Series 22 and 63 License 2004

American Bar Association (State of IL Attorney Registration & Disciplinary Commission) 2002 to Present

## *COMPUTER LITERACY*

Highly proficient in Microsoft Office, ARGUS and YARDI



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

# JEFFREY S. ROTHBART

## PUBLISHED AND CITED ARTICLES

- Net Lease Transaction Volume down 63% in Q4, Globest.com, January 22, 2009
- Net Lease Market Report Q4 2008, Boulder Net Lease Funds, December 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2008
- Net Lease Market Report Q3 2008, Boulder Net Lease Funds, October 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2008
- National Real Estate Investor, Sale Leaseback Quandary, September 1, 2008
- Net Lease Market Report Q2 2008, Boulder Net Lease Funds, June 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2008
- Forbes Magazine, Building Boom, Matthew Swibel, June 2, 2008
- Net Lease Insiders: Take What the Market Gives, Globest.com, April 28, 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2008
- Net Lease Market Report Q1 2008, Boulder Net Lease Funds, March 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2007
- Net Lease Market Report Q4 2007, Boulder Net Lease Funds, December 2007
- Real Estate Forum, Tomorrows Newsmakers, Top 250 Real Estate Executives under 35, August 2007
- Real Estate Forum, New Tools of the Trade, July 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2007
- Net Lease Market Report Q3 2007, Boulder Net Lease Funds, September 2007
- Commercial Property News Website, Net Lease Market Growth Slows, July 10 2007
- Retail Traffic, Traffic Patters May 2007
- Real Estate Forum, Today's Sale Leaseback Transactions Give Sellers More Than Just Cash Back, April 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2007
- Net Lease Market Report Q2 2007, Boulder Net Lease Funds, June 2007
- Real Estate Forum, Net Lease Review: Retail Still Riding High, April 2007
- Commercial Property News , Online Edition, March 3, 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2007
- Net Lease Market Report Q1 2007, Boulder Net Lease Funds, March 2007
- Commercial Property News, February 1, 2007
- Real Estate Forum, Another Wild Ride? January 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2006
- Net Lease Market Report Q4 2006, Boulder Net Lease Funds, December 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2006
- Net Lease Market Report Q3 2006, Boulder Net Lease Funds, September 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2006
- The Net Lease Restaurant Report, Boulder Net Lease Funds, June 2006
- Net Lease Market Report Q2 2006, Boulder Net Lease Funds, June 2006
- The Net Lease Bank Branch Report, Boulder Net Lease Funds, July 2006
- The Net Lease Drug Store Report, Boulder Net Lease Funds, July 2006
- Retail Traffic, April 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2006
- Net Lease Market Report Q1 2006, Boulder Net Lease Funds, March 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2005
- Net Lease Market Report Q4 2005, Boulder Net Lease Funds, December 2005
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2005
- Net Lease Market Report Q3 2005, The Boulder Group, September 2005
- The Sale Leaseback Report, The Boulder Group, August 2005
- Net Lease Forum, July 19, 2005, Vol. 03 No. 10
- The Credit Ratings Report, The Boulder Group, July 2005
- Net Lease Market Report Q2 2005, The Boulder Group, June 2005
- Mortgage and Real Estate Executives Report, May 15, 2005, Volume 38 Number 6
- The Net Lease Restaurant Market Report, The Boulder Group, May 2005
- Drugstores Command Higher Prices, Globest.com, April 20, 2005
- Mortgage and Real Estate Executives Report, April 1, 2005, Volume 38 Number 3
- The Net Lease Drug Store Report, The Boulder Group, April 2005
- Net Lease Market Report Q1 2005, The Boulder Group, March 2005
- The Big Box Net Lease Market Report, The Boulder Group, February 2005
- High Cap Rate Properties Report, The Boulder Group, January 2005

- Net Lease Market Report Q4 2004, The Boulder Group, December 2004
- The Chicago Net Lease Market Report, The Boulder Group, November 2004
- Net Lease Forum, October 19, 2004, Vol. 2 No. 16
- Net Lease Fund Returns Outperform Competitors, The Boulder Group, October 2004.
- Mortgage and Real Estate Executives Report, September 15, 2004, Volume 37 Number 14
- Mortgage and Real Estate Executives Report, September 1, 2004, Volume 37 Number 13
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2004
- Shopping Center Business, September 2004
- Mortgage and Real Estate Executives Report, September 15, 2004, Volume 38 Number 14
- Net Lease Forum, September 7, 2004, Vol. 2 No. 13
- Net Lease Market Report Q3 2004, The Boulder Group, September 2004
- Net Lease Forum, August 3, 2004, Vol. 2; Quarter Sees Jump in Net Lease Asset Market, Globest.com, August 25, 2004
- Mortgage and Real Estate Executives Report, August 1, 2004, Volume 37 Number 11
- The Estate Planning Net Lease Report, The Boulder Group, August 2004
- Mortgage and Real Estate Executives Report, July 15, 2004, Volume 37 Number 10
- Institutional Real Estate Investor, July 2004
- The Big Box Net Lease Market Report, The Boulder Group, July 2004
- Big-Box Net-Lease Properties Harder to Find, Globest.com, June 29, 2004
- More Retail Users Buying Big Boxes, Commercial Property News Website, June 29, 2004
- Net Lease Forum, June 15, 2004
- Net Lease Market Report Q2 2004, The Boulder Group, June 2004
- Mortgage and Real Estate Executives Report, June 1, 2004, Volume 37 Number 7
- Mortgage and Real Estate Executives Report, May 1, 2004, Volume 37 Number 5
- The Net Lease Drug Store Report, The Boulder Group, May 2004
- Mortgage and Real Estate Executives Report, April 1, 2004, Volume 37 Number 3
- The Net Lease Restaurant Report, The Boulder Group, April 2004
- The Chicago Net Lease Market Report, The Boulder Group, March 2004
- Net Lease Market Report Q1 2004, The Boulder Group, March 2004
- Chicago Area Real Estate Investors Association – Gave Presentation on I.R.C. §1031 exchanges, January 2004. I.R.C. §1033 Exchanges, The Boulder Group, February 2004
- Commercial Property News, January 1, 2004
- Retail Traffic, January 2004
- Ground Leases, The Boulder Group, January 2004
- Net Lease Forum, December 18, 2003, Vol. 1 No. 18
- Mortgage and Real Estate Executives Report, December 15, 2003, Volume 36 Number 20
- Net Lease Market Report Q4 2003, The Boulder Group, December 2003
- Retail Traffic, December 2003
- Mortgage and Real Estate Executives Report, December 15, 2003, Volume 36 Number 20
- Triple Net v. Tax?, The Boulder Group, November 2003

EXPERT TESTIMONY

**Morabito v. Jennings and Hall** — Orange County, CA

- Served as an expert witness relating liability of a general partner.

**Bistum Eichstatt K.D.O.R. Finanzkammer et al v Silverman et al** — Dallas, TX

- Served as an expert witness relating to financing documentation

**Arlington Heights Medical Center, LLC v. Arlington Dermatology, S.C.** — Arlington Heights, IL

- Served as an expert witness relating to landlord tenant, leasing dispute

**Hoodbhoy v. The City View Condominium, et al.** — Washington, DC

- Served as an expert witness relating to HOA standards of care

**Michael Greenberg et. al. v. Jim Angelopoulos et. al** — Chicago, IL

- Served as an expert witness on industry standards for the purchase and sale of real estate.

**Target 5, LLLP v Chicago Real Estate Resources, Inc.*** — Chicago, IL

- Served as an expert witness relating to brokerage standard of care issues.

**Richard Rudlaff & Pure Michigan, LLC v. Traverse Bay RV Park Condominium Association** — Acme, MI

- Served as an expert witness relating to damages corresponding to COA restrictive covenants.

**Spector v. Hammer** — Deerfield, IL

- Served as an expert witness on breach of representation and warranty in a Purchase Agreement as well as title and survey matters.

**White House Ventures, LLC v. Alice Phelan Sullivan Corp.** — San Francisco, CA

- Served as an expert witness on valuation due to an incomplete 1031 exchange.

**J.G. Wahlert v. Kovitz Shifrin Nesbit, a Professional Corporation, et. al.** — Mundelein, IL

- Served as an expert witness relating to title and survey and rights of a Property Owners Association

**Centerpointe TIC et. Al v, VEREIT, Inc., EFA Asset Management, LLC, et. al. *** — Los Angeles, CA

- Served as an expert witness relating to standard of care for a retail asset manager in a Tenant In Common program.

**Hunter's Ridge Loan Group, LLC v. US Capital Alliance, LLC, Allan Feker, et. Al.** — Volusia County, FL

- Served as an expert witness relating to foreclosure of land by private lender.

**Munster Steel Co., Inc., v. CPV Partners and Centennial Village, LLC** — Munster, IN

- Served as a litigation consultant relating to breach of contract for a purchase and sale agreement.

**In re Morrow Park*** — Dover, DE

- Served as an expert witness relating to market standards for the three-appraiser rule and corresponding business interference from failure to refinance.

**NNN 400 v. Wells Fargo** — Little Rock, AR

- Served as an expert witness relating to confidentiality and disclosure of information.

**Meribeth Nelson v. City of Kankakee** — Kankakee, IL

- Served as an expert witness on the diminution in value due to premature demolition.

**Meltzer et al v. Rixey, LLC and Hillhouse Group, LLC** — Baltimore, MD

- Served as an expert witness on partnership dispute and market standards for exempt private LLC offerings

**Oak Creek Investment Properties, Inc. v. American Electric Power Services Corporation, KMT Group, Inc., and Clearresult Consulting, Inc.** Texarkana, AR

- Served as an expert witness on breach of contract, negligence and damages to a manufactured housing community.

**Tuan Mahn Dang v. Tiffany Nguyen *** Chicago, IL

- Served as an expert witness on deceptive leasing practices

**Jack Riser, et al v. City of Chicago** Chicago, IL

- Served as an expert witness to opine on the diminution of value of residential homes from the opening of a new runaway at O'Hare International Airport

**OM Capital FM, LLC v. Hotel Capital, LLC** Fort Myers, FL

- Served as an expert witness on a dispute concerning brokerage fees

**The Groves of Palatine Condominium Association v. Groves of Palatine, LLC** Chicago, IL

- Served as an expert witness on the standard of care for real estate developers as it relates to construction defects.

**Crystal Lake Limited Partnership v. Baird & Warner Residential Sales, Inc.** Chicago, IL

- Served as an expert witness in a landlord tenant dispute.

**Mark Carlson, Robb Carlson and Thomas Vana v. Letke & Associates, et al** Chicago, IL

- Served as an expert witness for the Defendant in litigation discussing the standard of care for commercial real estate investment.

**Brian Germain and Rita Germain v. Steven Link and Emily Link*** Winnetka, IL

- Served as an expert witness for the Plaintiff in a breach of representation and warranties in a residential Purchase and Sale Agreement.

**Blackrock Burr Ridge, Inc. v Sterling Bay Companies, LLC et al*** Chicago, IL

- Served as an expert witness for the Plaintiff in litigation relating to the interoperation of the LLC operating Agreements and profit sharing.

* Denotes testimony at trial

**EXHIBIT B**

1. The complaint filed December 21, 2021 (the "Complaint") and the following exhibits thereto:
    a. Exhibit A – Noel Prospectus;
    b. Exhibit B – Wiksten Prospectus;
    c. Exhibit C – May 24 2021 Letter to ELS;
    d. Exhibit D – June 26, 2017 Order;
    e. Exhibit E – March 26, 2018 Order;
    f. Exhibit F – November 22, 2019 Pool Violation; and
    g. Exhibit G – Notice of Violation.
2. Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law (the "Class Certification Motion") and the following exhibits thereto:
    a. Exhibit 1 – Ellenberger Declaration;
    b. Exhibit 2 – Ross Declaration;
    c. Exhibit 3 – Hyte Declaration;
    d. Exhibit 4 – McNeill Declaration;
    e. Exhibit 5 – Noel Declaration;
    f. Exhibit 6 – Wiksten Declaration;
    g. Exhibit 7 – Ladouceur Declaration;
    h. Exhibit 8 – Mauser Declaration;
    i. Exhibit 9 – Aronowitz-Bedoya Declaration;
    j. Exhibit 10 – Paris Declaration;
    k. Exhibit 11 – Miller Declaration;
    l. Exhibit 12 – Fluckiger Declaration;



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e

m. Exhibit 13 – Turkasz Declaration;

n. Exhibit 14 – Woods Declaration;

o. Exhibit 15 – Praino Declaration;

p. Exhibit 16 – Weiler Declaration;

q. Exhibit 17 – Paxton Declaration;

r. Exhibit 18 – Moore Declaration;

s. Exhibit 19 – Palmes Declaration;

t. Exhibit 20 – Lockhard Declaration;

u. Exhibit 21 – Decker Declaration;

v. Exhibit 22 – Clay Declaration; and

w. Exhibit 23 – Keenan Declaration.



Doc ID: e468eaf79dfdfd8860fb495f442d61dea9c34d2e