**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FT. PIERCE DIVISION**

MICHAEL NOEL, KATHLEEN
WIKSTEN, and CLAIRE LADOUCEUR
on behalf of themselves and all others                    CASE NO: 2:21-CV-14492-DMM
similarly situated,

          Plaintiffs,

v.

MHC HERITAGE PLANTATION LLC,
and EQUITY LIFESTYLE PROPERTIES,
INC., f/k/a MANUFACTURED HOME
COMMUNITIES, INC.,

          Defendants.

_____

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION**

Defendants, MHC Heritage Plantation, LLC ("**MHC Heritage**") and Equity Lifestyle Properties, Inc. ("**ELS**"), by and through undersigned counsel, file this Response in Opposition to Plaintiffs' Revised Motion for Class Certification (DE 50), and state:

**Preliminary Statement**

This is not a single-incident mass tort case posing an "all or nothing" liability issue. Plaintiffs complain of periodic, non-uniform events of stormwater "flooding" at Heritage Plantation Mobile Home Park *over the course of decades*, not a specific flood event that either did or did not cause harm to an ascertainable class of persons. The nature, timing, severity and extent of stormwater events differed in the years since 2003 and will always differ. And for both the Park owner and the lessees, the availability and use of precautionary and mitigatory measures has differed and will differ by event, as will the nature, timing, severity, extent and cause(s) of any property or other damage.

Due to typical resident turnover, the "lessees" at the Park would be a dynamic assemblage, having changed significantly over the course of the 20 year class period. The class did not exist at some precise snap-shot in time as in a single-incident case. Climate conditions and weather

events have not been static over that time period. There have been several named storms that hit the east coast of Florida since 2003. And the stormwater drainage system itself has been the focus of various maintenance projects and has aged 20 years during the class period. (Declaration of Rebecca Ruby, at ¶ 21)(DE 61). The same is the case with the mobile homes themselves. On top of that, the homes vary by location within the Park, relative age, physical condition, and maintenance history, with many at or nearing the end of the anticipated life expectancy for a manufactured mobile home.

Plaintiffs and their proposed class of current and former "lessees" are an incohesive group with many divergent and conflicting interests. Based on the claims asserted and relief sought, defining the class by "lessees" will not work. A threshold problem is that not all "lessees" owned a mobile home in the Park. And a lessee's claims may be indivisible from the claims of co-lessees. Often multiple "lessees" simultaneously reside in the same home (Decl. R. Ruby, at ¶ 11), allocating rents and other costs between themselves as they see fit, raising competing claims to rent-related recoveries.

Other conflicts exist between proposed class members. *Former* lessees no longer residing in the Park have no current interest in entry of mandatory injunctive relief compelling improvements or abeyance of rents at the Park. They have no right of quiet enjoyment. They have no claims for continuing trespass or constructive eviction. Former lessees have no interest in recovery of home relocation costs. Former lessees have no continued concern with the level of rent rates or the amount of "pass-on" charges for improvements. By contrast, rent rates and the amounts of pass-on charges for improvements are important issues to *current* lessees.

And if they ever owned a home in the Park, most former lessees have since sold it to another member of the proposed class (which will implicate the nature of the disclosures made by selling class members to purchasing class members concerning alleged stormwater flooding or damage to the respective homes).[1]   It could be a purchasing class member has a claim against a selling class member. And to establish a claim for diminution in the resale value of a home, a former lessee must have sold for a below-market price because of the supposed stigma caused by alleged flooding or past repairs. If that occurred, the purchasing class members were aware and paid *below-*

---

[1]Over the years, some former lessees have simply abandoned their homes. (Decl. R. Ruby at ¶ 14). Others have been evicted via legal proceedings and their homes sold via auction. *Id.*

*market* prices because of the stigma. Financial harm on one side of the transaction means financial benefit on the other side. And if Plaintiffs' allegations are accurate concerning stigma at the Park, the extent of stormwater flooding has been known for decades, even before the 2003 cut-off date for the class. Stigma cannot exist in secret. *Every* subsequent buyer would have appreciated the cause of the stigma and knowingly purchased a home at a discounted rate.

Heritage Plantation is a "55+" mobile home park offering housing at a relatively modest price point in a part of Florida where affordable housing options are diminishing. Until a recent uptick in the market, the average price of a used mobile home in the Park was in the range of $10,000 – $20,000.[2] (Decl. of R. Ruby at ¶ 4). This price point is at the very low end of the price scale for manufactured housing and is due in large part to the advanced age of the homes. They are used, depreciated personal property. The vast majority of home sale transactions in the Park are private "resales" between individuals, who would qualify as putative class members here. (Decl. of R. Ruby at ¶ 12).

Many residents are retirees on fixed incomes. Maintaining affordable rents is important because relocating a mobile home involves costs and is often not possible due to applicable codes. (Declaration of Richard Longbrake, at ¶ 16)(DE 62). Rent rates rise correspondingly with rising park expenses. And the costs of improvements may be "passed on" directly to tenants and homeowners, as Plaintiffs concede. (DE 49 at ¶ 46). It is a balancing act to maintain a desirable yet affordable mobile home community and avoid pricing out homeowners.

Undoubtedly, some of the hundreds of homeowners who own or owned homes in the Park fell short on reasonable home maintenance, while others may have been diligent. Ms. Ladouceur's father installed enhanced "marine board" underflooring in vulnerable areas when he purchased his home in 1984. (Deposition of Claire Ladouceur at p. 11, l. 16 – p. 12, l. 9)(DE 59-1). But now, Ms. Ladouceur admits the vapor barrier underneath the home has been partially compromised during the course of standard plumbing repairs. *Id*. at p. 17, ll. 12-22. That barrier is the mainline protection for preventing moisture intrusion from underneath the house into flooring and walls due to humidity and other sources.   (Decl. of R. Longbrake, at ¶ 11).  Also, homeowners have added

---

[2]Examples gleaned from the Declarations and Questionnaires submitted by Plaintiffs:   Laura Mauser and her husband purchased a used home *in 2021* for $5,000 (DE 63 at Ex. A); John and Nina Clay purchased their home in 2015 for $9,500 *id*.; Ms. Bedoya and her husband own two homes in the Park and paid $5,415 for one of them *id*.; Deborah Harris purchased a home in 2013 for $5,000 *id*.; Wayne and Irene Frost purchased a home in 2012 for $1,000. *Id*.

improvements that may contribute to storm flooding around their homes. Again, Ms. Ladouceur's parents built an attached screened porch on their home that she complains flooded.[3] *Id*. at p. 14, ll. 13-20. It is unknown to Defendants whether the porch was permitted, met building codes, or has proper sloping.

Some residents board-up windows and take other precautionary measures to protect the integrity of their homes in the face of extraordinary storm events such as Hurricane Irma that flooded Indian River County in 2017. Paragraph 54 of the complaint has two imbedded photographs showing the aftermath of Irma in one part of the Park. The boarded-up windows on one home are front and center. The unprotected windows on other homes are also visible. Notably, Ms. Ladouceur's parents suffered damage to windows in her home during Hurricane Frances and Hurricane Jeanne and had to replace them. (Depo. C. Ladouceur at p. 12, l. 23- p. 13, l. 2; p. 13, ll. 11-15). Moisture also intruded into her home via a leaking roof she was forced to repair. *Id*. Suffice it to say the are many means of moisture intrusion into a mobile home in Florida that could cause the property damage described in the complaint.

Certain class members actually caused or contributed to flooding. In the immediate aftermath of Irma, a small group of residents defied park management's explicit instruction and took it upon themselves to unlawfully access the pump house and activate the pump system causing it to malfunction.[4] (Decl. of R. Ruby at ¶ 19). The malfunction caused the pump system to draw water *from* the drainage canal outside the Park via the discharge pipe and pump it back into the Park with sufficient pressure and flow to draw large fish from the ditch, through the system, up and out of the grates, depositing them on some streets. *Id*. Those are the fish Plaintiffs derisively reference in their complaint. (DE 49 at ¶ 83).

Declarant and putative class member Mark Decker is illustrative of the individualized issues here. His declaration is vague, perhaps intentionally so. He has never been a "lessee" in the Park. He lived with his "fiancé" – Leisa Walker – in a home at 550 Plymouth St. that she purchased in 2015. (Decl. of M. Decker at ¶¶ 5-6)(DE 50-21). He was not on the title, never executed a

---

[3]Because the return dates for written discovery served on them have not arrived, Plaintiffs Wiksten and Noel have not been deposed as of the date of this filing.

[4]One of these individuals is John Clay, the husband of Nina Clay. Nina Clay brags in a document attached to her declaration (DE 50-22 at p. 18) that her husband broke the seal to enter the pump house and supposedly repaired the pump (it was not in disrepair).

prospectus, and was not a lessee. (Decl. of R. Ruby at ¶ 24). He complains that home had flood damages prior to being repaired in 2015. (Decl. of M. Decker at ¶ 6).

Yet, in 2018, Ms. Walker sold that home (to another putative class member) and purchased another used home at 832 Concord St. for $10,500 (from yet another putative class member). Mr. Decker moved into that home but, again, he was not on the title, never executed a prospectus, and was not a lessee. (Decl. of R. Ruby at ¶ 24). Ms. Walker died in September 2020 and, apparently, gifted her home to him. In any event, he has since been the only adult occupant of the home and despite repeated requests from management he has yet to apply and execute the prospectus. *Id*. His claims raise individualized issues concerning his status in the Park (now and in the past), notice, estoppel, waiver, acceptance of the risk, and timing/expiration of the limitations period, and this list puts aside individualized issues of causation, comparative negligence and damages.

Declarant Patricia Weiler has lived in the Park since 2012. (DE 50-16 at ¶ 2).  In 2016 she sued ELS for negligence. (Decl. of R. Ruby at ¶ 25). Her claim was dismissed with prejudice in 2017 (pursuant to a settlement agreement). *Id*. She has continued to reside in the Park. In addition to individualized issues of causation and damages, her claims raise individualized issues of accord and satisfaction, *res judicata* and claim-splitting. At least nine other putative class members have filed lawsuits involving the Park since 2015.

The divisiveness between Plaintiffs and the majority of the current lessees is patent. Each Plaintiff is a member of the so-called "HPAC," a minority splinter group of residents often at odds with park management, the homeowner's association, and other residents of the Park. The recent April 20, 2022, membership vote of the homeowner association on a proposal to address and resolve some of the park-wide common issues raised in this case demonstrates the conflict. Approximately 88 members cast votes, 68 in person and 20 via proxy. (Depo. C. Ladouceur, p. 41, ll. 15-23). The majority of the votes (52) including all of the proxy votes were in favor of accepting the proposal, while the minority of the votes (36) were against accepting it. *Id*. The proxy votes were not counted, however, based on a misunderstanding of this Court's April 20, 2022 Order (DE 37). *Id.* Shortly thereafter, the President was removed (in contravention of Florida law) and another Director was harassed by HPAC to the point she resigned her position. *Id.*

### 1.     Heritage Plantation Mobile Home Park

At present, 401 mobile homes are situated in the Park. (Decl. R. Ruby, ¶ 4). Proper maintenance is crucial for mobile homes in Florida, and each homeowner is responsible for

maintenance of the mobile home under the prospectus, not the park owner. (*See* Decl. of R. Longbrake at ¶ 12). The ages of the mobile homes in the community range from used homes as old as ~ 45 years to brand new homes. The respective ages of the mobile homes at Heritage Plantation generally fall into three ranges: (1) approximately 334 homes manufactured at some point during the period from 1978 - 1984; (2) approximately 17 homes manufactured at some point during the period from 2001 - 2015; and (3) approximately 50 homes manufactured after 2015, including some new homes. (Decl. R. Ruby at ¶ 4).

Among other differences, older homes that were situated in the Park decades ago were typically set lower to ground level as was the norm in mobile home parks at the time. Newer homes are typically set higher from ground level than older homes. Effective in 2009, applicable codes were enacted mandating installation of a ground moisture barrier on grade, meaning post-2009 homes have two vapor barriers for enhanced protection.  (Decl. of R. Longbrake at ¶¶ 5-14). Most of the mobile homes have changed ownership over the course of years in private "resale" transactions. Maintenance histories will vary by home (and reconstruction of those histories over 20 years is a daunting prospect for Plaintiffs). Older homes were manufactured differently than newer homes and, for example, have HVAC ductwork running underneath the mobile home, exposed to the elements.  *Id.* at ¶¶ 11-12.

### 2.    Differing Statuses of Park Residents

Residents of the Park will have differing statuses. Not all homeowners are residents. Not all residents are homeowners. And not all residents are even *lessees*.[5]

Some homeowners are full-time residents of the Park, but not all. Approximately 10% of the homeowners can be described as typical "snowbirds" who winter in the Park and return north to their permanent residences in the summer. (Decl. of R. Ruby at ¶ 8). Most of their homes remain vacant during the summer off-season, which is the rainy season in Florida. *Id*. Some these homeowners rent their home on a short-term basis when it is vacant. *Id*.

---

[5]Some residents – like Mark Decker – reside with a homeowner but are not signatories to the governing prospectus or "lessees."   Ms. Ladouceur also held this status for 16 years, living with her mother in the home her parents purchased in 1988. (DE 49 at ¶ 37). She had no ownership interest in the home, was not a "lessee," and was free to leave the Park without breaching any obligations to the park owner.

Some homeowners do not reside in the Park at all. For example, some homeowners add their children or other family members to the title of their mobile homes, making them co-owners. These added co-owners typically do not co-sign the governing prospectus or reside in the Park. (Decl. R. Ruby at ¶ 9). They are not considered "lessees." *Id.* Ms. Wiksten apparently now occupies this status as a non-resident co-owner, having just recently been added to the title of another resident's mobile home. (DE 49 at ¶ 37).

Other homeowners do not reside in the Park because they, in turn, sublease their homes to their own tenants. The terms of the sublease are established between the landlord homeowner and the sublessee, and the park owner is not typically privy to those. The homeowner continues as the lessee under the prospectus with the park owner. Ms. Wiksten is also a past example of a landlord homeowner. She subleased her prior home at 709 Justice St. (usually on a short-term basis) during the majority of the four-year period she owned it, presumably for a profit. (Decl. of R. Ruby at ¶ 9). She sold the home *after* she filed this lawsuit (DE 49 at ¶ 9), meaning Ms. Wiksten's buyer purchased and moved into the Park fully aware.

The owner of the most homes in the Park is Realty Systems Arizona, Inc. ("**RSA**"). (Decl. of R. Ruby at ¶ 10). RSA is a subsidiary of ELS. RSA currently owns and subleases approximately 40 homes in the Park. *Id.* Each of the homes owned by RSA is governed by one of the *same* two park prospectuses that govern the other homes in the Park, including with respect to the allocation of the same *pro rata* share of allowable "pass-on" charges to homeowners. *Id.* Yet, RSA is excluded from the proposed class because of its affiliation with Defendants.

### 3. The Prospectus

As Plaintiffs allege, the prospectus is a disclosure document. (DE 49 at ¶ 32). It is the "contract" upon which Plaintiffs base their breach of contract claim (Count I), although the terms of a so-called "Long Term Agreement" also apply to the landlord/tenant relationship between the Park owner and the homeowners (see below). And the prospectus is specific with respect to the "storm drainage" system provided at the Park. *See id.* at ¶ 46. It discloses (accurately) that drainage is provided by street drains draining to culverts and then into the lake. *Id.* It accurately references two pumps that also divert stormwater by pumping into a drainage canal on the northside of the Park. *Id.* And it is clear: "**There is no other storm drainage system available**." *Id.* (emphasis added).

Maintaining the stormwater drainage system, "**as provided**," is the responsibility of the Park owner. *Id*. But, "[t]he cost of storm drainage is allocated to the individual lots on a pro rata basis and included in the base rent portion of the monthly lot rental amount." *Id*. at ¶¶ 46-47. As far as improvements and repairs, the prospectus specifies that the costs of those too may be charged to homeowners via *pro rata* increases in lot rental amounts. *Id*.; *see also*, DE 49-4 at p. 18; DE 49-5 at p. 14 ("The manufactured home owner may also be required to bear, in the form of increases in the lot rental amount, the cost incurred by the Park owner in installing and constructing capital improvements *and/or performing major or minor repairs or renovations* in the Park.")(emphasis added).  This is part of the balancing act that can create dissension between homeowners.

The set-up and installation of mobile homes falls to respective homeowners. DE 49-4 at p. 17; DE 49-5 at p. 13. So too, homeowners are responsible for "the maintenance and repair of said mobile home, the mobile home lot and all improvements thereon (including landscaping)."  *Id.*

### 4.      The HOA

Forty years ago, the residents of the Park exercised their collective right to form a homeowner's association in compliance with the Florida Mobile Home Act, Chapter 723, *Florida Statutes* (the "**FMHA**"). "Heritage Village Homeowners Association, Inc." (the "**HOA**") was and still is duly incorporated as a Florida corporation. Under FMHA mandate, once formed, the HOA "shall become the representative of all the mobile homeowners in all matters relating to this chapter, regardless of whether the homeowner is a member of the association." § 723.075(1), *Fla. Stat*. *See also*, *Maralago Cay Homeowners Ass'n, Inc. v. MHC Operating Ltd. P'ship, et al*., 2021 WL 6135304, *2 (S.D. Fla. Oct. 5, 2021)(J. Middlebrooks). Thus, the HOA is the designated representative and negotiating party with whom the Park owner is obligated and entitled to interact. The powers of the HOA "include, but are not limited to, the maintenance, management, and operation of the park property."  § 723.079(1), *Fla. Stat.* For their parts, each of the Plaintiffs decided for themselves to join and become Members of the Heritage HOA. As Members of the HOA, Plaintiffs have consented as a matter of law under the FMHA "to be bound by the articles of incorporation, bylaws, and policies of the incorporated homeowners' association." § 723.075(1), *Fla. Stat*.

### 5.      The "Long Term Agreements"

The owner of the Park is required to and has routinely dealt with the HOA concerning rent and maintenance issues. The FMHA requires delivery of a written notice *to homeowners* and the

Directors of the HOA 90 days prior to implementation of an increase in lot rent or other charges. § 723.037, *Fla. Stat.* When the HOA receives a 90-day notice of a rent increase or other charge, the HOA is required to designate a committee of homeowners to review the proposed increases and attempt to negotiate any objections with the park owner *on behalf of all homeowners.* § 723.037(4)(a), *Fla. Stat.* That process has been followed at the Park, and written three-year agreements were reached between the Park owner, the homeowner committee and the HOA on three separate occasions, in 2015, 2018, and again in March 2021. (DE 59-2; DE 59-3; DE 59-4).

Those agreements are referred to as a "Long Term Agreement" ("**LTA**") because they address certain matters for each of the three years following execution of the LTA. The LTAs benefit homeowners and impose obligations on the Park owner, including establishing the maximum respective annual rent increases for each of the three years following execution of the LTA. The HOA and the homeowner committee bargained for those caps on annual rent increases (and other consideration) on behalf of the homeowners. Plaintiffs themselves and all homeowners at the Park accepted and enjoyed the benefits afforded to them under those LTAs, including the capped annual rent increases, as Ms. Ladouceur admits. (Depo. of C. Ladouceur at p.87, ll. 12-23). Each of the executed LTAs include *mutual* releases of existing claims relating to the subject matter of the LTA, including services, maintenance, and alleged violations of the FMHA. *Id.* at ¶ 8.

The release language in each LTA is relevant here to park-wide issues concerning maintenance, including the stormwater drainage system. Moreover, in terms of cohesiveness, many of the class members favor the predictability of the capped annual rent increases established in the LTA and are happy with the annual caps in the current LTA (3.5% for 2021-22 term; 3.75% for 2022-23; 3.95% for 2023-24) considering the current inflationary climate and do not want it disavowed.

<u>**Argument**</u>

"Plaintiffs are required to prove, at the class certification stage, more than just a *prima facie* case, *i.e.*, more than just a 'pretty good case.'" *Sher v. Raytheon Co.*, 419 F.App'x. 887, 890 (11th Cir. 2011). "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Donoff v. Delta Air Lines, Inc.,* No. 18-81258-CV, 2020 WL 3268272, *1 (S.D. Fla. Jan. 24, 2020)(J. Middlebrooks) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349 (2011)). "A party seeking class certification must affirmatively demonstrate compliance with [Federal Rule of Civil Procedure 23][,]" and "[a] district court must

9

conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Donoff,* 2020 WL 3268272 at *1. "Although the trial court should not determine the merits of plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Id*. Thus, district courts may probe behind the pleadings as Rule 23 does not establish a mere pleading standard. *Id*. (citations omitted). "[T]he more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits." *Id.*

To certify a class action, the named plaintiffs must have standing, and the proposed class must meet each of the requirements specified in Rule 23(a), as well as at least one of the requirements set forth in Rule 23(b). *Id*. In addition, the named plaintiffs must propose an adequately defined class that satisfies the requirements of Rule 23. *Id*.  "The burden of proof to establish the propriety of class certification rests with the advocate of the class."  *Id.*

I.      **The prerequisite of class representative standing is not satisfied here.**

Plaintiffs lack standing for two independent reasons.

(1)      **Plaintiffs' claims for park-wide relief are released.**

Plaintiffs' claims for park-wide relief are released pursuant to each of the LTAs.  Each of the Plaintiffs purchased a home and executed a prospectus after 2015 during the uninterrupted time period when an LTA has been in place. Their claims as of March 2021 (when the current LTA was executed) for park-wide relief relating to maintenance, violations of the FMHA, and abeyance of rents are barred by the release language of the LTA. The same would be the case with any current or class member that resided in the Park after 2015.

(2)      **Plaintiffs lack standing to seek relief for time-barred claims.**

Of the three named class representatives, Mr. Noel was the first to become a homeowner in the Park subject to a prospectus, in April 2017. Yet, Plaintiffs seek to represent a class of individuals seeking damages for time-barred claims that accrued as far back as 2003. No Plaintiff has standing to assert a claim or seek damages that allegedly accrued prior to the time he or she became a homeowner in the Park subject to a prospectus.  It follows that no Plaintiff has standing as a class representative to bring such claims on behalf of putative class members that accrued prior to the time at least one Plaintiff became a homeowner in the Park subject to a prospectus (April 2017).   Allowing that would enable persons whose claims are time-barred to end-around that bar by using class treatment and selecting a representative whose claims may still be timely.

10

Plaintiffs instituted this case in late-December 2021. Plaintiffs acknowledge a four-year limitations period applies to all of their claims except breach of express contract (Count I), which is subject to a five-year limitations period. (DE 49, pp. 39-40). Under Florida law, a cause of action accrues when the last element constituting the cause of action occurs, and Florida applies the "first injury rule."

> The general rule, of course, is that where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.

*Kipnis v. Bayerische Hypo–Und Vereinsbank, AG*, 202 So.3d 859, 861-62 (Fla. 2016)(citing §95.031(1), *Fla. Stat.*)(answering question certified by Eleventh Circuit in *Kipnis v. Bayerische Hypo–Und Vereinsbank, AG,* 784 F.3d 771, 783 (11th Cir.2015)). Plaintiffs allege they and the class members suffered various economic damages, mental anguish and stress-related emotional issues as a result of flooding. The triggering "first injury" each respective class member suffered would have accrued upon the occurrence of the first particular flood event that caused economic or emotional harm to that respective class member.  When that first injury occurred would be a highly individualized, fact intensive determination necessary for each class member.

Appreciating that, Plaintiffs invoke the "continuing violation" doctrine as an exception to the first injury rule, but that doctrine cannot eliminate the problem here with class treatment. Whether the doctrine applies under Florida law in a case of periodic, recurrent flooding requires a threshold determination if and when the injuries became permanent. That generally turns on whether the flooding was "abatable" or, if not, when it became permanent.  *See, generally, Baker v. Hickman*, 969 So.2d 441 (Fla. 5th DCA 2007)(reversing summary judgment that claims were time-barred because fact questions existed concerning the nature and timing of injuries caused by flooding); *Kulpinski v. City of Tarpon Springs*, 473 So.2d 813 (Fla. 2d DCA 1985)(reversing dismissal of complaint because periodic flooding alleged). But even if the continuing violation exception is applicable, it only applies to flooding injuries that accrued *within* the limitations period immediately preceding the filing of the complaint. *Baker*, 969 So.2d at 443; *Kulpinski,* 473 So.2d at 814.   The doctrine does not resurrect time-barred claims for injuries that accrued outside the limitations period.   So, even assuming, *arguendo*, that Plaintiffs have standing to invoke the

continuing violation doctrine for injuries accruing prior to April 2017 when Mr. Noel became a homeowner, for purposes of determining whether a particular member's claim for a particular injury is time-barred it would still be necessary for the Court to find when each injury occurred. That cannot be determined on a class-wide basis except, possibly, for members who moved into the Park *inside* the applicable limitations period (*i.e.*, four or five years before December 2021).

In terms of the bigger picture, Plaintiffs' need to invoke the continuing violation doctrine puts them in a pickle. It highlights the inherent differences between *this* case alleging periodic flooding and injuries accruing over the course of decades, and an "all or nothing" case such as *Navelski* (see below) alleging a single incident that either caused all the injuries or none of them.

**II.    Prerequisites of an adequate class definition and ascertainable class are not satisfied.**

Plaintiffs have not proposed an adequate class definition or a clearly ascertainable class. Here, Plaintiffs use only two criteria: (1) status as a "lessee," and (2) sometime after 2003. That minimal effort does not achieve administrative feasibility. It does not even require that a class member have suffered any harm, much less specified types of harm. Every lessee since 2003 will be in the class until subsequent individualized determinations demonstrate they are not.

Plaintiffs' proposed class definition is also overly broad and latently ambiguous. It does not suit the claims and requested relief which, for class purposes, now appear to be limited to property damage or other economic harm *that would only have been suffered only by a "homeowner."*   It is overly broad because it includes lessees whose personal claims are time-barred. Also, it includes former lessees who have no claim for continuing trespass or a continuing right of quiet enjoyment, and who cannot be constructively evicted. It includes former lessees that breached their obligations and were evicted from the Park years ago via legal proceedings. It does not differentiate lessees from sublessees. Would the landlord homeowner (*e.g.*, Ms. Wiksten) or the sublessee be entitled to recovery of rent-related damages? It also does not address or differentiate between co-lessees who may share undifferentiable claims. What occurs if a co-lessee opts out of a class? Likewise, the many joint co-homeowners in the Park – *see, e.g.,* Ms. Wiksten – would have competing claims for undifferentiated property damages to the same co-owned home. What if a co-owner chooses to opt-out of a class?

It also excludes, as an "affiliate" of Defendants, the lessee of the most homes in the Park – RSA. For each home it owns, RSA is bound by the same terms and pays the same freight as any other lessee. On a *pro rata* basis, it will shoulder by far the largest share of any resulting rent

increases or pass-on charges for maintenance or improvements to the Park mandated by a permanent injunction. A Rule 23(b)(2) class seeking injunctive relief typically does not allow for opt-out rights.  And excluding RSA from the class does not alleviate the problem because it will unavoidably be affected by determinations concerning park-wide common issues.

### III.     Plaintiffs do not meet the class requirements of Rule 23(a).

Plaintiffs fail for a number of reasons to satisfy the requirements of Rule 23(a).

#### (1)     No reliable evidence of numerosity:

There is insufficient record evidence of the number of putative class members at any point in time when the many events at issue in this case occurred. *See, e.g., Donoff,* 2020 WL 3268272 at *2 (quoting *Abby v. Page*, 282 F.R.D. 576, 578 (S.D. Fla. 2012)) ("[t]he Eleventh Circuit has [ ] made it abundantly clear that the burden to satisfy numerosity is on the plaintiff seeking to certify a class, and a plaintiff is not permitted to make a purely speculative showing that numerosity has been met.").

#### (2)     No common central questions of law or fact:

Plaintiffs do not identify any common question of law. They identify two common questions *of fact* they contend justify class treatment: (1) "whether Defendants failed to adequately maintain and repair the storm water drainage system," and (2) "whether the inadequacies and disrepair of the system were the cause of the flooding in the Park." (DE 50, at p. 20).   This ignores the "when," the "where," the "who" and the "what."   When during the 20-year course of time was maintenance or repair inadequate?   When (and for how long) did the periodic events of flooding occur?  Where in the Park did flooding occur during a particular flooding event?  What historical flooding events were in fact caused by inadequate maintenance as opposed to an intervening act of God such as a hurricane, an unlawful act like residents tampering with the pump system, or some other cause?  Who resided in the Park or was otherwise injured during a particular event of flooding?   What particular injury, if any, was caused by each particular event of flooding caused by improper maintenance and to what extent?  What other causes contributed to the extent of any particular injury?

Here, causation is not an "all or nothing" proposition as it was in *Navelski v. International Paper Co.*, 244 F. Supp. 3d 1275 (N.D. Fla. 2017), a primary case upon which Plaintiffs rely. The *Navelski* approach might satisfy Rule 23 in a case alleging a single occurrence that either caused all or none of the injuries at once to a group that can be identified in a snapshot, but it is a

13

square peg in a round hole in a case like this alleging periodic flooding and injuries accruing over the course of decades to a changing group of persons.

### (3) The claims and defenses are not typical.

The typicality requirement is satisfied "if the claims or defenses of the class and the class representative arise from the same event or pattern of practice and are based on the same theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Notably, the requirement of standing is a function not only of Article III, but also the typicality requirement of Rule 23(a)(3). *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1287-88 (11th Cir. 2001).

> It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class. . . . Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class. As the Supreme Court has explained, "[w]e have repeatedly held that a class representative must be part of the class and possess the same interests and suffer the same injury as the class members."

*Prado-Steiman v. Bush,* 221 F.3d 1266, 1274 (11th Cir. 2000)(quoting *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). Because they lack standing to bring the claims, Plaintiffs cannot satisfy the typicality requirement.

Plaintiffs' claims that each class representative and each putative class member experienced flooding "either in the common areas or on their lots (or both)." (DE 50 at p. 21) (emphasis added). Those are materially different experiences.  For example, to the extent a group of class members has not experienced flooding on their lots, they have not suffered a trespass or any property damage to their mobile homes, possibly unlike others who allegedly experienced flooding on their lots or in contact with their mobile homes. Additionally, there is no discussion of the competing interests of current tenants and former tenants. There is no explanation how the class representatives, who became homeowners in 2017 and 2018, have "the same interest and suffer the same injury" as putative class members that leased lots between 2003 and 2017.

Ms. Wiksten testifies that flooding damage and mold were present when she bought her home. (DE 50-6, at ¶ 9). If so, she bought it with notice from a class member, presumably at a below-market price. The selling class member suffered the financial harm, if any, from "stigma" damages.  None of the class representatives vacated the Park or incurred any relocation expenses resulting from an alleged constructive eviction. None of them has claims typical of putative class

14

members that may have vacated the Park or incurred such expenses. Finally, none of the class representatives claim to have suffered mental anguish or stress-related physical symptoms, so their alleged injuries are not typical of putative class members who have allegedly suffered those injuries. The claims and injuries of the class representatives and the putative class members each arise from "a factually unique set of circumstances" that precludes a finding of typicality.

**(4)      Plaintiffs do not satisfy the "adequacy" requirement.**

Plaintiffs offer no argument or proof to satisfy the adequacy requirement of Rule 23(a) that no conflicts of interest exist that preclude certification. They simply make the conclusory statement that "Plaintiffs have no interests that are antagonistic to or conflict with the interests of unnamed class members." (DE 50 at p. 21). To the contrary, substantial conflicts and antagonistic interests exist between Plaintiffs and certain putative class members, as well as between putative class members. Former tenants have no interest in current maintenance issues, the amount of rent charged, or other prospective relief sought in the complaint. There also are antagonistic interests caused by the desire of some to keep the rents affordable and the competing desire of others to compel additional capital improvements and maintenance that will likely translate to higher rents.[6] The conflict is perhaps best evidenced by the recent HOA vote *after this lawsuit was filed*.   There also is conflict between (i) class members that acquired their homes in or after 2017 at presumably diminished values – which includes the class representatives - and class members that acquired their homes prior to any alleged diminution, and (ii) class members that allegedly suffered injuries from flooding under the footprint of their homes and class members who only experienced flooding to common areas and did not suffer any alleged injury to their mobile homes. These inherent conflicts within the class preclude certification in this case.

**IV.      Plaintiffs do not satisfy the class requirements of Rule 23(b).**

Plaintiffs have not proved that at least one of the requirements of Rule 23(b) is met.

**(1)      Rule 23(b)(2)**

Plaintiffs' alternative, least preferred argument is that an issue-class be certified under Rule 23(b)(2) only for purposes of entry of injunctive relief. That would require a finding of liability on the part of some or all of Defendants. Certification is not appropriate where the relief sought

---

[6]It goes without saying that former lessees have no interest in those issues.

equates to a declaration of liability. *Marino v. Home Depot USA, Inc.*, 245 F.R.D. 729, 736 (S.D. Fla. 2007)(J.Middlebrooks).

> Here the Plaintiff seeks injunctive relief, but that relief is essentially seeking a declaration of liability against Defendant.  Courts have held that class certification is not appropriate in such a circumstance.  Certification is not appropriate where the declaratory relief sought is equivalent to a request for a declaration of liability.

*Id*. (internal quotation and citation omitted).

### (2)      Rule 23(b)(3)

Plaintiffs have not satisfied the "predominance" or "superiority" requirements of Rule 23(b)(3).

### (i)      Individualized questions predominate over the two common questions of fact.

"To determine whether common issues predominate, a district court first must identify the parties' claims and defenses and their elements and then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Donoff,* 2020 WL 3268272 at *5 (internal quotation omitted). The predominance requirement is "far more demanding" than the commonality requirement and test whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Id*. (internal quotation omitted).  "Common" questions are those "where the same evidence will suffice for each member" and "individual" questions are those "where the evidence will vary from member to member." *Id*. at *6 (internal quotation omitted). The next inquiry is whether common questions predominate over individual ones, and the Eleventh Circuit has explained that "certification is inappropriate when after adjudication of the class wide issues, plaintiffs still must introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims." *Id*. (quoting *Sellers v. Rushmore Loan Mgmt. Servs*., *LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019)(internal quotation omitted)).

"Florida contract law requires that in a breach of contract action, the breach in question must be material." *Marino,* 245 F.R.D. at 734 (emphasis added). "[I]t is well established that a plaintiff must show the defendants' breach was a substantial factor in causing the damage alleged." *Great Lakes Reinsurance (UK) PLC v. Morales*, 2009 WL 10718050, at *4 (S.D. Fla. Oct. 2, 2009). Moreover, alleged damages "based upon speculation" are insufficient to sustain an action for breach of contact. *A.R. Holland, Inc.*, 884 So. 2d at 1008. "A plaintiff may only recover if the damages are a proximate result of the material breach." *Morales* 2009 WL 10718050, at *4.

16

The elements of a Florida common law negligence claim are: "(1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; (3) that this breach was the proximate cause of plaintiff's injury; and (4) that plaintiff suffered damages." *Exum v. Nat'l Tire & Battery*, 437 F. Supp. 3d 1141, 1158 (S.D. Fla. 2020). In addressing the necessary element of proximate cause, this Court has stated:

> Proximate cause consists of two elements: cause in fact and foreseeability. To determine whether cause in fact exists, Florida courts generally follow the "but-for" test-that is, but for the defendant's actions or failure to act, plaintiff's injuries would not have occurred. "If cause in fact is satisfied, the factfinder must determine whether the injury was foreseeable from the negligence. Foreseeability asks 'whether the harm that occurred was within the scope of danger attributable to the defendant's negligent conduct.'"

*Flight Training, Inc. v. Tropical, Inc.*, No. 06-22538-CIV, 2007 WL 5117263, at *6 (S.D. Fla. Dec. 19, 2007)(internal quotations omitted).

The jury will have to make individualized determinations regarding various essential elements to establish liability for breach of contract (Count I) or negligence (Count II). Establishing the scope of Defendants' contractual and common law *duties* will be fact specific, and those duties possibly differed over time and by event. Hurricane Irma in 2017 was an act of God. To what extent did the severity of that storm and other intervening factors limit or excuse non-performance of a duty? What other storm events over the last 20 years constituted an act of God or otherwise effected the scope of duty? The age, maintenance history and status of repair of the stormwater system varied over the course of the 20 years at issue. At what points during those decades was the level of maintenance adequate or, conversely, inadequate?

The *manner* by which Plaintiffs allege Defendants breached the contract or were negligent may be the same (by failing to "adequately maintain" the storm drainage system over the course of decades).  But the *events* of breach allegedly happened every time it rained over a period spanning decades ("ruining *countless* floors")(DE 49, ¶ 6)(emphasis added). The events were not identical in terms of cause, extent or duration.  Some allegedly resulted from "average rainfall," while some allegedly resulted from acts of God such as hurricanes that cut electric power to the Park and left water ponded for days.  Temporary back-up of water in streets over storm grates during a storm event in a flood zone is normal and unavoidable. "Flooding" is an imprecise concept. What constitutes "flooding" at this Park that can constitute a *breach.* And whether any particular breach was *material* will turn in part on the location and duration of each event. Did the

water extend beyond the streets? How long did it take to drain? To what extent was any class member's ingress/egress impeded and for how long? Were proximate and similar locations in the county simultaneously "flooded" to the same extent and for how long? Was the particular injury alleged suffered at a specific time or did it accrue over the course of time.   Which storm event, if any, led to flooding that caused the particular injury in question.   Where there intervening or contributing causes or failures to mitigate any particular injury?

The same individual questions, plus others, are necessary in the possession-related claims. In discussing what constitutes a breach of the implied covenant of quiet enjoyment (Count V) under Florida law, this Court has explained: "The covenant protects 'the lessee from any act or omission by the lessor which interferes with the lessee's right to use and enjoy the premises for the purposes contemplated by the lease.'" *Alonso Cano v. 245 C & C, LLC*, No. 19-21826-CIV, 2021 WL 2498824, at *34 (S.D. Fla. May 18, 2021), *appeal dismissed sub nom.,* No. 21-12065-D, 2021 WL 4239641 (11th Cir. July 15, 2021).   The covenant is breached "where the landlord so *substantially* altered some essential features of the premises as to render the property unsuitable for the purpose for which it was leased." *Id.* (internal quotation omitted)(emphasis added). The is a time-specific, home-by-home analysis.

The elements of a claim for trespass to personal property are: "[T]he intentional use of, or interference with, a chattel which is in the possession of another, without justification. *Bloom v. Alvereze*, 498 F. App'x 867, 876 (11th Cir. 2012) (quoting *Coddington v. Staab*, 716 So. 2d 850, 851 (Fla. 4th DCA 1998)). The individualized questions raised by the other claims are present here. In addition, the individualized issue of "justification" must be tried in the context of different storms, including hurricanes, and differing age and status of repair of the system.

To state a claim for constructive eviction (Count , Plaintiff's must establish "a wrongful act by the landlord which, though not amounting to an actual eviction, is done with the express or implied intention of interfering with the tenant's beneficial enjoyment of the leased property." *Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co.*, 923 F.2d 810, 815 (11th Cir. 1991). Florida law generally requires a tenant to abandon the premises within a reasonable time after the landlord's wrongful act to establish a claim for constructive eviction. *Id.*

Defendants' defenses to the claims also call into play individual issues. These include whether a claim is time-barred by the statute of limitation or laches. So too, notice/knowledge related defenses such as estoppel, waiver and acceptance of the risk are at issue.   Other

18

individualized defenses include release, intervening cause, Act of God, comparative negligence, and failure to mitigate.[7]

The individualized questions concerning damages, standing alone, predominate over any common issue of fact.   Plaintiffs have been preparing this case since the summer of 2021, and their new trial plan still does not solve this.   Their recently disclosed expert's "preliminary" *ipse dixit* opinion does not pass muster for the reasons set forth in Defendants' motion to strike it.  (DE 60). The case does not satisfy the predominance test of Rule 23(b)(3).

        **(ii)**        **Class treatment is not superior to other methods to adjudicate the controversy.**

An issue-class action is not the superior or only mechanism for resolving the common issue Plaintiffs identify – the maintenance and repair of the drainage system. They pluck the standard of care from the FMHA, but for some reason take pains to point out they are not bringing a claim for failure to maintain under the FMHA. (DE 49 at f.n. 5). The FMHA creates a cause of action for a homeowner or the HOA to bring a cause of action to challenge issues of maintenance or concerning rents at the Park.  § 723.031(7)(c), *Fla. Stat*.  It also has a prevailing party attorney's fee provision. § 723.068, *Fla. Stat*. Here, the individual damage claims appear to be substantial.  But, even if the amount of damages is small, the existence of the FMHA claim with a prevailing party fee provision means bringing suit thereunder would not be deterred. *Marino*, 245 F.R.D. 737.  The HOA, too, has standing to bring such an action.

## V.      <u>Plaintiffs have not proven treatment under Rule 23(c)(4) is appropriate</u>.

Using an issue-only class under Rule 23(c)(4) is not appropriate here.   Plaintiffs rely on *In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 241 F.R.D. 435, 437 (S.D.N.Y. 2007), involving claims arising from a release of gasoline onto a property in Illinois in November 1988, and *Navelski* involving a single-incident flood event caused by failure of a dam. Both are "single-incident tragedies," and "all-or-nothing" causation cases.  The single incident either caused all the harm or none of it.

The court in *Ray v. Judicial Corrections Svcs., Inc*., 333 F.R.D. 552, 580 (N.D. Al. 2019), rejected that approach in a case where the need for individualized proof defeated predominance under Rule 23(b)(3).  The Plaintiffs in *Ray* also relied on *Navelski.*  The *Ray* court noted that courts are split as to whether classes may be certified under Rule 23(c)(4) unless the class as a whole first

---

[7]As a practical matter, it is not possible to know all of the individual defenses that will be at issues until it is known which homeowners, if any, are members of a class.

satisfies the predominance test under Rule 23(b)(3), and the Eleventh Circuit has not weighed in on that yet.  *Id*.  Nonetheless, courts have been wary of certifying classes under Rule 23(c)(4) without a showing that common issues predominate over the case.  *Id*.  The court refused to certify an issue-class, finding that even if it did so each class member's claim would still need to be individually tried to determine issues such as indigency, tolling and damages, meaning the individualized issues would still predominate even in a liability trial under Rule 23(c)(4).  That is the same situation in the instant case.  *See also, Castano v. Am. Tobacco Co*., 84 F.3d 734, n. 21(5th Cir. 1996)("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (C)(4) is that *a cause of action, as a whole, must satisfy the predominance requirement of (b)(3)* and that (C)(4) is a housekeeping rule that allows courts to sever the common issues for trial.")(emphasis added).

## Conclusion

Plaintiffs' Revised Motion for Class Certification (DE 50) should be denied.

Respectfully Submitted,

**LUTZ, BOBO & TELFAIR, P.A**

*/s/ J. Allen Bobo*
J. Allen Bobo
Florida Bar No. 0356980
2 North Tamiami Trail, Suite 500
Sarasota, FL  34236-5575
T: (941) 951-1800
F: (941) 366-1603
E: jabobo@lutzbobo.com
   ahodgins@lutzbobo.com
*Co-Counsel for Defendants*

          *and*

*/s/ Mahlon H. Barlow*
Mahlon Barlow
Florida Bar No. 871117
mbarlow@sbwlegal.com
mhbassistant@sbwlegal.com
Nicholas R. Consalvo
nconsalvo@sbwhlegal.com

20

ddevlin@sbwlegal.com
SIVYER BARLOW & WATSON, P.A.
Truist Place
401 E. Jackson Street, Suite 2225
Tampa, FL 33602
Main: (813) 221-4242
Fax: (813) 227-8598
*Co-Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Robert C. Gilbert, Esq., Daniel E. Tropin, Esq., Kopelowitz, Ostrow Ferguson, Weiselberg & Gilbert, 2800 Ponce de Leon Blvd, Suite 1100, Coral Gables, Florida 33134 gilbert@kolawyers.com, tropin@kolawyers.com, Elizabeth A. Fegan, Esq., Fegan Scott LLC, 150 S. Waker Drive, 2th Floor, Chicago, IL 60606 beth@feganscott.com, Lynn A. Ellenberger, Esq., Fegan Scott LLC, 500 Grant Street, Suite 2900, Pittsburgh, PA 15219 lynn@feganscott.com via the Southern District Court E-portal on this 20th day of May, 2022.

*/s/ Mahlon H. Barlow*
Attorney

21