UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-14492-CV-MIDDLEBROOKS/MAYNARD

MICHAEL NOEL, KATHLEEN WIKSTEN, and
CLAIRE LADOUCEUR, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

v.

MHC HERITAGE PLANTATION, LLC,
MHC OPERATING LIMITED PARTNERSHIP,
MHC PROPERTY MANAGEMENT, L.P., MHC
PROPERTY MANAGEMENT GP, LLC, and
EQUITY LIFESTYLE PROPERTIES, INC. f/k/a
Manufactured Home Communities, Inc.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

    **THIS CAUSE** is before me upon Plaintiffs' Revised Motion for Class Certification

("Motion"), which has been referred to me for a report and recommendation. DE 132. The Motion is

fully and extensively briefed. DE 50; DE 62; DE 63; DE 64; DE 66; DE 72; DE 93; DE 102; DE 103.

For the following reasons, I respectfully recommend that the Motion be **DENIED**.

## BACKGROUND

    This case stems from disputes involving flooding episodes at a mobile home park. Defendants

own and operate Heritage Plantation Mobile Home Park ("Heritage Park") located in Vero Beach,

Florida. Heritage Park is "an age 55 or older" mobile home community with over 430 residential lots.

Plaintiffs are three mobile homeowners who currently lease lots from Defendants in Heritage Park. In

this putative class action, Plaintiffs allege that Defendants breached their duties to them and other

Heritage Park residents by failing, among other things, to maintain an adequate stormwater drainage

system. Plaintiffs allege that this failure by Defendants has led to unusually severe flooding episodes

and resulting damage to common areas and personal property at Heritage Park dating back to at least 2003.

On December 21, 2021, Plaintiffs filed their original complaint against two Defendants. DE 1. On May 6, 2022, Plaintiffs filed an Amended Complaint to add three more Defendants. DE 49. The Amended Complaint asserts claims for breach of contract, breach of quiet enjoyment, negligence, private nuisance, trespass, and constructive eviction. In their Answers, Defendants deny liability and assert affirmative defenses, including but not limited to statute of limitations; laches; contractual release and waiver; preemption under Florida law; contributory negligence; failure to join the Heritage Village Homeowners Association, Inc. ("HOA")[1] as an indispensable party; and impossibility of performance due to intervening causation. DE 61; DE 84.

The same day they filed their Amended Complaint, Plaintiffs filed the instant Motion seeking to certify a class of "All persons who leased a lot in Heritage Plantation mobile home park since October 6, 2003." DE 50 at 7. Defendants challenge every aspect of the Class Certification Motion. On May 20, 2022, the two original Defendants—MHC Heritage Plantation and Equity Lifestyle Properties—filed a response opposing certification on grounds that Plaintiffs lack standing to pursue class relief, do not propose an ascertainable class, and fail to satisfy any criteria of Rule 23. DE 66 at 10-20. On May 27, 2022, Plaintiffs replied. DE 72.

Later, on June 24, 2022, the three new Defendants—MHC Operating Limited Partnership, MHC Property Management GP LLC, and MHC Property Management L.P.—filed a separate response opposing class certification. The later response makes similar arguments as the first response

---

[1] The HOA is the active Florida corporation authorized to act on behalf of all Heritage Park mobile homeowners under the Florida Mobile Home Act ("FMHA"). *See* Fla. Stat. § 723.075(1) (upon incorporation, a mobile homeowners' association represents all mobile home owners in all matters relating to the FMHA, regardless of whether the homeowner is a member of the association).

regarding standing, ascertainability, and failure to meet Rule 23's requirements, but adds new arguments about adequacy of representation under Rule 23(a)(4).  DE 93 at 11-20.[2]  On July 14, 2022, Plaintiffs filed an authorized second reply.  DE 102.

In their extensive class certification briefing, the parties cite affidavits, declarations, agreements, and reports by Plaintiffs, other Heritage Park residents, a Heritage Park on-site Manager, and other professionals in the areas of real estate appraisals, class action settlement administration, and water engineering.  I have carefully considered the voluminous record, all relevant filings, and the evidence of record.[3]

## ANALYSIS[4]

Class actions are an exception to the rule that litigation is ordinarily conducted only on behalf of individually named parties.  *Donoff v. Delta Air Lines, Inc.*, No. 18-81258-Civ-Middlebrooks, 2020 WL 3268272, at *1 (S.D. Fla. Jan. 24, 2020); *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  The road to class certification is long and paved with several strict requirements.  Before a class can be certified, at least one named plaintiff must have constitutional standing.  *Prado-Steiman ex rel.*

---

[2]  Plaintiffs swiftly moved to strike this separate response as unauthorized.  DE 94.  On July 8, 2022, Judge Middlebrooks issued an Order denying the motion to strike but authorizing Plaintiffs to file another reply.  DE 100.  Judge Middlebrooks "question[ed] the timing" of the second response since all Defendants shared the same counsel but declined to strike the filing "in the interest of providing all Defendants with an opportunity to respond" and "[b]ecause the decision of whether to certify this matter as a class action is highly significant with respect to how this litigation will proceed."  *Id.* at 2.

[3]  For reasons stated in a separate report, I recommend the denial of a referred motion to strike a report by real estate appraisal expert, Jeffrey Rothbart.  I recognize the pendency of other unreferred motions concerning the admissibility of other expert testimony.  DE 141 (Defendants' Motion to Exclude Expert Testimony of Stephen Boyle, a certified commercial real estate appraiser); DE 183 (Plaintiffs' Amended Motion to Exclude Expert Richard Longbrake, a manufactured housing expert); DE 184 (Plaintiffs' Amended Motion to Exclude Expert Dr. Devo Seereeram, a consulting geotechnical engineer).  Defendants posit that "all *Daubert* motions must be considered and ruled upon prior to a ruling on class certification."  DE 160 at 3.  Plaintiffs disagree.  *Id.* at 2.  Upon consideration, I agree with Plaintiffs.  A court must perform a *Daubert* analysis before resolving a class certification motion only if challenged expert testimony is "critical" to class certification.  *Sher v. Raytheon Co.*, 419 Fed. Appx. 887, 890 (11th Cir. 2011) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) (per curiam)).  Such is not the case here.

[4]  Defendants filed a motion seeking leave to request an evidentiary hearing on class certification issues.  DE 108.  I previously denied this motion and found an evidentiary hearing unnecessary based upon the "extensive documentary record and the completeness of the parties' briefing."  DE 134.

*Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000). In addition, the proposed class must be "adequately defined and clearly ascertainable." *Carriuolo v. Gen. Motors, Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)).

A plaintiff seeking class certification must also establish all four requirements of Rule 23(a) and at least one requirement of Rule 23(b). *Donoff*, 2020 WL 3268272, at *1 (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009)); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003) ("Failure to establish any one of these four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification."). The burden of proof rests with the class advocate and, if doubts exist regarding whether the movant satisfies the standards, then the burden is not met. *Valley Drug*, 350 F.3d at 1187; *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).

A court has broad discretion in deciding whether to certify a class and may do so only if, after "a rigorous analysis," the court is satisfied that Rule 23's requirements are met. *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *Carriuolo*, 823 F.3d at 981; *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). "Although the trial court should not determine the merits of plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug*, 350 F.3d at 1188 n.15. Thus, a court may "probe behind the pleadings before coming to rest on the certification question[,]" as "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350-51; *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n.12 (1978) ("The class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' ... '[T]he more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'").

Under Rule 23(a), a proposed class may only be certified if the following prerequisites known as "numerosity, commonality, typicality, and adequacy of representation" are met:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Little*, 691 F.3d 1302, 1304 (11th Cir. 2012). The plaintiff must prove that there are "*in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast*, 569 U.S. at 33 (emphasis in original).

A proposed class must also comply with at least one requirement of Rule 23(b). *Little*, 691 F.3d at 1304. Here, Plaintiffs rely on Rule 23(b)(2) and 23(b)(3). Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Defendants challenge class certification on almost every ground. Specifically, Defendants argue that Plaintiffs lack standing to raise claims on behalf of putative class members, fail to propose an ascertainable class, and fail to meet the requirements of Rule 23(a) or Rule 23(b). This report addresses each argument in turn.

A.    **Standing**

Article III standing is a threshold jurisdictional issue.  "[P]rior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Fox v. Ritz-Carlton Hotel Co., LLC*, 977 F.3d 1039, 1046 (11th Cir. 2020), quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).  The plaintiff bears the burden of proving three elements of standing; that is, "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*, 965 F.3d 1210, 1217 (11th Cir. 2020).

Notably, the Motion does not address or cite supporting evidence to establish standing.  In their reply, Plaintiffs again do not cite supporting evidence and devote two paragraphs to the overall counter-argument that Plaintiffs' "standing is not eviscerated by the affirmative defenses of release or statute of limitations." DE 72 at 2.  Plaintiffs' lack of citation to evidence and corresponding argument is unhelpful.  As discussed above, as movant, the burden is on Plaintiffs to show standing.

Fortunately for Plaintiffs, record evidence establishes that they meet the three requirements of standing.  First, Plaintiffs allege actual injury in the form of harm to them due to severe flooding and constant water-soaked ground that substantially interferes with their ability to reside in Heritage Park.  The Amended Complaint describes sinkholes, collapsing pipes, cracked foundations, damaged roadways, water contaminants, damaged vehicles, and other damage as depicted in selected photos and due to severe flooding that "has plagued [Heritage] Park for decades." *See* DE 49 at ¶¶ 4, 6, *and generally*.  Attached to the Motion are supporting affidavits by the three Plaintiffs and 24 other Heritage Park residents describing alleged harm to them and their personal property.  DE 50-8 to DE

50-31 (Declarations of Heritage Park lessees Laura Mauser, Phylicia Aronowitz-Bedoya, Kathleen Paris, Dennis Miller, Robert Fluckiger, Edward Turkasz, Robert Woods, Dominick Praino, Patricia Weiler, Stanley Paxton, Sally Moore, CarolAnn Palmes, Richard Lockard, Mark Decker, Nina Clay, Ann Keenan, Kathleen Hill, Donna Downey, Deborah Harris, Wayne Frost, Carol Streib, Thomas Streib, Michael Young, and Helen Ritter).

Second, Plaintiffs assert that these injuries were caused by Defendants' failure to adequately maintain the stormwater system in Heritage Park. Here, I note the unchallenged preliminary opinion of professional water resources engineer, Robert Ross, P.E. Mr. Ross reviewed and visually inspected "certain elements of [Heritage] Park's master storm water management system, including drains in the center of the streets, two pumping stations, and various pipes discharging into a nearby canal/ditch." DE 50-2 at 2-3, 5. He concluded "that the original design and the failure to appropriately modify the Park's existing storm water system appears to be [the] cause of flooding at the Park." *Id.* at 8.

Third, Plaintiffs seek legal relief on their claims for breach of contract, breach of quiet enjoyment, negligence, private nuisance, trespass, and constructive eviction. Relief in the form of a favorable judicial decision would redress these alleged injuries.

I am not persuaded by Defendants' arguments. First, Defendants argue that Plaintiffs lack standing because their claims are released under Long Term Agreements ("LTA") between Defendants, as the owners of Heritage Park, and the HOA.[5] DE 66 at 10, DE 93 at 11. Defendants raise the issue of contractual release as an affirmative defense in their Answers. DE 61 at 12-13; DE 84 at 12-13. Second, Defendants argue that Plaintiffs lack standing because they cannot seek relief on

---

[5]  LTAs are written three-year agreements between Defendants as Heritage Park owners, the HOA, and a designated HOA negotiating committee concerning rent and maintenance issues. Written LTAs were most recently executed on three separate occasions, in 2015, 2018, and 2021. DE 59-2; DE 59-3; DE 59-4.

behalf of putative class members whose claims accrued as far back as 2003 before named Plaintiffs became lessees in Heritage Park.  Such claims, Defendants argue, are time-barred.[6]  Similar to their first argument, Defendants raise the statute of limitations issue as an affirmative defense in their Answers.  DE 61 at 11; DE 84 at 11.  These affirmative defenses do not prevent Plaintiffs from establishing the jurisdictional requirement of standing.  *See, e.g.*, *JSK v. Hendry Cnty. Sch. Bd.*, 941 F.2d 1563, 1570 (11th Cir. 1991) ("the statute of limitations is an affirmative defense" and is not jurisdictional); *see also Venerus v. Avis Budget Car Rental, LLC*, 723 F. App'x 807, 814 (11th Cir. 2018) (finding that a district court erroneously conflated Article III standing with class certification requirements).  Plaintiffs allege harm, fairly traceable to Defendants, that is likely to be redressed by a favorable judicial decision.  They have therefore established standing to my satisfaction.  *See Spokeo*, 136 S.Ct. at 1547.

### B.   <u>Ascertainability</u>

"Ascertainability is an implied prerequisite of Rule 23."  *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (citing *Little*, 691 F.3d at 1304).  "Class representatives bear the burden of establishing that their proposed class is adequately defined and clearly ascertainable, and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)."  *Id.*  The Eleventh Circuit traditionally collapses class definition and ascertainability into one inquiry: "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination."  *Id.* at 1304.  And "membership can be capable of determination without being capable of convenient determination."  *Id.* at 1303.  On the other hand, a

---

[6] This case was first filed on December 21, 2021.  As Plaintiff's acknowledge in the Amended Complaint, under governing Florida statutes, a four-year limitations period applies to all of Plaintiffs' claims except for their breach of contract count, which is subject to a five-year limitations period.  DE 49 ¶ 102.

class is inadequately defined when its definition relies on vague or subjective criteria such that class membership cannot be ascertained.  *Id.* at 1301-02.

Plaintiffs seek to certify of a class of "[a]ll persons who leased a lot in the Heritage Plantation mobile home park since October 6, 2003."  DE 50 at 7.  Defendants contend that this definition, based on only two criteria, is overbroad and ambiguous because it does not require a class member to have suffered any specified harm, it includes lessees whose claims are either time-barred or no longer valid, and it excludes a defense affiliate corporation that owns and subleases approximately 40 homes in the park.  DE 66 at 7, 12-13; Ruby Decl. ¶ 9; DE 93 at 12.  Defendants argue also that the class is not ascertainable because "it does not differentiate lessees from sublessees" and "does not differentiate between co-lessees who may share undifferentiable claims."  DE 66 at 12; DE 93 at 12.  Defendants cite no legal authority in support of these arguments.[7]

I find Plaintiffs' proposed class to be adequately defined such that class membership is capable of determination.  The proposed definition includes two criteria: (1) status as a Heritage Park lot lessee who (2) leased a lot since October 6, 2003 or later.  This definition is not vague or subjective.  It turns on objective, verifiable criteria, that is, whether a person leased a lot in Heritage Park after October 6, 2003. To determine if someone meets this definition, the Court can look to whether that person has signed a Heritage Park Prospectus ("Prospectus"), which is a disclosure document prepared by the park owner containing certain information required by Florida law about the mobile home park property, common facilities, park management, utilities and services, and explanation of rental

---

[7] Defendants invoke the concept of administrative feasibility but do not cite supporting authority.  DE 66 at 12 (arguing that Plaintiffs' "minimal effort" in proposing a class definition "does not achieve administrative feasibility").  In *Cherry*, the Eleventh Circuit squarely held that administrative feasibility—described as "one of the most hotly contested issues in class action practice" at the time in 2021—is not an inherent aspect of ascertainability and is *not* a requirement for class certification.  *Cherry*, 986 F.3d at 1303 (emphasis added).

charges.  DE 49 ¶ 32.[8]  The Prospectus identifies the lot to be leased and the rent to be paid, and is signed by the lot lessee(s).  *Id.*  It is also the contract upon which Plaintiffs premise their breach of contract claim.  The Court can also consider if a person has signed a sublease agreement for a lot in Heritage Park and determine if a sublease agreement is sufficient to establish class membership.  The fact that certain lots have co-lessees or sublessees makes the process of identifying class members more complicated, but not impossible.  And "class definitions may undergo modification, possibly several times, during the course of a class action."  *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1133 n.16 (11th Cir. 2004).  Other issues about harm suffered or time bars are not determinative of ascertainability.  Nor does the proposed class's exclusion of Defendants' corporate affiliate render the class unascertainable.  For now, Plaintiffs' proposed class definition is ascertainable under *Cherry*—it is sufficiently clear and tied to objective criteria (including a date certain and a signed Prospectus for each leased lot) for determining prospective class members.

### C. __Rule 23(a) Prerequisites__

#### 1. __Numerosity__

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable."  *Ruderman v. Washington Nat'l Ins. Co.*, 263 F.R.D. 670, 678 (S.D. Fla. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). The general rule in the Eleventh Circuit is that "less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see also Vega,* 564 F.3d at 1267 (numerosity is "a generally low hurdle" and "more than forty [is] adequate").

---

[8] Example prospectuses and related documents for two Plaintiffs are attached to the Amended Complaint.  DE 49-4; DE 49-5.

Here, the evidence shows that Heritage Park contains over 400 mobile home sites with a recent annual occupancy rate of more than 90%.   DE 62, Ruby Decl. ¶¶ 4, 7 (Heritage Park's on-site manager's declaration that Heritage Park has approximately 401 mobile homes and that all homeowners rent the lot upon which their mobile homes are located); DE 50-1 at 37 (SEC annual filing reporting 437 sites with an annual site occupancy rate of 90.4% as of 12/31/21).   As presently defined, the proposed class would encompass all former and current Heritage Park lot lessees dating back to 2003.   The Motion attaches the sworn declarations of 24 other Heritage Park lessees with claims similar to those raised by Plaintiffs.   The numerosity requirement is met.

### 2.  <u>Commonality</u>

Rule 23(a)(2) requires a showing of questions of law or fact that are common to the entire class. Fed. R. Civ. P. 23(a)(2).   A "common" question has a classwide answer or resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Carriuolo*, 823 F.3d at 984.   Commonality also requires a showing that the class members have all suffered the same injury.   *Wal-Mart*, 564 U.S. at 350.   Individual member claims do not need to be factually or legally identical, however, and differences among them will not defeat commonality if common questions of law exist.   *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986).

In *Wal-Mart Stores v. Dukes*, the Supreme Court explained that commonality requires the claims of the putative class to depend upon a common contention that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 349, 350.   "What matters to class certification ... is not the raising of common questions—even in droves—but, rather the

capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation and internal quotation marks omitted; emphasis in original).

Here, the commonality requirement is met. A key common contention that is central to the validity of all of Plaintiffs' claims is whether Defendants adequately maintained the master stormwater drainage system at Heritage Park and, if not, whether such failure caused the severe flooding and resulting damage in Heritage Park. Determining common answers to this key contention would resolve central issues at play in this case.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is not demanding and centers on the relationship between the interests of the representative parties and the interests of the class as a whole. *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 642 (S.D. Fla. 2015); *Wolf Prado-Steiman*, 221 F.3d at 1279. "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322–23 (11th Cir. 2008).

While similar to commonality in that it concentrates on the "nexus" between class members and their designated representative, typicality differs in that it focuses on the class representative's individual characteristics in comparison to those of the proposed class. *Piazza v. EBSCO Indus. Co.*, 273 F.3d 1341, 1346 (11th Cir. 2001); *Prado–Steiman v. Bush*, 221 F.3d 1266, 1269 (11th Cir. 2000). Typicality is met if the plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985). This does not mean that the plaintiffs' claims and those of the class must be identical. *Id.* Once plaintiffs show that the same unlawful

conduct affected both them and the rest of the class, factual variations among the individual claims generally will not defeat typicality. *Id.*

Here, I find Plaintiffs' claims to be sufficiently typical of those of the proposed class. All claims are brought under the same legal theory—that is, Plaintiffs seek relief from Defendants based upon an alleged breach of various legal obligations owed to them and fellow Heritage Park lessees stemming from a failure to maintain a parkwide stormwater system. "Although this legal theory may ultimately not be sustained by the evidence, it is typical of the class" and meets the relatively low bar to establish typicality. *See Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009).

### 4. <u>Adequacy of Representation</u>

Lastly, Rule 23(a)(4) requires a showing that the plaintiffs and class counsel "will fairly and adequately protect the interests of the class." The purpose of this requirement is to "protect the legal rights of absent class members." *Lyons v. Georgia–Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000). Adequacy of representation is primarily based on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the ... class" and "whether plaintiffs have interests antagonistic to those of the rest of the class." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987). This requirement "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (quoting *Valley Drug Co.*, 350 F.3d 1181 at 1189 (11th Cir. 2003).

The adequacy inquiry is meant to identify any substantial conflicts of interest between the plaintiffs and the rest of the class. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Minor conflicts will not defeat class certification. *Valley Drug*, 350 F.3d at 1189. To render

representative plaintiffs inadequate, a conflict must be "fundamental" and go "to the specific issues in controversy." *Id.* A fundamental conflict exists when "the economic interests and objectives of the named representatives differ significantly from those" of unnamed class members. *Id.* at 1190. "[I]f substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Id.* at 1189.

The parties hotly contest whether Plaintiffs and their class counsel can adequately represent the proposed class. Plaintiffs contend that no conflict exists; that they and the proposed class members have shared interests in requiring Defendants to fix the stormwater system and recovering losses caused by Defendants' failure to maintain it; and that they and their counsel are committed to litigating this action vigorously on behalf of the entire class. DE 50 at 21; DE 102 at 2. While the original Defendants do not challenge adequacy of class counsel, they argue that Plaintiffs are unfit to adequately represent the class based upon substantial inherent conflicts and antagonistic interests. DE 66 at 15. The second set of Defendants adopt and expand upon these arguments, arguing that disqualifying conflicts abound—including divided loyalties and hostility between the HOA and HPAC,[9] conflicting interests between former and current lessees, and highly individualized potential claims and defenses. DE 93 at 14-16. These Defendants also challenge class counsel's ability to represent the class based on asserted conflicts of interest between the HOA and HPAC members, alleged failure to timely produce expert reports, and an alleged ethical violation under a Florida Bar rule. DE 93 at 17.

---

[9] HPAC, which stands for Heritage Plantation Action Committee, is a separate group of Heritage Park residents formed by Plaintiffs in response to dissatisfaction with the HOA. The named Plaintiffs are all original HPAC members. According to deposition testimony of Plaintiff Ladouceur, HPAC is separate and distinct from the HOA and was formed in 2020 to "represent the people in the park … to voice our concerns and to see that things get done that need to be done, or answer questions or, you know, just do what we have to do." DE 59-1 at 32-3. HPAC's stated mission is to address "hazardous living conditions in Heritage Plantation and to enlist all cities, county and state government agencies to intercede on behalf of the home owners of this park." DE 92-1 at 2.

Upon careful consideration, I find that Plaintiffs' counsel meets the adequacy requirement but that Plaintiffs themselves do not.

To be adequate, Plaintiffs' counsel "must be qualified, experienced, and generally able to conduct the proposed litigation." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.,* 481 F. Supp. 3d 1258, 1279 (S.D. Fla. 2020). "[A]bsent specific proof to the contrary, the adequacy of class counsel is presumed." *Cardenas v. Toyota Motor Corp.*, 2021 WL 5811741, at *15 (S.D. Fla. Dec. 6, 2021). Here, Plaintiffs' counsel has significant experience litigating class actions and other complex litigation as evidenced by the two firm resumes submitted with the Motion. DE 50-1 at 190-99, 201-14. The record confirms that Plaintiffs' counsel have done substantial work to identify, investigate, and pursue potential claims in this case. Defendants' challenges based upon a motion to extend deadlines and alleged conflicts among class members do not cast "serious doubt" on counsel's ability to loyally represent the class. *Richardson v. Progressive Am. Ins. Co.,* 2022 WL 154426, at *17 (M.D. Fla. Jan. 18, 2022) (denial of class certification required if "serious doubt" exists, such as when counsel's misconduct "prejudices the class or creates a direct conflict between counsel and the class"). In addition, Defendants' ethical challenge based on Florida Rule of Professional Conduct 4-1.8(e)[10] does not mandate a finding of inadequacy of counsel. Where class counsel acts improperly, the ordinary remedy is disciplinary action against counsel and remedial notice to class members rather than denial of class certification. *Richardson v. Progressive Am. Ins. Co*., 2022 WL 154426, at *17. I thus find Plaintiffs' counsel adequate under Rule 23(a)(4).

---

[10] Rule 4-1.8(e) prohibits financial assistance to a client in connection with litigation but allows attorneys to advance costs and expenses with payment contingent on the outcome of the case. Defendants claim that Plaintiffs' counsel violated this rule by allegedly agreeing to indemnify the class by paying any assessed adverse attorney fee or cost award. DE 93 at 17.

Turning to Plaintiffs, however, I find that disqualifying conflicts exist.  Importantly, a "conflict" for these purposes is not just that the named Plaintiffs and class members do not get along or disagree.  Rather, a disqualifying conflict exists when their motivations and economic interests differ significantly.  For example, in *Amchem Products v. Windsor*, 521 U.S. 591 (1997), the Supreme Court held that a group of plaintiffs who suffered present injury from being exposed to asbestos could not adequately represent a class with members who were not presently injured but who might develop exposure-related injuries in the future.  *Id.* at 625-27.  The Supreme Court found this difference constituted a fundamental conflict because the plaintiffs suffered diametrically different injuries which demanded different compensation structures:  some plaintiffs wanted immediate compensation while others wanted payment in the future.  *Id.* at 626.

Similarly, in *Valley Drug Co. v. Geneva Pharms., Inc*., 350 F.3d 1181 (11th Cir. 2003), the named plaintiffs alleged that they and other direct buyers of terazosin hydrochloride (sold under the brand name "Hytrin") were harmed when Abbott Laboratories, as manufacturer of Hytrin, entered into anticompetitive settlement agreements to prevent generic versions of the drug from entering the market.  The Eleventh Circuit held that the named plaintiffs could not adequately represent a class with members who actually benefited from the absence of generic drugs in the market.  *Id.* at 1186. The Eleventh Circuit found this difference to be a fundamental conflict because "some party members claim to have been harmed by the same conduct that benefited other members of the class."  *Id.* at 1189.

Here, Defendants describe a "hostile divide" between certain (now former) members of the HOA board and members of the informally created HPAC committee that Plaintiffs established.  DE 93 at 14-15.  The parties' arguments in this regard refer to heated HOA meetings and serious rifts between HOA board members and the newer HPAC group.   For example, Defendants cite the

deposition testimony of former HOA board members expressing frustration and general discontent with Plaintiffs and their HPAC motives.  DE 93 at 7 (citing deposition testimony of HOA board members William Shield, Dennis Fluckiger, and Richard Charles Bruce, Jr.).  Unfortunately, these sorts of interpersonal disagreements are not uncommon in communities with governing homeowner associations.  Dissension among community members, however acrimonious, does not necessarily rise to the level of disqualifying conflict under Rule 23(a)(4).

By contrast, Rule 23(a)(4) contemplates fundamental conflicts going to the heart of the litigation.  In *Amtech*, the fundamental conflict was differences in the type of relief sought, *i.e.*, immediate payouts versus future payouts.  In *Valley Drug*, the fundamental conflict was a situation where theories of law or fact benefitted some members while harming others.  Here, I find the existence of similar conflicts between the economic interests and motivations of Plaintiffs versus members of the proposed class they seek to represent.

One apparent conflict is the difference between the economic interests and motivations of current and former lessees.  Plaintiffs are current lessees residing at Heritage Park, but they seek to represent all Heritage Park lessees dating back roughly 20 years, including those who no longer lease a lot in Heritage Park.  Similar to *Amtech*, former lessees will likely prefer to maximize money damages and immediate payouts for any demonstrated losses. These former lessees presumably have no current interest in stormwater drainage maintenance issues at Heritage Park or any corresponding mandatory injunctive relief compelling improvements or abeyance of rental payments.  Current lessees, on the other hand, have an interest in forward-looking injunctive relief and ways to remedy any stormwater drainage defects.  This is a fundamental conflict between the types of relief sought by the named Plaintiffs and some of the class members they seek to represent.

Further, under the governing Prospectus signed by each Heritage Park lessee, the cost of repairs to the water drainage system may be passed onto current Heritage Park lessees through higher rent payments.  DE 49-4 at 18-19.[11]  The potential for repair charges causing higher rent payments for current lessees could lead to financial harm to one set of class members not borne by others.  That is, former lessees have no continued concern with rental rates or the amount of any "pass-on" charges for improvements.  By contrast, such issues and concerns are important issues to current lessees.  This creates conflicting litigation goals and economic incentives that make it difficult for the named Plaintiffs to adequately represent former lessees who no longer reside in Heritage Park.

Even among current lessees, economic conflicts exist between the named Plaintiffs' priority interest in having the stormwater system repaired and other current lessees whose priority interest may be to maintain current negotiated caps on rental increases.  Current lessees are subject to Long Term Agreements (LTAs), which are written three-year agreements between Defendants (as Heritage Park owners) and the HOA.  The LTAs are negotiated by and between Defendants and a committee designated by the HOA to negotiate on the HOA's behalf.  Among other things, the LTAs establish the maximum respective annual rent increases for each of the three years following execution of the LTA.  It is undisputed that written LTAs were most recently executed in 2015, 2018, and 2021.  DE 59-2; DE 59-3; DE 59-4.  The most recent LTA capped annual rent increases at 3.5% for 2021-22 term; 3.75% for 2022-23 term; and 3.95% for 2023-23 term.  DE 59-2 at 2.

---

[11] The Prospectus states that "[t]he storm drainage system, as provided, is the responsibility of the Park."  *Id*.  However, "the cost of storm drainage is allocated to the individual lots on a pro rata basis and included in the base rent portion of the monthly lot rental amount."  *Id*.  Moreover, the mobile homeowner may "be required to bear, in the form of increases in the lot rental amount, the cost incurred by the Park owner in installing and constructing capital improvements and/or performing major and minor repairs or renovations in the Park."  *Id*. at 18.

As previously mentioned, however, lessees are also subject to the Prospectus they signed to lease a lot in Heritage Park. DE 49-4.[12]  Thus, some Heritage Park lessees are concerned that Defendants will "pass on" charges for repairs to the stormwater drainage system to mobile homeowners through rent increases under the Prospectus.  DE 59-1 at 30-31. As a result, recent record evidence reveals significant ongoing conflicts among Heritage Park residents about how to address stormwater drainage issues.  For example, at her deposition on May 2, 2022, Plaintiff Ladouceur described an HOA member meeting on April 20, 2022 (while this lawsuit was pending) where Heritage Park residents spoke for and against a pending proposal by Defendants to enter into a revised LTA to resolve disputes over park-wide common issues, including stormwater system concerns.  DE 59-1 at 28-32, 38-40.  According to Plaintiff Ladouceur, the in-person votes for and against the proposal were "very close"—36 "no" votes and 32 "yes" votes—with several uncounted proxy votes.  *Id.* at 15-23. This "very close" vote on key issues underscoring this litigation demonstrates a fundamental conflict between Plaintiffs and other proposed class members and casts doubt on Plaintiffs' ability to adequately represent the interests of all the members of the class.

Other evidence in the record raises concerns about "the forthrightness and vigor" with which Plaintiffs can be expected to assert and defend class interests.  *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987).  "HPAC Statement 1-24-2021" memorializes a meeting led by Plaintiffs Noel and Wiksten in which Heritage Park residents in attendance were told that these two Plaintiffs were leading an effort to "bring about necessary services to have the community be a safe place for all to live free from corruption, selective enforcement and management neglect."  DE 92-1 at 2.  Among other things, Plaintiff Noel announced his plan to be the lead plaintiff in a class action

---

[12] See fn. 8, supra.

against Heritage Park's owners and told those in attendance that "this is your opportunity to decide if you want to be compensated for the abuse and neglect you have faced due to the flooding, or to seek damages for physical injuries or property damages that are constant and real to all of us." *Id.* at 8. He added: "If you would like to be part of the class members who are seeking damages, then now is the time to act. Just like the lottery, you have to be in it to win it. Only HPAC members will receive any judgments awarded by the courts. The door closes once I submit the final membership roster." This is plainly incorrect information as all affected class members, whether a member of HPAC or not, would potentially be eligible for relief upon a demonstrated showing of liability. This statement and the misrepresentations contained therein also signals inadequacy of representation.

Ultimately, I conclude that Plaintiffs do not meet Rule 23(a)(4)'s adequacy requirement. The record reveals fundamental conflicts between Plaintiffs and other proposed class members going directly to claims raised in this litigation. I therefore find that Plaintiffs have not met their burden to show that are adequate class representatives.

### D.   Rule 23(b)

In addition to not meeting Rule 23(a)(4)'s adequacy requirement, which alone makes class certification improper, Plaintiffs also do not meet Rule 23(b). Rule 23(b) offers alternative certification paths. Plaintiffs invoke Rule 23(b)(2) and 23(b)(3). Rule 23(b)(2) is reserved for classes seeking class-wide injunctive relief, while Rule 23(b)(3) is available if class-wide questions predominate and class litigation is the superior method of adjudication. Plaintiffs primarily focus on Rule 23(b)(3). I will thus address these provisions in reverse order.

1.      **Rule 23(b)(3) – Predominance and Superiority**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

a.      **Predominance**

Rule 23(b)(3)'s predominance inquiry requires a finding that questions of law or fact common to the class members predominate over questions affecting only individual members. The predominance requirement "is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)); *Comcast*, 569 U.S. at 34. It tests if "proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, by asking if "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Thus, the predominance inquiry

> calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.

*Id.*

To determine if common issues predominate, a court "first must 'identify the parties' claims and defenses and their elements' and 'then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial.'" *Donoff*, 2020 WL 3268272 at *5 (quoting *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019) and *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016)). "Where, after

adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."  *Marino v. Home Depot U.S.A., Inc*., No. 06-80343-Civ-Middlebrooks, 245 F.R.D. 729, 734 (S.D. Fla. 2007).

Plaintiffs' lead claim is for breach of contract.  Plaintiffs allege that Defendants breached their contractual duties under the Prospectus "by failing to maintain the Park's stormwater drainage system; ignoring the residents' repeated complaints about the flooding; failing to clean up the muddy and slippery roads after flooding; and failing to maintain the Park's common areas."  DE 49 ¶ 122.   "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1326 (11th Cir. 2012). "A 'material breach' of a contract is a failure, without legal excuse, to perform any promise or obligation or that goes 'to the essence of the contract.'" *Oriole Gardens Condos., III v. Indep. Cas. & Sur. Co.*, 2012 WL 718803, at *11 (S.D. Fla. Mar. 6, 2012) (quoting *Covelli Family, L.P. v. ABG5, LLC*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008)).  Further, a party injured by a breach of contract is entitled to recover damages that "naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was entered." *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. 5th DCA 2002).

Plaintiffs assert a separate claim for negligence, which requires a showing (1) that defendant owed plaintiffs a legal duty; (2) that defendant breached that duty; (3) that this breach was the proximate cause of plaintiffs' injury; and (4) that plaintiff suffered damages as a result of that injury. *Exum v. Nat'l Tire & Battery*, 437 F. Supp. 3d 1141, 1158 (S.D. Fla. 2020); *Estate of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 788 (Fla. 2nd DCA 2010). The third element of proximate cause

consists of "cause in fact and foreseeability." *Flight Training, Inc. v. Tropical, Inc.*, 2007 WL 5117263, at *6 (S.D. Fla. Dec. 19, 2007).  Cause in fact is determined under the familiar "but-for" test, *i.e.* but for the defendant's actions or failure to act, plaintiff's injuries would not have occurred.  *Id.* Foreseeability asks if the harm that occurred was within the scope of danger attributable to the defendant's negligent conduct.  *Id.*

Plaintiffs also assert claims for breach of quiet enjoyment, trespass, and constructive eviction. In Florida, a breach of the implied covenant of quiet enjoyment happens "where the landlord so substantially altered some essential features of the premises as to render the property unsuitable for the purpose for which it was leased."  *Alonso Cano v. 245 C & C, LLC*, 2021 WL 2498824, at *34 (S.D. Fla. May 18, 2021).  A trespass claim requires a showing of "the intentional use of, or interference with, a chattel which is in the possession of another, without justification."  *Bloom v. Alvereze*, 498 F. App'x 867, 876 (11th Cir. 2012).  A constructive eviction claim requires a showing of "a wrongful act by the landlord which, though not amounting to an actual eviction, is done with the express or implied intention of interfering with the tenant's beneficial enjoyment of the leased property."  *Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co.*, 923 F.2d 810, 815 (11th Cir. 1991).

Defendants respond to these claims with several affirmative defenses, including but not limited to contractual release and waiver, statute of limitations, contributory negligence, and impossibility of performance due to intervening causation.  DE 61; DE 84.

Although proof of Plaintiffs' claims and Defendants' defenses at trial will involve some common questions as discussed in the commonality section *supra*, it also will require the trier of fact to make several individualized determinations as to each class member.  For example, for the breach of contract claim, not all members of the proposed class are governed by the same contract.  The

contract claims of some class members, specifically former lessees who left Heritage Park before the LTAs were instituted in 2015, will be governed by the Prospectus only.  The contract claims of other class members who leased lots after 2015 will be governed by the Prospectus along with the LTA in effect during their respective leases.  An individual determination of what contracts govern will be needed for each class member based on when he or she leased in Heritage Park.  This determination is key to Defendants' affirmative defense of mutual release because, while all class members purportedly executed a Prospectus, only some of the class members are subject to the more recent LTAs which contain additional legal provisos, including potential release of certain claims.  This gives rise to liability issues that will have to be determined on an individualized basis.

Another individualized issue involves Defendants' statute of limitations defense.  As Plaintiffs concede, under governing Florida statutes, a four-year limitations period applies to all of Plaintiffs' claims except for their breach of contract count, which is subject to a five-year limitations period.  DE 49 ¶ 102.  In Florida, the limitation period begins to run when the last element constituting the cause of action occurs.  *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999); Fla. Stat. § 95.031(1).  Defendants argue that the triggering event for statute of limitations purposes "would have accrued upon the occurrence of the first particular flood event that caused economic or emotional harm to that respective class member."  DE 66 at 11.  Such an analysis would require a highly individualized, fact intensive determination regarding each class member.

To address this point, Plaintiffs invoke the continuing violation doctrine and assert that the question of whether this doctrine applies is a common one.  DE 50 at 24-25.  Generally, the continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period.  *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001).  This doctrine is based upon "the equitable notion that the statute of

limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Id.* Determining if this doctrine applies here turns on if and when the repeated flooding allegedly caused by the defective stormwater system caused permanent damage to each putative class member. *See Baker v. Hickman*, 969 So.2d 441 (Fla. 5th DCA 2007) (reversing summary judgment that claims were time-barred because fact questions existed concerning the nature and timing of injuries caused by flooding); *Kulpinski v. City of Tarpon Springs*, 473 So.2d 813 (Fla. 2d DCA 1985) (reversing dismissal of complaint and holding that homeowner alleging recurrent damages due to abatable flooding caused by defective drainage and paving plans could sue for damages "caused by each repetition of the flooding occurring within the limitations period immediately preceding the filing of the complaint" but acknowledging that builder defendant "may ultimately succeed in proving that the damage suffered was permanent and that the suit is barred by the statute of limitations"). Thus, even accounting for potential application of the continuing violation doctrine, individualized determinations must still be made regarding when each class member experienced permanent damage.

Moreover, the continuing violation doctrine applies only to damages that accrue "*within* the limitations period immediately preceding the filing of the complaint." *Kulpinski,* 473 So.2d at 814 (emphasis added). The doctrine does not preserve otherwise stale claims for damages that accrued outside the limitations period. This case was first filed on December 21, 2021. DE 1. As a result, damages occurring five years before that date (for the breach of contract claim) or four years before that date (for Plaintiffs' other claims) would fall beyond the statutory period. Determining if a particular member's claim for a particular injury is time-barred, even under the continuing violation doctrine, would require individualized, fact-specific determinations of when each injury occurred.

Such determinations cannot easily be resolved for a class encompassing a 20-year time period and is a factor weighing against class certification.

If Plaintiffs surmount the hurdles presented by Defendants' release and statute of limitations arguments, individualized proof will still be needed for Plaintiffs to prevail on their breach of contract and negligence claims.

To persuade the Court that common issues predominate for their contract and negligence claims, Plaintiffs principally rely on *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1290 (N.D. Fla. 2017). In *Navelski,* an "extraordinary storm" event caused a creek to overflow and flood approximately 160 homes. *Navelski*, 244 F. Supp. 3d at 1284. During the storm, a dam on a nearby paper mill's property collapsed and discharged impounded stormwater into the creek. *Id.* The homeowners sued the paper mill for negligence, trespass, nuisance, and strict liability, alleging that the flooding was caused or made more severe by the dam collapse caused by the paper mill's failure to properly maintain or remove it. *Id.* After a comprehensive analysis, the *Navelski* court certified a class of homeowners on the issue of liability only. *Id.* at 1310-11. In evaluating predominance, the *Navelski* court found that each homeowner's claim was based on the contention that the paper mill "did not maintain or abandon the Dam properly, which led to its failure during the Storm, causing harm to the subject neighborhood" and the homeowners' homes. *Id.* at 1308-09. The core factual and legal issues regarding liability—*i.e.* "whether or not [the paper mill's] conduct caused the Dam to fail, whether or not the Dam's failure caused flooding in the subject neighborhood, and, if so, to what extent [the paper mill] should be held liable"—were found to be "resolvable by proof that is common to all class members." *Id.* at 1309. Even though damage computations would be "a property-specific endeavor[,]" because "every aspect of liability can be resolved on a classwide basis" the *Navelski* court found "common issues of law and fact as to causation and liability predominate over the issues

requiring individualized proof, and the need to bifurcate and allow individual trials as to damages does not preclude certification of a class for these common issues." *Id.*

Here, like *Navelski*, computation of damages if liability were to be established would be a highly individualized "property-specific endeavor."[13]   It is undisputed that the approximately 401 mobile homes located in Heritage Park are of varying age and condition.   According to the sworn declaration of an on-site Heritage Park manager, the ages of the mobile homes range from "used homes as old as ~ 45 years to brand new homes."  DE 62 ¶ 4.   Further, older homes "are typically set lower to ground level" while newer homes "are typically set higher from ground level" with the difference in height being "as much as 3 feet."  *Id.* ¶ 5.   It goes without saying that maintenance histories and the overall condition of each potentially affected property in Heritage Park dating back two decades will vary significantly.   Determining the nature and extent of flooding-related damage would necessarily depend on these and other individualized factors.   Importantly, as noted in *Navelski*, this need for individualized damages determinations does not necessarily preclude a finding that common issues predominate.  *See Navelski*, 244 F. Supp. 3d at 1309 (citing *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003).   However, here, the presence of individualized determinations pertaining to both damages *and liability* precludes a finding that common issues predominate.

Unlike *Navelski*, Plaintiffs here will be required to introduce individualized proof and argue individualized legal points to establish the elements of their asserted claims.   Under the alleged facts, the contours of Defendants' contractual and common law duties will be fact specific.   Unlike the group of property owners affected by a single extraordinary storm event occurring on a single date certain in

---

[13] Plaintiffs' proffered real estate appraisal expert, Mr. Rothbart, opined that certain damages such as mobile home relocation costs, rental overcharges, diminution in property value, and loss of use are capable of determination on a class-wide basis.  DE 50-32.  Even accepting this opinion, other damages alleged by Plaintiffs clearly are not capable of class-wide determination.  Individualized determinations would need to be made regarding damages to class members' mobile homes, landscaping, vehicles, etc.

*Navelski*, the proposed class here encompasses a group of current and former Heritage Park lessees experiencing storms and flood events spanning roughly two decades.  In *Navelski*, the single material breach was a common one.  Here, by contrast, proposed class members have allegedly been damaged by a series of floods over the course of two decades during which time there have been intervening natural disasters such as hurricanes and other major weather events that would need to be considered in determining the nature and extent of Defendants' liability.  While it may be true that Defendants' failure to maintain the stormwater system was a contributing factor, there would need to be individualized determinations about if and when any system defects caused more severe flooding and if other naturally occurring events during the time period in issue limited or excused Defendants' legal duties and obligations.  Indeed, one affirmative defense invoked by Defendants is that Florida law only obligates mobile home park owners like Defendants to maintain utilities and systems—such as the stormwater drainage system—in proper operating condition, but there is no duty or obligation to prevent flooding caused by natural weather disasters.  DE 61 at 14; DE 84 at 14.  Evaluating this affirmative defense will generate individual questions about the timing of significant weather events affecting a vast group of individuals residing in Heritage Park during the twenty-year period in issue.

Individual proof is also required to determine Plaintiffs' other claims.  For example, Florida law generally requires a tenant to abandon the premises within a reasonable time after the landlord's wrongful act to establish a claim for constructive eviction.  *Id.*  Thus, for a valid constructive eviction claim to exist, an individualized determination would have to be made with respect to each class member as to if and whether they were forced to abandon the premises.[14]

In all, it is evident that common questions of law and fact do not predominate here.  On the contrary, several different individualized factual and legal inquiries will be required to evaluate

---

[14] Notably, none of the named Plaintiffs have moved out or relocated from Heritage Park.

Plaintiffs' claims in light of the alleged facts and affirmative defenses.  I find that predominance is not met, which is fatal to a finding of class certification eligibility.

### b.   Superiority

As the Eleventh Circuit has observed, a "lack of predominance...effectively ensures that, as a substantive matter, a class action is almost certainly not superior to other available methods for fairly and efficiently adjudicating the controversy." *Vega*, 564 F.3d at 1278 n.18; *see also Hutton v. Norwegian Cruise Line Ltd.*, 2000 U.S. Dist. LEXIS 23724 at *8 (S.D. Fla. Dec. 21, 2000) (holding that because predominance was not satisfied, there would not be a mechanism superior to individual adjudications).  Here, because predominance is not satisfied, the class action will not constitute a superior method of adjudication.

### 2.   Rule 23(b)(2) – Class-Wide Injunctive Relief

Plaintiffs also invoke Rule 23(b)(2), which permits a class action if "the party opposing the class has acted or refused to act on grounds applying throughout the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   This provision was designed for use in civil rights cases and is traditionally used to vindicate the widespread deprivation of civil rights.  *See Wal-Mart*, 564 U.S. at 361 (Rule 23(b)(2) "reflects a series of decisions involving challenges to racial segregation—conduct that was remedied by a single classwide order"); Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed.) (discussing the range of civil-rights actions certified under Rule 23(b)(2) and explaining that "the class suit is a uniquely appropriate procedure in civil-rights cases").  Rule 23(b)(2) presents two distinct requirements: (1) that the opposing party has acted or failed to act on grounds that apply generally to the class, and (2) the class must primarily pursue declaratory and injunctive relief — not damages.  *Wal-Mart*, 564 U.S. at 362-363 (2011).

Plaintiffs fail to establish that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," as Rule 23(b)(2) requires. On the contrary, a large portion of Plaintiffs' suit seeks to recover monetary damages for class members, which will require individualized inquiries as discussed above. In addition, members of the proposed class who are former lessees will have no interest in injunctive relief at all. Neither scenario – *i.e.*, class members with no interest in injunctive relief or class members seeking determination of individualized monetary damages – is suitable for Rule 23(b)(2) class certification.

To address these deficiencies, Plaintiffs suggest certifying an "injunctive relief subclass" under Rule 23(b)(2). DE 72 at 13. That subclass presumably would be limited to current lessees seeking an injunction ordering Defendants to remedy disrepair caused to "common areas of the park, including roads and recreational areas, [that] were affected by the flooding after rain, and that flood events created public health issues that would be the concern of all park residents, such as seepage, sewage overflow, mold, sinkholes and slime." DE 50 at 29; DE 72 at 14. Such an injunction, however, is equivalent to a declaration of liability against Defendants. Importantly, courts have held that class certification "is not appropriate where the declaratory relief sought is equivalent to a request for a declaration of liability." *Marino v. Home Depot U.S.A., Inc.,* No. 06-80343-Civ-Middlebrooks, 245 F.R.D. 729, 736 (S.D. Fla. 2007) (quoting *Goldberg v. Winston & Morrone, P.C.,* 1997 WL 139526, at *3-4 (S.D.N.Y. Mar. 26, 1997) and further noting that this conclusion "is supported by the fact that 23(b)(2) class actions were designed for civil rights cases, or situations where the class of plaintiffs had a cohesiveness that pre-existed the lawsuit").

By way of example, in *Marino*, a buyer plaintiff sued a defendant carpet seller and installer for alleged systematic overcharging of consumers across the nation as part of the carpet installation process. *Marino*, 245 F.R.D. at 731, 733. In finding that the buyer's proposed breach of contract class

did not satisfy Rule 23(b)(2), the Court found that Plaintiff's request for injunctive relief "is essentially seeking a declaration of liability against the Defendant." *Id.* at 736. Moreover, "[t]he members of a (b)(2) class are generally bound together through 'pre-existing or continuing legal relationships' or by some significant common trait such as race or gender that transcends the specific set of facts giving rise to the litigation." *Id.* at 736 (citing *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 n. 8 and 1156 (11th Cir.1983)). In *Marino*, the proposed class was found to have "no preexisting cohesiveness, and the only thing bringing them together is that they all chose Home Depot for their carpet installations." *Id.* at 736. "The fact that injunctive relief equates to a finding of liability against Defendant, along with the absence of any pre-existing cohesiveness among class members, causes Plaintiff's proposed 23(b)(2) breach of contract class to fail." *Id.*

Similarly, here, there exists no preexisting cohesiveness among class members as the only thing bringing them together is that they all decided to lease lots in Heritage Park. Indeed, the proposed class extends beyond those who currently lease at Heritage Park to others who leased previously over the course of twenty years but no longer have any connection to Heritage Park or other class members whatsoever. Moreover, the injunctive relief sought would equate to a finding of liability against Defendants. These factors combined lead to the inescapable conclusion that Rule 23(b)(2) certification is not the appropriate vehicle here. The more appropriate subsection is Rule 23(b)(3), as discussed more fully above.

### E.      Rule 23(c)(4)

Alternatively, "Plaintiffs propose certification of a Rule 23(c)(4) class as to the issues of Defendants' liability." DE 50 at 28. Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). However, courts "emphatically reject[] attempts to use the (c)(4) process for certifying individual issues as a means for

achieving an end run around the (b)(3) predominance requirement." *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630 (S.D. Fla. 2010) (quoting *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 481 (S.D. Fla. 2006)); *Teggerdine v. Speedway, LLC*, 2018 WL 2451248, at *8 (M.D. Fla. May 31, 2018) (because "[p]laintiff has not satisfied the predominance requirement of Rule 23(b)(3) . . . therefore Rule 23(c)(4) is not available to her."). Based on my above finding that predominance is not shown, I find certification of an issue class to be inappropriate here.

## CONCLUSION

After engaging in the required rigorous analysis under Rule 23 and for the reasons explained above, I find that Plaintiffs have not met their burden to demonstrate that this case is appropriate for class certification. On the contrary, there is evidence of fundamental conflicts going to the heart of this litigation rendering Plaintiffs unable to adequately represent the interests of the proposed class members they seek to represent. Moreover, individual issues relating to liability and damages predominate such that class treatment in this case would not be the superior mechanism for adjudicating the parties' controversy.

In reaching the above conclusion, I wish to make clear that I am not finding that significant issues with flooding and resulting damage in Heritage Park are non-existent or that the class action mechanism could not be available as a potential means to resolve some of those significant issues. Perhaps narrowed to current residents and a more discrete time frame, some of the economic conflicts and individualized differences could potentially be mitigated and a class action may be the appropriate vehicle. But the class—as currently framed by Plaintiffs in the extensive class certification briefing— simply does not meet the strict requirements of Rule 23. Class actions are the exception to the rule. Here, Plaintiffs have not met the strict requirements to warrant a deviation from the normal course of

individualized litigation.  Accordingly, I respectfully recommend that Plaintiffs' Revised Motion for Class Certification, DE 50, be **DENIED**.

<u>NOTICE OF RIGHT TO OBJECT AND SHORTENED OBJECTIONS PERIOD</u>

Because this referred motion has been pending for a long time, and to promote judicial economy and finality to the parties, a prompt resolution is required.  As such, I find it necessary and appropriate to shorten the time for any objections pursuant to Southern District of Florida Magistrate Judge Rule 4(a).   Accordingly, the parties shall have TEN (10) DAYS from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Donald M. Middlebrooks.  *See* 28 U.S.C. § 636(b)(1)(C); S.D. Fla. Mag. J. R. 4(a). Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within FIVE (5) DAYS of the date of this Report and Recommendation.**

**DONE  AND  RECOMMENDED**  in Chambers at Fort Pierce, Florida, this 24th day of February, 2023.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE